# EXHIBIT 1
# Part 1 of 2

Name  Rizalino Cayabo

Address  Correctional Training Facility

P.O. Box 705

Soledad, CA 93960

CDC or ID Number  D-09912

MC-275

**FILED**
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

**NOV 27 2006**

LARAYNE CLEEK, CLERK

BY: _____

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF TULARE

(Court)

RIZALINO CAYABO,
Petitioner

vs

ARNOLD SCHWARZENEGGER (Gov);
BEN CURRY (Warden (A)),
Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No.  VHC174532

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

☐ A conviction        ☐ Parole

☐ A sentence        ☐ Credits

☐ Jail or prison conditions        ☐ Prison discipline

☒ Other (specify): __Governor's decision to reverse suitability for parole__

1. Your name: __Rizalino Guerrero Cayabo__

2. Where are you incarcerated? __Correctional Training Facility, Soledad, Calif.__

3. Why are you in custody? ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   __Second degree murder w/use of a firearm__

   b. Penal or other code sections: __187 / 12022.5__

   c. Name and location of sentencing or committing court: __Superior Court of California, County of Tulare, in Vasalia, California__

   d. Case number: __22849__

   e. Date convicted or committed: _____

   f. Date sentenced: __July 1, 1985__

   g. Length of sentence: __15 years to life plus 2 years for firearm__

   h. When do you expect to be released? __When the Court rules in my favor__

   i. Were you represented by counsel in the trial court? ☐ Yes.   ☐ No.   If yes, state the attorney's name and address:
   __N/A__

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☒ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

---

MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

6.  GROUNDS FOR RELIEF

**Ground 1:**  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement."  *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four.  For additional grounds, make copies of page four and number the additional grounds in order.)*

PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6(a)

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

PLEASE SEE APPENDIX "B" STARTING AT PAGE 12 FOR ANSWERS TO 6(b)

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.   If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):   N/A

   b. Result: _____   c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

       (2) _____

       (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:
       N/A
    _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.   If yes, give the following information:
       N/A

   a. Result: _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    N/A

_____

_____

11. Administrative Review:
   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

           THERE IS NO ADMINISTRATIVE REVIEW

_____

_____

_____

_____

_____

_____

_____

_____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
   *Attach documents that show you have exhausted your administrative remedies.*  N/A

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?    ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result *(Attach order or explain why unavailable)*: _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result *(Attach order or explain why unavailable)*: _____

   (5) Date of decision: _____

   c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

   No delay

_____

16. Are you presently represented by counsel?    ☐ Yes.    ☒ No.  If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?    ☒ Yes.    ☐ No.  If yes, explain:
   Federal habeas corpus challenging the Board of Prison Terms finding
   of unsuitability for parole in 2005, which is now moot.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   This is the proper court.

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 11-16-06                          ▶ _____
                                                (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]              **PETITION FOR WRIT OF HABEAS CORPUS**
                                                    – 4 –

A P P E N D I X  "A"

Answer to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION WHEN THE GOVERNOR OF THE
STATE OF CALIFORNIA REVERSED PETITIONER'S FINDING OF
SUITABILITY FOR PAROLE, SOLELY ON THE COMMITMENT OFFENSE
OVER TWO DECADES IN THE PAST, ABSENT ANY EVIDENCE THAT
PETITIONER IS A <u>CURRENT</u> THREAT TO PUBLIC SAFETY, THE
DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

Answer to 6(a), Supporting facts:

On October 4, 1984, Rizalino Cayabo (hereafter Petitioner)

murdered his brother-in-law, Medaro Lozano.  After committing the

offense, Petitioner drove to a Tulare County Sheriff's Office and

turned himself in.  After a trial by judge, being found guilty of

second degree murder in violation of Penal Code § 187[1]/ and personal

use of a firearm in violation of Penal Code § 12022.5, on July 1,

1985, Petitioner was sentenced to an indeterminate sentence of 15

years to life pursuant to Penal Code § 190, and two years for the

use of a firearm, to run consecutive to the 15 years to life.

The facts of Petitioner's commitment offense are taken from

the Probation Officer's Report (EXHIBIT 1, at p. 4).  The facts of

the offense and Petitioner's statement are in agreement, accept

Petitioner's statement provides more detail, so other than motivation

for committing the instant offense was Petitioner feeling that his

brother-in-law "had betrayed him and violated Filipino custom, by

not asking his permission to marry his, Cayabo's sister" (EXHIBIT

---

1.  All statutes and regulations are California, unless otherwise noted.

1, p. 4), facts are taken from Petitioner's statement and are as
follows:

> "[Petitioner] stated that he shot Lozano because Lozano had not apologized to
> him for not asking permission to marry his sister. Cayabo indicated that on
> the evening of the shooting, he decided to go to his friend's house to gamble.
> He indicated he had not been with his friend's house for an extended period of
> time because he knew that Lozano would be there gambling. He had stayed away
> from his friends, as he did not want to confront Lozano. Cayabo stated that
> approximately one month earlier, he had purchased a handgun from an unknown
> subject in Orosi. He indicated he purchased the gun for protection while gambling
> because some of the men who gambled became angry and he felt he needed protection.

> "Cayabo stated that he needed to be with his friends, therefore, he went to
> Rosario's home. Upon arrival, he saw Lozano and decided not to stop. He
> indicates he drove around for approximately one hour, getting more and more upset.
> He drank approximately one-half pint of vodka and orange juice during that hour's
> period of time. He indicates he had heard rumors that Lozano had been saying
> things about him, regarding the fact that he, Lozano, had not asked permission
> to marry his sister. He then returned to Rosario's, took the .38 caliber pistol
> from the glove compartment of his vehicle, walked up behind Lozano, and shot
> him one time in the head.

> "Cayabo indicates that this crime would never have occurred, if Lozano had come
> to him and apologized, as was Filipino custom."

Under mitigating circumstances in the POR, the Probation Officer
found "[t]he crime was committed due to unusual circumstances, which
is unlikely to recur" (EXHIBIT 1, p. 5).

In preparation for sentencing of Petitioner, a psychological
evaluation was prepared by Jose Icasiano, Ph.D, dated May 6, 1985
(EXHIBIT 2). Dr. Icasiano is a forensic expert in Filipino culture.
Dr. Icasiano explained how Pilipino customs motivated Petitioner
to commit the instant offense. Dr. Icasiano observed that
Petitioner's "behavior in the events of his life that he narrated
manifested a reaction typical to Pilipino culture, with a motivation
characteristic of the Pilipino personality" (EXHIBIT 2, p. 1).
Dr. Icasiano's statement, "[t]o a non-Pilipino, Mr. Cayabo's behavior
and its motivation in this tragic incident present a puzzle" (Id.)
proved to be true. It is respectfully requested that Your Honor

- 6 -

read Dr. Icasiano's report in full to better understand the cultural dynamics behind this tragic offense. Petitioner will refer to relevant factors from Dr. Icasiano's report more fully in his arguments as they relate to the Governor's decision.

The psychological evaluation prepared by the Board of Parole Hearings (hereafter Board) relied on in determining Petitioner's suitability for parole was prepared by the Board's own forensic experts, E.W. Hewchuk, Ph.D., and B. Zika, Ph.D. (EXHIBIT 3). Under review of the life crime (EXHIBIT 3, p. 3), in relevant part, Dr. Hewchuk writes: Petitioner "has become fully cognizant of the impact and gravity of his actions, not only for the victim's family, but also his own. He now admits that his misplaced sense of duty and responsibility to protect his sister's honor did not justify the taking of a human life. He is remorseful, and deeply regrets that he is unable to undo the consequences of his former behavior."

Most importantly, under "assessment of dangerousness" Dr. Hewchuk concludes that Petitioner's "violence potential within a controlled institutional setting is considered to be minimal relative to the total inmate population" (EXHIBIT 3, p. 3). Dr. Hewchuk basis Petitioner's threat to public safety, inter alia, on the fact that "[t]he instant offense itself involved an unfortunate juxtaposition of cultural variables, a misplaced sense of responsibility, and impulsivity fueled by the excessive use of alcohol. Inmate Cayabo has addressed these issues through active institutional programming..." (Id.). Dr. Hewchuk concluded Petitioner's threat to public safety "is estimated to be no greater than that of the average citizen in the community" (EXHIBIT 3, p. 4). Under Dr.

Hewchuk's comments and recommendations, he concluded "[i]n view of inmate Cayabo's low risk factors, this inmate is an excellent candidate for parole consideration" (Id.).

On May 9, 2006, twenty-two years after the commitment offense, the Board of Parole Hearings, presenting its findings in a twenty page decision, found Petitioner suitable for parole (EXHIBIT 4, HT 49:18-68:9,[2/] incorporated herein by reference).

After passing through the scrutiny of the Decision Review Unit of the Board and the Board's determination that Petitioner is not currently a threat to public safety, the Board's determination was forwarded to the Governor's office for the Governor's review of the decision.

On September 28, 2006, exercising his authority under Penal Code § 3041.2, Governor Schwarzenegger reversed the Board's decision to grant Petitioner parole (EXHIBIT 5). The Governor reversed the decision solely on the gravity of the commitment offense, the motive being "trivial" and "some level of premeditation." In relevant part (EXHIBIT 5, pp. 1-2):

> The "offense was especially heinous because his stated motive for the crime — that he felt angry and betrayed because Mr. Lozano did not ask his permission to marry his sister — is very trivial in relation to the magnitude of the brutal murder he committed. According to Mr. Cayabo's statement in the probation report, he killed Mr. Lozano because he violated Filipino custom by not asking for Mr. Cayabo's permission to marry his sister. Mr. Cayabo further stated that 'this crime would never have occurred, if Lozano had gone to him and apologized, as was Filipino custom.' In addition to the trivial basis for the murder, there is also evidence in the record before me that the murder involved some level of premeditation."

The Governor also took into consideration that Parole was opposed by the Tulare County District Attorney's Office and the Tulare County

---

2. Reference to parole the hearing transcript (EXHIBIT 4) will be indicated by "HT" followed by page number, e.g., (HT 1:1).

Sheriff's Office, "based in part on the gravity of the murder he committed" (EXHIBIT 5, p. 2).

The Governor concluding: "given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Cayabo presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Cayabo" (EXHIBIT 5, p. 2).

### Claim II

IT WAS A VIOLATION THE FIFTH AMENDMENT GUARANTEE AGAINST DOUBLE JEOPARDY AND SIXTH AND FOURTEENTH AMENDMENTS GUARANTEEING DUE PROCESS FOR THE BOARD TO ADD TWO YEARS FOR THE USE OF A FIREARM WHEN PETITIONER HAD SERVED THAT ENHANCEMENT CONSECUTIVELY TO THE INDETERMINATE SENTENCE.

On July 1, 1985, Petitioner was sentenced to an indeterminate term of 15 years to life for second degree murder, plus 2 years for the use of a firearm; the enhancement to be served consecutively to the indeterminate term (see EXHIBIT 6).

The Board acknowledged that the two years for the gun use enhancement was served separate to the indeterminate sentence of 15 years to life (HT 1:17-19).

After finding that Petitioner is not a current threat to public safety, in calculating his term, the Board added two years to his sentence for the use of a firearm (HT 62:6-8 ["And adjustment for weapons, because you used a firearm we added two years, 24 months"]).

Moreover, the Board put Petitioner in the wrong matrix, the relationship part being correct, having a prior relationship with the victim, but erred in placing Petitioner in the column of "the

- 9 -

death resulted from severe trauma inflicting -- inflicted with deadly intensity" (HT 61:14-26), fixing the term at 19 years (HT 62:1-4), plus the two years for the weapon (HT 62:6-8), for a total of 252 months.

## C O N C L U S I O N

It that both State and Federal courts have recently held that after 15 or so years the commitment offense has zero predictability on _current_ or future threat to public safety, based on the court records in this case, the foregoing facts, and the accompanying memorandum of law, Petitioner respectfully requests that this Honorable Court issue an Order to Show Cause why relief should not be granted and the Governor's decision vacated and Petitioner released directly to parole; and, why any excess credits for good behavior that exceed Petitioner's legislatively mandated uniform term for the commitment offense should not be accredited to any period of parole Petitioner would otherwise serve if that time would exceed parole and Petitioner therefore discharged.

Date: _11 - 16 - 06_

Respectfully submitted,

Rizalino Cayabo
Petitioner in pro per

- 10 -

## V E R I F I C A T I O N

I, Rizalino Cayabo, hereby declare under penalty of perjury, that I have read the foregoing facts and reviewed the exhibits in support thereof and declare the facts to be true and the exhibits true copies thereof. Doing so this ___16___ day of November, 2006, at Soledad, California.

_____
Rizalino Cayabo
Petitioner in pro per

## P R A Y E R  F O R  R E L I E F

I, Rizalino Cayabo, state that I have no other plain or speedy relief save habeas corpus, and therefore pray that this Honorable Court grant the following:

1. Issue an Order To Show Cause why the writ should not be granted;

2. Appoint counsel to protect the rights of Petitioner;

3. Grant discovery so that Petitioner may obtain further evidence to support his claims;

4. Grant an evidentiary hearing to determine what is contained in the "executive case summary" (ECS) provided to the Governor by the Board (In re Elkins, supra, 2006 DJDAR 14489, at 14499 fn. 12), as it would be "inappropriate for the Governor to rely on Board Investigation Unit Report" (Sanchez v. Kane, supra, 2006 WL 2252640, *6) and to determine if the reports are one and the same, and what is contained in each if separate;

5. Declare the rights of the parties; and

6. Any other relief the Court may deem necessary to further the interest of justice and preserve the integrity of the Court.

Date: ___11-16-06___

Prayerfully submitted,

_____
Rizalino Cayabo
Petitioner in pro per

- 11 -

A P P E N D I X   "B"

M E M O R A N D U M   O F   L A W

Answers to 6(b)

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION WHEN THE GOVERNOR OF THE
STATE OF CALIFORNIA REVERSED PETITIONER'S FINDING OF
SUITABILITY FOR PAROLE, SOLELY ON THE COMMITMENT OFFENSE
OVER TWO DECADES IN THE PAST, ABSENT ANY EVIDENCE THAT
PETITIONER IS A <u>CURRENT</u> THREAT TO PUBLIC SAFETY, THE
DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

INTRODUCTION

COMES NOW Rizalino Cayabo (hereafter Petitioner) with his points
and authorities and arguments in support of his claim that the
Governor's decision to reverse the Board of Parole Hearings finding
that Petitioner is not "presently too dangerous to grant a fixed
parole release date" was not supported by any reliable evidence and
therefore arbitrary and an abuse of discretion, the decision not
being in the interest of public safety but rather political safety.

The issue is consistent with the Due Process Clause of the United
States Constitution: Would the state's penological interest be served
by continued imprisonment of an indeterminately sentenced prisoner
when there is no evidence that he is <u>currently</u> a threat to public
safety?

A.  THE STANDARD OF EVIDENCE THE GOVERNOR IS TO USE ON REVIEW OF
    A DECISION BY THE BOARD OF PAROLE HEARINGS IS "A PREPONDERANCE
    OF THE EVIDENCE": JUDICIAL REVIEW IS THE MINIMAL "SOME EVIDENCE."

In 2002 the California Supreme Court, citing <u>In re Powell</u> (1988)
45 Cal.3d 894, 904, which relied on <u>Superintendent v. Hill</u> (1985)
472 U.S. 445, held in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, at

656 that due process requires that the governor's decision to reverse a finding of suitability by the Board of Parole Hearings (hereafter Board) need be supported only by "some evidence."

Superintendent v. Hill, supra, 472 U.S. 445, was ambiguous as to when the "some evidence" standard was to apply, at the administrative level or upon judicial review? That ambiguity was clarified in the recent decision of Hamdi v. Rumsfeld (2004) 542 U.S. 507, 124 S.Ct. 2633, at 2651, the High Court holding that the "[some evidence]" standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker." The Governor is not a "neutral decisionmaker" who makes his decision of review with an eye toward public safety, but post Willie Horton makes his decisions with an eye toward political safety, abusing his authority under Penal Code § 3041.2. According to statistics provided by the Governor's Legal Affairs Secretary, dated June 6, 2006, of the 72 second degree murderers found suitable for parole in 2005, the Governor reversed 60, or 83 percent, the reversals based on a mere "some evidence" citing primarily the immutable factors of the commitment offense. Indeed, the Governor has "little to gain and potentially much to lose by granting parole, and accordingly, the incentive to give only pro forma consideration to the parole decision is strong" (In re Dannenberg, supra, 34 Cal.4th, at 1105, dissenting opinion by Moreno, J.). See also In re Scott II (2005) 133 Cal.App.4th 573, 594 fn. 7 ["in appears that gubernatorial reversals of Board decisions granting parole are most often based solely or

primarily on the gravity of the inmate' soffense"]).

In reviewing the facts of a case in consideration of parole, "'some evidence' of unsuitability for parole would exists in virtually every [review]" (In re Caswell (2001) 92 Cal.App.4th 1017, 1029). "Some evidene," however, does not mean literally "any evidence," if it did, the protection afforded by due process would be meaningless.  Indeed, as held recently by the Second Appellate District in the cas of In re Wen Lee (2006) ___ Cal.App.4th ___, 2006 DJDAR 13961, at 13963 (10/19/06):

> "The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole denied is prisoner 'will pose an unreasonable risk of danger to society if released from prison']; see e.g. In re Scott (2005) 133 Cal.App.4th 573, 595 ['The commitment offense can negate suitability [for parole] only if circumstances of the crime...rationally indicate that the offender will present an unreasonable public safety risk if released from prison'], but see In re Lowe (2005) 130 Cal.App.4th 1405 [suggested] 'some evidence' applies to the factors, not dangerousness].)  Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Emphasis in original.)

"[A]s applied in Rosenkrantz, the 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact" (In re Scott II, supra, 13 Cal.App.4th at 590 fn. 6).  Moreover, the decision must reflect "due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards" and "cannot be arbitrary or capricious" (Id.).

If the Governor's decision only need be supported by "some evidence" (In re Rosenkrantz, supra, 29 Cal.4th, at 656), and judicial review is the "some evidence" standard (Id., at 658), how does the

"some evidence" standard apply itself?  In Hamdi v. Rumsfeld the "preponderance of the evidence" standard at the administrative level was applied to terrorist.  If international terrorist who are enemy combatants of the United States are entitled to "a preponderance of the evidence" standard at the Executive level, are citizens of the United States or those who are in our country legally not entitled to anything less?  Especially when the Board's own regulations call for "a preponderance of the evidence" standard to support its decisions (Cal. Code Regs., tit. 15, § 2000(b)(50)).  Whether it be by "a preponderance of the evidence" or "some evidence," the Governor's decision was arbitrary, being unsupported by any evidence that Petitioner is currently a threat to public safety.

B.  AFTER TWENTY-TWO YEARS THE COMMITMENT OFFENSE IS NO LONGER RELIABLE EVIDENCE THAT PETITIONER IS CURRENTLY A THREAT TO PUBLIC SAFETY.

The only statutory reason to deny Petitioner parole is the "timing and gravity" of the offense (Penal Code § 3041(b)).  Our Supreme Court has taken this to mean an indeterminately sentenced prisoner is to be granted parole unless the prisoner "is presently too dangerous to grant a fixed parole release date" (In re Dannenberg (2005) 34 Cal.4th 1061, 1080), the "abiding concern that the Board not schedule the release of any life-maximum prisoner who is still dangerous" (Id., at 1088).  Although the Governor may be more stringent in making his determination on review of the Board's decision, the Governor must consider the same factors the Board considers (In re Rosenkrantz, supra, 29 Cal.4th, at 686).  In case at bench, although the Governor agreed with all of the Board's finding weighing in favor of suitability for parole, he nonetheless exercised

his discretion and reversed the Board's decision based on two reasons. Firstly and primarily, Petitioner commitment offense was "especially henious"; the motive being "very trivial" and "involved some level of premeditation" (EXHIBIT 5, p. 2).  Secondly, parole was opposed by the Tulare County District Attorney's Office and the Tulare County Sheriff's Department (Id.).

In considering the same factors and criteria as the Board, it is presumed that the Governor was relying on Cal. Code Regs., tit. 15, § 2402(c)(1)(E), his finding of the motive being "trivial." ["The motive for the crime is inexplicable or very trivial in relation to the offense."]  The other finding used by the Governor, the murder "involved some level of premeditation" is not found in the statutes or regulations (In re Rosenkrantz, supra, 29 Cal.4th, at 654 ["parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation"]; In re Scott II, supra, 133 Cal.App.4th, at 590).

The trial court heard all the evidence and weighed and considered any premeditation involved in case at bench, finding Petitioner guilty of second degree murder, therefore foreclosing the Governor retrying the case and substituting his own verdict for that of the trial court. Presuming, however, the Governor is correct and Petitioner's murder "was particularly egregious for a second degree murder, it is another matter whether any evidence would support the same conclusion for a first degree murder" (In re Rosenkrantz, supra, 29 Cal.4th, at 679, concurring, Moreno, J.).  Justice Moreno continued: "The

- 16 -

significance of the above observation is this: there will come a
point, which already may have arrived (and has been surpassed by
Petitioner), when petitioner would have become eligible for parole
if he had been convicted of first degree murder.  Once petitioner
reaches that point, it is appropriate to consider whether the offense
would still be considered especially egregious for a first degree
murder...."

Every crime will have unique facts.  Merely reciting those facts,
as a prelude to expressions of moral outrage, does not amount to
"a preponderance of the evidence" or even "some evidence."  While
it is true when determining a prisoner parole suitability the Governor
considers all relevant and reliable information, including the timing
and gravity of the offense, the offense is not to be viewed in a
vacuum as though it occurred yesterday, but is to be put into
perspective relative to time, "entailing primarily what a man is
and what he may become rather than simply what he has done"
(Greenholtz v. Inmates of Nebraska Penal and Correctional Complex
(hereafter Greenholtz) (1979) 442 U.S. 1, 10).  The commitment
offense, after 22 years is not "reliable" evidence that Petitioner
is a current threat to public safety.  Indeed, see In re Scott II,
supra, 133 Cal.App.4th, at 595; Biggs v. Terhune (9th Cir. 2003)
334 F.2d 910, 916-917; Irons v. Warden of California State
Prison-Solano (E.D. Cal. 2005) 358 F.Supp.2d 942, 947 fn. 2; Martin
v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1047-1048; Sanchez
v. Kane (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2252640, *11;
Rosenkrantz v. Marshall (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006
WL 2327085, *16-17).  Rosenkrantz is the guidon from which all second

degree murders can be measured, the facts so well knows they need not be repeated here, and Petitioner's case coming nowhere near to that of Rosenkrantz, and if Rosenkrantz has been paroled after 19 years, then the Governor cannot demonstrate Petitioner is a Current threat to public safety based on the offense alone.

Petitioner request that the Court TAKE JUDICIAL NOTICE of two most recent appellate court decisions: In re Lee, supra, ___ Cal.App.4th ___, 2006 DJDAR 13961, and In re Elkins (2006) ___ Cal.App.4th ___, 2006 DJDAR 14489. In Lee, a case somewhat similar to case at bench in that stress built up over a period of time and Lee went to his victim's place of business with the intent to kill him, after citing several murder cases the Lee court opined at DJDAR, p. 13964-13965:

> "Besides not being especially atrocious, heinous or callous, Lee's crime have little, if any, predictive value for future criminality. Simply from the passing of time, Lee's crimes alomst 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had committed them five or ten years ago. (In re Scott, supra, 133 Cal.App.4th 573, 595 [past crime's value for predicting future crime diminishes over time].) Moreover, Lee's motivation for the shooting--his desperate rage against Soong driving him toward murder and suicide--augurs against any future offenses. As one court explained, a defendant's "'motivation'" for the offense tends to show suitability when it was 'the result of significant stress in his life, especially if the stress has built over a long period of time'" (Id. at p. 596.)."

The Lee court went on, "Instead of being atrocious, Lee's conduct involved no more than the necessary to commit his crimes. (Rosenkrantz, supra, 29 Cal.4th at p. 683 [cannot deny parole based on nature of offenses if defendant's acts were the minimum necessary to commit the offense])." Interestingly, the Lee court opined that Lee would have been in even a better position to argue his case if he would have been convicted of two first degree murders Id.).

Although the governor's use of motive being "very trivial,"

"there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed 'trivail.' The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must 'normally' be given release dates when they approach their minimum eligible parole date" (In re Scott (2004) 119 Cal.App.4th 871, 893). Petitioner does not use motive as an excuse, but if motive is to be a factor, it must be placed in perspective and the significant stress it caused. Moreover, the motive must be viewed as Petitioner thought at the time of the offense and not today. This was not a random killing, but rather an "honor killing." The victim and Petitioner's sister violated cultural Filipino customs by not asking permission to marry; then after violating the custom not coming to Petitioner and apologizing (please see EXHIBIT 2 for the importance of this custom in the Filipino culture). Petitioner was dishonored. To make matters worse, the victim was boasting of what he did and belittling Petitioner to Petitioner's friends. When Petitioner needed his friends and went to see them the sight of the victim being there was too much. The stress that had been weighing on Petitioner for over a year finally overcame him. Petitioner had to regain his honor. Such motive may be foreign and strange to the American culture, and today, currently, Petitioner knows it is not acceptable and would not commit such an act again, knowing how many people he hurt and such actions being unacceptable. Clearly, this was an isolated act of violence in Petitioner's life, the victim giving Petitioner "a once-in-a-lifetime motive to kill" (In re Van Houton (2004) 116 Cal.App.4th 339, 356).

It has been 22 years since the commitment offense. Petitioner

- 19 -

has no previous record of violence, or any criminal record as far
as that goes, and has an "exemplary" postconviction record, the Board
finding that he is not <u>currently</u> a threat to public safety, and
passing the decision review unit, confirming he is not a <u>current</u>
threat to public safety.  Just as in  <u>In re Scott II</u>, <u>supra</u>, 133
Cal.App.4th, at 595; <u>Biggs v. Terhune</u>, <u>supra</u>, 334 F.2d, at 916-917;
<u>Irons v. Warden of California State Prison-Solano</u>, <u>supra</u>, 358
F.Supp.2d, at 947 fn. 2; <u>Martin v. Marshall</u>, <u>supra</u>, 431 F.Supp.2d,
at 1047-1048; <u>Sanchez v. Kane</u>, <u>supra</u>, ___ F.Supp.2d ___, 2006 WL
2252640, *11; <u>Rosenkrantz v. Marshall</u>, ___ F.Supp.2d ___, 2006 WL
2327085, *16-17; <u>In re Lee</u>, <u>supra</u>, 2006 DJDAR, at 13961; and <u>In re
Elkins</u>, <u>supra</u>, 2006 DJDAR 14489, "[t]he Governor's decision reversing
the Board's grant of parole on the basis of the facts of the offense
lacks "some evidence" that granting parole posed 'an unreasonable
risk of danger to society" (<u>Id</u>., at 14499).

C.   OPPOSITION LETTERS FROM THE DISTRICT ATTORNEY AND POLICE
     DEPARTMENT ARE NOT EVIDENCE SUPPORTING UNSUITABILITY FOR PAROLE.

     While it is true that letters in opposition to parole may be
submitted by the district attorney or other interested parties (Penal
Code § 3042(a)(f)(3), and the Governor may consider such letters
(<u>In re Dannenberg</u>, <u>supra</u>, 34 Cal.4th, at 1085), it is not within
the statutes or regulations as a factor upon which parole can be
denied.

     Firstly, like opposition to parole from a victim, the district
attorney and police department added no "new and significant adverse
information" about the offense (<u>Bono v. Benov</u> (9th Cir. 1999) 197
F.3d 409, 421).  Secondly, as one appellate court opined, "[w]e find
nowhere in the statutes or regulations where it states that parole

should be granted or denied based on the position of the District
Attorney's office.  The decision to grant parole rests on the
guidelines listed in section 2400 et seq and Penal Code section 3041.
(Rosenkrantz, supra, 29 Cal.4th at p. 658 [there must be 'some
evidence in the record before the Board [that] supports the decision
to deny parole, based upon the factors specified by statute and
regulation' (italics added)])" (In re Samble, 2006 WL 401282 (Cal.App.
6 Dist. 2/21/06); see also Rosenkrantz v. Marshall, supra, ___
F.Supp.2d ___, 2006 WL 2327085, *12 fn. 14 [evidence from these
agencies was merely "cumulative" to the Governor's opinion and added
no new evidence]).  If the decision to grant or deny parole were
to be influenced by the district attorney or some other agency, then
all grants or denials of parole would be arbitrary because of the
changing opinions of these agencies, as clearly evidenced in
Rosenkrantz v. Marshall where the Dstrict Attorney flipped flopped
back and forth, and the Board and Governor denies parole when opposed
by the above agencies, they also grant parole when opposed by the
same, resulting in an arbitrary use of the statute.

### Claim II

IT WAS A VIOLATION THE FIFTH AMENDMENT GUARANTEE AGAINST
DOUBLE JEOPARDY AND SIXTH AND FOURTEENTH AMENDMENTS
GUARANTEEING DUE PROCESS FOR THE BOARD TO ADD TWO YEARS
FOR THE USE OF A FIREARM WHEN PETITIONER HAD SERVED THAT
ENHANCEMENT CONSECUTIVELY TO THE INDETERMINATE SENTENCE.

Cal. Code Regs., tit. 15, § 2406, et seq., controls time
calculations for enhancements.  Cal. Code Regs., tit. 15, § 2406(b)
cogently states, "Punishment Imposed by the Court.  If the court
imposed the consecutive punishment for the enhancement, the board
shall not add an additional adjustment for using a deadly or dangerous

weapon, being armed with a firearm, using a firearm...."

The language is mandatory, "shall," creating a liberty interest in not being punished twice for the same behavior. In that the Board added two years for the gun use when Petitioner had already served two years, it not only violates Petitioner's right to due process and to be free from double jeopardy, but does violence to the Board's own regulations.

Moreover, pursuant to Cal. Code Regs., tit. 15, § 2403(c)(C), "severe trauma," is, "e.g., beating, clubbing, stabbing, strangulation...." Petitioner fits more appropriately in column B: "Death was almost immediate or resulted at least partially from contributing factors from the victim." Thus Petitioner's time was not fixed according to the individual circumstances of his offense, again violating his right to due process.

Petitioner's term should have been fixed at 18 years, "prior relationship" to the victim and "death was almost immediate or resulted at least partially from contributing factors from the victim" (Cal. Code Regs., tit. 15, § 2403(c)(II-B)). This comes out to be 218 months for the life offense, minus 82 months for good behavior credits (HT 62:8-14). Petitioner's total term is not 252 months as calculated by the Board (HT 62:16), then subtracting 82 months for good behavior reducing Petitioner's total period of confinement to 170 months (HT 52:16-18), but is actually 216 months, then substracting 82 months for good behavior for a total adjusted period of confinement of 134 months, or 11 years 2 months. In that Petitioner has exceeded his legislatively mandated uniform term for the offense by 106 months as of the date of this habeas petition,

the life offense beginning approximately July of 1986, and his parole
is to be for a period subject to discharge in 7 years, exceeding
that by 2 months, the excess credits are to be deducted from any
period of parole Petitioner would have otherwise served (Cal. Code
Regs., tit. 15, § 2345 [If any custody credits remain after deducting
it from the offense to which it applies, the remaining credit shall
be deducted from the parole period"], citing In re Sosa (1980) 102
Cal.App.3d 1002; In re Ballard (1981) 115 Cal.App.3d 647).  See also
In re Scott, supra, 133 Cal.App.4th, at 604; Sanchez v. Kane, supra,
___ F.Supp.2d ___, 2006 WL 2252640, *12; In re Elkins, supra, ___
Cal.App.4th ___, 2006 DJDAR, at 14499; McQuillion v. Duncan (9th
Cir. 2003) 342 F.3d 1012, 1016; affirming district order for discharge
(McQuillion v. Duncan (C.D. Cal. 2003) 253 F.Supp.2d 1131, carrying
out the intent of the Ninth Circuit remand in McQuillion v. Duncan
(9th Cir. 2002) 306 F.3d 895.

### C O N C L U S I O N

The Governor's decision was not only fixated on immutable factors
but the Governor presented no contravening evidence to the
psychological forensic expert's finding that Petitioner would not
pose a threat to public safety if released from prison at this time,
nor did the Governor make any rational connections between his
findings and Petitioner's **present** threat to public safety.

WHEREFORE, it is respectfully requested that this Court grant
the writ and order the Governor's decision vacated, grant of parole
reinstated, and the California Department of Corrections and
Rehabilitation immediately calculate Petitioner's term as instructed
by the Court, and, apply excess conduct credits to any time of parole

- 23 -

Petitioner may serve.

Date: 11-16-06

Respectfully submitted,

Rizalino Cayabo
Petitioner in pro per

- 24 -

REPORT

At the request of Atty. David M. Liebowitz of the Tulare County Public
Defender's Office, I interviewed Mr. Rizalino Guerrero Cayabo at my home
in San Jose, California on April 21, 1985.

The interview, which started at 1:00 p.m. and lasted for about 45 minutes,
was for the purpose of evaluating the dynamics of Mr. Cayabo's personality.
The interview was conducted in the Pilipino language.

We immediately established cultural rapport. Throughout the session, Mr.
Cayabo appeared relaxed and comfortable, speaking openly, without hesitation.
His behavior in the events of his life that he narrated manifested a reaction
typical to Pilipino culture, with a motivation characteristic of the Pilipino
personality.

To a non-Pilipino, Mr. Cayabo's behavior and its motivation in this tragic
incident present a puzzle. How could a man with such human sensitivity be
capable of such a violent act? And it does not help much either to hear
him, while expressing deep sorrow and regret, often repeat, as if trying to
explain: "I can not understand why he did not come to me to ask for forgive-
ness. If he did not like to approach me, he could have come to my mother."

For to a Pilipino, the course of action was simple and determined. Pilipino
custom dictates that the man go to the woman's parents ("mamanhik") to ask
for her hand in marriage, but in case of elopement it becomes necessary for
the couple to come to the woman's parents to beg forgiveness. Why the victim
did not do this, since he was a fellow Pilipino, Mr. Cayabo could not under-
stand. For if he had only done this, the unfortunate consequence would not
have occured.

The violation of this Pilipino custom "mamanhik", although expected to cause
very strained relationship, does not always lead to violence. But in this
case, other culturally determined factors precipitated the tragic outcome.
We shall now deal with these cultural forces and re-enforcing circumstances
that made this tragic "confrontation" inevitable.

The closely knit Pilipino family has for its center the child. Because it
is child-centered, care and protection are its most important values. The
wife's faithfulness as well as the woman's honor is then considered priceless.
Out of instinct, a Pilipino will confront death if necessary to defend his
woman's honor or protect his family from great, imminent harm. The father,
when the harm is done, will then feel obliged to seek redress.

When their father died, Mr. Cayabo assumed according to Pilipino custom the
responsibility of caring for and protecting his siblings. Feeling naturally
less secure than the father in his status, the oldest brother tends to be
even more protective and authoritative than the father he has replaced.
Besides, Edita, nicknamed "Bubot" (very unripe fruit) was most vulnerable.
When Mr. Cayabo went back for a visit to the Philippines in 1977 after many
years of absence, it was  seeing Bubot, who had grown into pubescence, that
was one of the fondest memories he brought back to Visalla.

Unlike her younger sisters who went to study in Manila, Bubot stayed and lived in the province.

In the Pilipino culture, a woman's virtue or honor is considered as precious as it is fragile. Mr. Cayabo was only too aware of the dangers to purity that a young woman, with traditional Pilipino upbringing, would be exposed to in U.S. When therefore he petitioned for the coming to U.S. of Edita, he felt the double obligation of protecting her from harm. And when the victim, without courting Edita at her home according to Pilipino custom, succeeded in taking her out and getting her pregnant, Mr. Cayabo felt that he had failed in protecting Edita from being robbed of her womanly virtue and honor. Although there was eventual marriage for which the victim's father came to ask for Edita's hand, the victim himself never came to Mr. Cayabo nor to Edita's mother.

Even Edita did not come. The family had lost her. With their close family ties, and with the feeling of gratitude ("utang-na-loob") that Edita must have in her heart for everything her family and especially her brother had done for her Mr. Cayabo could only explain her conduct by thinking that she was given no choice in the matter. Mr. Cayabo waited for a year: neither came to ask forgiveness. The only explanation that seemed to make sense was Edita was probably drugged and the victim had feelings of guilt. From friends Mr. Cayabo learned that the victim stayed out until late at night drinking, which made him even more concerned about his sister. He felt very agrieved and hurt by what the victim had already done and was continuing to do to his family.

Besides family protection and care, another very significant Pilipino cultural trait involved in the motivation of this tragic act was "hiya" or extreme concern about being embarrassed. Mr. Cayabo said that his friends, who were also the friends of the victim, were laughing at him in his back ("pinagtatawanan") for his inability to do anything about his grievance: he himself felt that he was cowardly. Besides, according to Mr. Cayabo, the victim was "pasikat" (showing off) about treating him as if he was nothing ("bale wala"). In the dynamics of the Pilipino personality, "hiya", when serious enough, is adequate motivation for violence.

The Pilipino personality is oriented to feeling-person rather than to object-achievement. This orientation is involved in the development of "hiya" and the reinforcement of family protection. Born and reared in a child-centered family, the Pilipino is immersed in love and develops great awareness of feelings as well as high self-regard. "Pakikisama" or harmonious human-emotional relations becomes very important to him. He carefully avoids any situation that will hurt his or other's feelings and disturb this harmony. He shies away from disagreements, arguments and any kind of confrontation that will cause hurt feelings or even excite anger– thus appearing to be non-assertive, indifferent to his personal rights and even cowardly. But, he's really just trying to avoid getting angry.

Anger brings us to the very core of the dynamics that motivated or precipitated this violent, tragic event. Mr. Cayabo was so scared of his

anger, as a true Pilipino is.  The Pilipino always tries to inhibit his anger, controlling consciously or unconsciously its expression or release. Anger builds up like steam through continued inhibition until the critical explosion force is reached.  Anger then shatters the containing boiler and escape with destructive violence.  The fear of this violent release creates the need to inhibit anger which inhibition in turn brings about the explosion. Paradoxically, the Pilipino's fear of anger makes anger even more fearful.

Mr. Cayabo, as we stated was scared of his anger.  For one year he avoided a confrontation.  The victim continued to fuel Mr. Cayabo's anger.  They both lived in the same town, having the same friends and haunts.  Mr. Cayabo was forced to avoid his friends and the labor camp for fear of meeting the victim and having to confront him.  As his anger built up, he waited for the victim-still hoping that he would come and ask forgiveness.  The victim's approach would be to make peace - Mr. Cayabo's can only be a confrontation, a war.

That fateful day, because of a special need for friends to talk to, Mr. Cayabo decided to go to the labor camp.  When he arrived in his pick-up, he saw the victim.  He did not go down, trying to avoid a confrontation. He drove away and for an hour waited for the victim to leave.  The victim was made aware by a friend of Mr. Cayabo's arrival.  He was warned of the trouble - the victim did not leave - he said he didn't care.  When Mr. Cayabo came back after an hour and the victim was still there, the critical point of explosion was reached.  Mr. Cayabo's whole awareness was on the victim - he was no longer aware of their friends who were there.  It was like a volcanic erruption that is beyond the human power to control.

For the Pilipino personality can be symbolized by Mayon volcano, the most perfectly cone shaped volcano in the world - beautiful, but very destructive when it explodes.

Jose Icasiano, Ph.D.
May 6, 1985
San Jose, California

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life   )
Term Parole Consideration   )        CDC Number D-09912
Hearing of:                 )
                            )
RIZALINO CAYABO             )
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2006

9:05 A.M.

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DAVID YACONO, Deputy Commissioner

OTHERS PRESENT:

RIZALINO CAYABO, Inmate
MARY ANN TARDIFF, Attorney for Inmate
CORRECTIONAL OFFICER, Unidentified

**PENDING REVIEW AND APPROVAL**

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum

Marsha Mees, Peters Shorthand Reporting

1

1                P R O C E E D I N G S

2         DEPUTY COMMISSIONER YACONO:  Tape is

3    rolling.

4         PRESIDING COMMISSIONER SAWYER:  Okay.

5    This is a subsequent parole consideration

6    hearing for Rizalino?

7         INMATE CAYABO:  Yes.

8         PRESIDING COMMISSIONER SAWYER:  Rizalino?

9         INMATE CAYABO:  Yes.

10        PRESIDING COMMISSIONER SAWYER:  Rizalino,

11   R-I-Z-A-L-I-N-O, Cayabo, C-A-Y-A-B-O.  CDC

12   number D as in David 09912.  Today's date is the

13   ninth of May 2006.  We're located at the

14   Correctional Training Facility in Soledad.  Date

15   received was 7-8-1985 from the County of Tulare.

16   The offense was murder in the second degree with

17   the use of a firearm, case number 22849.  Count

18   number one, 187 and 12022.5 of the Penal Code.

19   The term is 15 to life plus two years.  And the

20   minimum eligible parole date was 8-28-1995.  And

21   it's five minutes past nine in the morning.

22   This hearing is being tape recorded.  And for

23   the purpose of voice identification each of us

24   is required to state our first and last name,

25   spelling our last name.  And when it comes to

26   your turn, as you recall, we also want you --

27   want your CDC number.  I'll start.  Tom Sawyer,

2

1    S-A-W-Y-E-R, Commissioner.

2         DEPUTY COMMISSIONER YACONO:   David

3    Yacono, that's Y-A-C-O-N-O, Deputy Commissioner.

4         ATTORNEY TARDIFF:   Mary Ann Tardiff,

5    T-A-R-D-I double F, attorney for Mr. Cayabo.

6         INMATE CAYABO:   Rizalino Cayabo,

7    C-A-Y-A-B-O, D-09912.

8         PRESIDING COMMISSIONER SAWYER:   Thank

9    you.   The record reflects, Mr. Cayabo, that you

10   signed a BPT Form 1073, which is the reasonable

11   accommodation notice, on 5-13-05 and you

12   indicate -- actually you don't indicate anything

13   on this.   The boxes aren't checked.   Did you --

14   Would you point out to him that he needs to

15   check one of these boxes.   Do you have anything

16   that would prevent you, disability wise, from

17   participating in today's hearing?

18        INMATE CAYABO:   No, Sir.

19        PRESIDING COMMISSIONER SAWYER:   Okay.   As

20   he pulls his glasses out --

21        ATTORNEY TARDIFF:   Yeah, right.

22        PRESIDING COMMISSIONER SAWYER:   Okay.

23        DEPUTY COMMISSIONER YACONO:   Third time

24   in a row.

25        PRESIDING COMMISSIONER SAWYER:   Yeah.

26   You need glass sir --

27        INMATE CAYABO:   Yes.

3

1            PRESIDING COMMISSIONER SAWYER:   -- to

2   read?

3            INMATE CAYABO:   To read, yes.

4            PRESIDING COMMISSIONER SAWYER:   Okay.

5   Okay.  That's a disability.  But overall --

6   There's a box right above your signature that

7   needs to be checked.

8            ATTORNEY TARDIFF:   Right here.

9            INMATE CAYABO:   Yes, this one.

10           PRESIDING COMMISSIONER SAWYER:   If you

11   need anything for your -- Okay.  That box's been

12   checked by his attorney, Ms. Tardiff.  Very

13   good.  Thank you.  Is that information current

14   and correct?

15           INMATE CAYABO:   Yes.

16           PRESIDING COMMISSIONER SAWYER:   Thank

17   you.  Okay.  We have a copy of the scripts for

18   the accommodation for disability.  Counsel, did

19   you talk to Mr. Cayabo about the disability

20   script?

21           ATTORNEY TARDIFF:   I did.

22           PRESIDING COMMISSIONER SAWYER:   And all

23   the issues that we talk about?

24           ATTORNEY TARDIFF:   Yes.

25           PRESIDING COMMISSIONER SAWYER:   And the

26   outline of the hearing procedure, the inmate's

27   rights and the confidential material?

4

1          ATTORNEY TARDIFF:  Yes.

2          PRESIDING COMMISSIONER SAWYER:  Okay.

3    And I have a document that's signed.  Do you

4    wish to waive the reading of those scripts?

5          ATTORNEY TARDIFF:  I do.

6          PRESIDING COMMISSIONER SAWYER:  Thank

7    you.  Signed and dated by both.  I will mark

8    that Exhibit One and leave it in the file.  Is

9    there any confidential material that will be

10   used today, sir?

11         DEPUTY COMMISSIONER YACONO:  No, Sir.

12         PRESIDING COMMISSIONER SAWYER:  Okay.

13   Would you pass the hearing checklist marked

14   Exhibit Two over to Ms. Tardiff.  You can check

15   that against your documents.

16         ATTORNEY TARDIFF:  I have these

17   documents.  I have nothing further to add.

18         PRESIDING COMMISSIONER SAWYER:  Okay.

19   You have no additional documents to --

20         ATTORNEY TARDIFF:  No, I don't.

21         PRESIDING COMMISSIONER SAWYER:  --

22   submitted today?  Are there any preliminary

23   objections, counsel?

24         ATTORNEY TARDIFF:  No.

25         PRESIDING COMMISSIONER SAWYER:  Okay.

26   Will the inmate be speaking with the Panel?

27         ATTORNEY TARDIFF:  Yes.

5

1        PRESIDING COMMISSIONER SAWYER:  He will

2  be talking about the crime?

3        ATTORNEY TARDIFF:  Yes.

4        PRESIDING COMMISSIONER SAWYER:  Okay.

5  Would you raise your right hand, sir?  Do you

6  solemnly swear or affirm the testimony you're

7  about to give in this hearing will be the truth,

8  the whole truth and nothing by the truth?

9        INMATE CAYABO:  Yes, I do.

10       PRESIDING COMMISSIONER SAWYER:  Thank

11  you.  Okay.  I'm going to be reading from the

12  August '04 calendar, that's the -- There is a

13  September '05 calendar but they refer back to

14  the '04 calendar, page one, summary of the

15  crime.  On 10-4-1987 Tulare County sheriff's

16  Office deputies responded to a shooting on --

17  doesn't give the road.  What road number was

18  that?  I have an address and it says road and

19  number 144, Orosi.

20       INMATE CAYABO:  I forgot the name of the

21  road already, Sir.

22       PRESIDING COMMISSIONER SAWYER:  Okay.

23  Well I can -- We'll just reference it to 40971

24  Road, number 144.  Is that -- apartment?  Is

25  that an apartment?

26       INMATE CAYABO:  No, Sir.

27       PRESIDING COMMISSIONER SAWYER:  Or it's a

6

1    --

2            INMATE CAYABO:  It's just like -- labor

3    camp.

4            PRESIDING COMMISSIONER SAWYER:  Labor

5    camp.  Okay.

6            "Investigation revealed that

7            Medaro, M-E-D-A-R-O, Lozano,

8            L-O-Z-A-N-O, had been shot in the

9            back of the head.  The witnesses

10           -- The witnesses advised

11           investigators that Mr. Cayabo,

12           brother-in-law of the victim, had

13           driven his vehicle up to the

14           carport area where the victim and

15           others were watching TV.  Cayabo

16           exited his vehicle, walked behind

17           Lozano and shot him at close range

18           in the back of the head.  Cayabo

19           returned to his vehicle and drove

20           away.  Victim Lozano died at the

21           scene.  Cayabo surrendered a short

22           time later after the shooting at

23           the Tulare County Sheriff's Office

24           in Visalia, California.  Sheriff's

25           detectives interviewed Cayabo.  He

26           admitted to shooting Mr. Lozano in

27           the back of the head with a .38

7

1    caliber revolver.  Cayabo claims

2    to have shot the victim because he

3    had violated Pilipino custom by

4    not asking his permission to marry

5    Cayabo's sister.  Cayabo felt that

6    since his father was deceased,

7    Lozano should have spoken to him

8    before eloping with his sister.

9    Cayabo indicated that he was sorry

10   for what he'd done but was angry

11   at the victim."

12   And the source of that was the probation

13   officer's report.  And as far as his version is

14   concerned:  "He is very sorry for what happened.

15   However, there's nothing I can do now.  What he

16   did to my family was wrong."  You're still

17   feeling the same way, that what he did was

18   wrong?

19        INMATE CAYABO:  No, Sir, not anymore.

20        PRESIDING COMMISSIONER SAWYER:  Not

21   anymore?

22        INMATE CAYABO:  No, Sir.

23        PRESIDING COMMISSIONER SAWYER:  Why were

24   you feeling that way at the time of this crime

25   in 1987?

26        INMATE CAYABO:  Because by the time I

27   think -- I'm drinking that day too when I went

8

1    to the labor camp.  And I think I drink maybe

2    that's the one that triggered me --

3            PRESIDING COMMISSIONER SAWYER:  Okay.

4            INMATE CAYABO:  -- to do this crime.

5            PRESIDING COMMISSIONER SAWYER:  Let's

6    talk about your addiction.  How much had you had

7    to drink?

8            INMATE CAYABO:  I drink half pint of

9    Vodka with orange juice.

10           PRESIDING COMMISSIONER SAWYER:  And so

11   you feel that that --

12           INMATE CAYABO:  I think that's the one

13   that triggered me because I don't mean to harm

14   him, Sir.

15           PRESIDING COMMISSIONER SAWYER:  Tell me

16   this, if you -- if you hadn't been drinking, do

17   you think this would have happened?

18           INMATE CAYABO:  No, Sir.

19           PRESIDING COMMISSIONER SAWYER:  What

20   would you have done?

21           INMATE CAYABO:  Maybe I just shine him

22   on.  I just get out from there and I don't go

23   back to that area.

24           PRESIDING COMMISSIONER SAWYER:  After you

25   killed your sister's husband, your

26   brother-in-law.

27           INMATE CAYABO:  Yes.

9

1          PRESIDING COMMISSIONER SAWYER:   Right?

2          INMATE CAYABO:  Yes, Sir.

3          PRESIDING COMMISSIONER SAWYER:   Did you

4     -- What did your sister say to you?

5          INMATE CAYABO:  She didn't spoke for me

6     for awhile.  She's mad at me.

7          PRESIDING COMMISSIONER SAWYER:   She was

8     mad at you at the time?

9          INMATE CAYABO:  Yes.  Yes.

10          PRESIDING COMMISSIONER SAWYER:   I saw a

11    letter that she's not mad at you anymore.

12          INMATE CAYABO:  Yes, Sir.

13          PRESIDING COMMISSIONER SAWYER:   But --

14          INMATE CAYABO:  She was forgiven me.

15          PRESIDING COMMISSIONER SAWYER:   She has

16    forgiven you?

17          INMATE CAYABO:  Yes.

18          PRESIDING COMMISSIONER SAWYER:   Had you

19    been drinking a lot up to this point in time of

20    your life?

21          INMATE CAYABO:  Occasionally, Sir.

22          PRESIDING COMMISSIONER SAWYER:   Was this

23    a weekend?

24          INMATE CAYABO:  Yes.

25          PRESIDING COMMISSIONER SAWYER:   What,

26    Saturday or Sunday night?

27          INMATE CAYABO:  Saturday, Sunday or

10

1    there's a party, christening or wedding,

2    birthday party or something like that.

3         PRESIDING COMMISSIONER SAWYER:  That's

4    what you --

5         INMATE CAYABO:  Only time I drink.

6         PRESIDING COMMISSIONER SAWYER:  That's

7    what -- when did this -- Did this occur on a

8    weekend or during the week?

9         INMATE CAYABO:  I think it's close to

10   weekend.  I think it's Friday or Thursday.

11   Something like that.

12        PRESIDING COMMISSIONER SAWYER:  Okay.

13        INMATE CAYABO:  Friday.

14        PRESIDING COMMISSIONER SAWYER:  Did you

15   work that day?

16        INMATE CAYABO:  Yes, Sir.

17        PRESIDING COMMISSIONER SAWYER:  And what

18   time of the day was this, did the shooting go

19   down?

20        INMATE CAYABO:  Probably about six

21   o'clock or seven o'clock.  I'm not really sure

22   what time it is.

23        PRESIDING COMMISSIONER SAWYER:  So you

24   were doing some speed drinking after work,

25   between work and this crime?

26        INMATE CAYABO:  Yeah, because I stop by

27   the liquor store and buy a pint of vodka and I

11

1    drink and then I went to -- labor camp.  Because

2    there's gambling going on there and I want to go

3    gamble, to play.  And I see Medaro and all of a

4    sudden I get mad, what he's doing over here, and

5    so --

6              PRESIDING COMMISSIONER SAWYER:  He didn't

7    live there?

8              INMATE CAYABO:  No, I don't live there,

9    Sir.

10             PRESIDING COMMISSIONER SAWYER:  No, he

11   didn't?

12             INMATE CAYABO:  No, he did not.

13             PRESIDING COMMISSIONER SAWYER:  Okay.  So

14   you just ran into him?  You weren't going there

15   specifically to kill him?

16             INMATE CAYABO:  No, Sir.

17             PRESIDING COMMISSIONER SAWYER:  This was

18   just something that happened after you got

19   there?

20             INMATE CAYABO:  It's not my intention,

21   Sir.  It just happened that he was there and I

22   went there too.

23             PRESIDING COMMISSIONER SAWYER:  And you

24   carried a gun with you?

25             INMATE CAYABO:  Yes, Sir.

26             PRESIDING COMMISSIONER SAWYER:  You had

27   your .38 with you?

12

1          INMATE CAYABO:  Yes, Sir.

2          PRESIDING COMMISSIONER SAWYER:  And why

3    did you carry a gun?

4          INMATE CAYABO:  Because you know what's

5    going on there, there's gambling going on and

6    sometimes they have little bit argument and I

7    feel that I need something to protect me.

8          PRESIDING COMMISSIONER SAWYER:  Did

9    everybody have guns?

10          INMATE CAYABO:  Some of them.

11          PRESIDING COMMISSIONER SAWYER:  Now what

12    kind of gambling was going on?

13          INMATE CAYABO:  They have -- They playing

14    mahjong.  And they call it -- Pilipino game,

15    they call it pepito (phonetic), just like

16    Russian poker.

17          PRESIDING COMMISSIONER SAWYER:  Ever go

18    to a cock fight?

19          INMATE CAYABO:  Sometimes.

20          PRESIDING COMMISSIONER SAWYER:  Yeah.

21    Did you have a permit for this gun?

22          INMATE CAYABO:  No.

23          PRESIDING COMMISSIONER SAWYER:  So you

24    were carrying a gun illegally?

25          INMATE CAYABO:  Yes.

26          PRESIDING COMMISSIONER SAWYER:  You know

27    it was against the law, right?

13

1          INMATE CAYABO:  Yes.

2          PRESIDING COMMISSIONER SAWYER:  To have a

3     loaded gun without a permit?

4          INMATE CAYABO:  Yes.

5          PRESIDING COMMISSIONER SAWYER:  On your

6     person or in your car?

7          INMATE CAYABO:  Yes.

8          PRESIDING COMMISSIONER SAWYER:  So how

9     are you feeling about this?  Taking this man's

10    life?  Was it worth it?

11         INMATE CAYABO:  No, Sir.  I feel really,

12    really bad about it.  It should not happen.

13         PRESIDING COMMISSIONER SAWYER:  Yeah.

14    Did he have a family, other than your -- other

15    than your sister?

16         INMATE CAYABO:  Yes.  I have a wife and I

17    have a --

18         PRESIDING COMMISSIONER SAWYER:  Does he

19    have a family?

20         INMATE CAYABO:  Yes.

21         PRESIDING COMMISSIONER SAWYER:  Does he

22    have a mother and sisters and brothers?

23         INMATE CAYABO:  Yes.

24         PRESIDING COMMISSIONER SAWYER:  Nieces

25    and nephews?

26         INMATE CAYABO:  Yes, Sir.

27         PRESIDING COMMISSIONER SAWYER:  Okay.  It

14

1    says you have no juvenile or adult record of

2    crime.

3            INMATE CAYABO:  No, Sir.

4            PRESIDING COMMISSIONER SAWYER:  You've

5    never been arrested for anything?

6            INMATE CAYABO:  Never, Sir.

7            PRESIDING COMMISSIONER SAWYER:  You were

8    born in -- on 9-4-1945.

9            INMATE CAYABO:  Yes.

10           PRESIDING COMMISSIONER SAWYER:  So are

11   you 61 now?

12           INMATE CAYABO:  Sixty.

13           PRESIDING COMMISSIONER SAWYER:  Sixty

14   now.  Yeah, you'll be 61 this year.

15           INMATE CAYABO:  September.

16           PRESIDING COMMISSIONER SAWYER:  And to

17   the union of Maria Marina is your mother.

18           INMATE CAYABO:  Yes.

19           PRESIDING COMMISSIONER SAWYER:  And

20   Fernando Cayabo.

21           INMATE CAYABO:  Yes.

22           PRESIDING COMMISSIONER SAWYER:  The

23   oldest of four children raised by your natural

24   parents in the Philippines.  Father died in 1981

25   due to multiple sclerosis.  You completed two

26   years of college at the University of Manila in

27   1967, came to the United States in 1972.  Is

15

1   that correct?

2           INMATE CAYABO:  Yes, Sir.

3           PRESIDING COMMISSIONER SAWYER:  And what

4   kind of work -- Well, let me ask you this.  What

5   kind of college did you have?  You have two

6   years of college.  I assume you graduated from

7   high school?

8           INMATE CAYABO:  Yes, Sir.

9           PRESIDING COMMISSIONER SAWYER:  And what

10  was your course of study in college?

11          INMATE CAYABO:  Taking Bachelor of Arts,

12  pre-law.

13          PRESIDING COMMISSIONER SAWYER:  Pre-law?

14          INMATE CAYABO:  Yes, Sir.

15          PRESIDING COMMISSIONER SAWYER:  Now let

16  me -- I'm trying to understand this -- the

17  cultural issue here.  Was it acceptable to -- If

18  a person married and did not ask for permission

19  in the Philippines, not here, was it -- was it a

20  cultural offense and the remedy was to kill them

21  in -- Philippines?

22          INMATE CAYABO:  No, Sir.

23          PRESIDING COMMISSIONER SAWYER:  Okay.  So

24  what would -- what would happen in the

25  Philippines if the same thing happened?  If your

26  sister -- If he came along and married your

27  sister in the Philippines and did not ask for

1    permission from the family, what would -- what

2    would happen to him?

3              INMATE CAYABO:  The family get mad.

4              PRESIDING COMMISSIONER SAWYER:  He what?

5              INMATE CAYABO:  The family get mad at him

6    and they just shine him on.  They don't want him

7    to go to their residence.

8              PRESIDING COMMISSIONER SAWYER:  He

9    wouldn't be invited to the parties?

10             INMATE CAYABO:  Not at all, Sir.

11             PRESIDING COMMISSIONER SAWYER:  Okay.

12    But he wouldn't be murdered?

13             INMATE CAYABO:  No.

14             PRESIDING COMMISSIONER SAWYER:  Okay.  So

15    this was something you took upon yourself to do

16    and it's not cultural in a sense.  I'm trying to

17    understand the culture --

18             INMATE CAYABO:  No, it's not --

19             PRESIDING COMMISSIONER SAWYER:  -- from

20    another county.

21             INMATE CAYABO:  No, Sir, the killing, no.

22             PRESIDING COMMISSIONER SAWYER:  Okay.

23    Your future plans, you plan to reside with your

24    wife, Sylvia.

25             INMATE CAYABO:  Yes.

26             PRESIDING COMMISSIONER SAWYER:  And

27    children.  Was it on Road -- it's the same.

17

1    They just give the address and road, number 36.

2    Does she live in an apartment?

3          INMATE CAYABO:  No, we have a residence.

4    That's a residential area.  Road 136.

5          PRESIDING COMMISSIONER SAWYER:  Road 136.

6          INMATE CAYABO:  Yes.

7          PRESIDING COMMISSIONER SAWYER:  Okay.

8          INMATE CAYABO:  We have a double wide

9    mobile him.

10         PRESIDING COMMISSIONER SAWYER:  Mobile --

11         INMATE CAYABO:  Yeah, live with -- And my

12    wife father, he gave them -- he gave her two

13    acres of land.  That's where we put that mobile

14    home.

15         PRESIDING COMMISSIONER SAWYER:  I see.

16    Okay.  And was this your wife at the time of the

17    offense?

18         INMATE CAYABO:  Yes.

19         PRESIDING COMMISSIONER SAWYER:  You've

20    been married all these years?

21         INMATE CAYABO:  Yes, Sir.

22         PRESIDING COMMISSIONER SAWYER:  And she

23    stayed by you?

24         INMATE CAYABO:  Yes, Sir.

25         PRESIDING COMMISSIONER SAWYER:  She's a

26    saint.  Don't you think?  You being away in

27    prison --

18

1        INMATE CAYABO:  For the sake of my

2  children too.

3        PRESIDING COMMISSIONER SAWYER:  For the

4  sake of your children.  Okay.

5        INMATE CAYABO:  Yes, Sir.

6        PRESIDING COMMISSIONER SAWYER:  Okay.

7  Well that's what I mean.  She could have done a

8  lot of things, but she stayed with you.  Does

9  she visit with you?

10       INMATE CAYABO:  Yes, Sir.

11       PRESIDING COMMISSIONER SAWYER:  How

12  often?

13       INMATE CAYABO:  During my family -- When

14  we still have our family visits, I always have a

15  family visit.

16       PRESIDING COMMISSIONER SAWYER:  And who

17  visits you?

18       INMATE CAYABO:  My wife and my childrens.

19       PRESIDING COMMISSIONER SAWYER:  How many

20  children do you have?

21       INMATE CAYABO:  I have three daughters

22  and one son.

23       PRESIDING COMMISSIONER SAWYER:  And do

24  they all visit?

25       INMATE CAYABO:  Yes.

26       PRESIDING COMMISSIONER SAWYER:  Okay.

27  Does your sister come and visit too?

19

1          INMATE CAYABO:  Sometimes.

2          PRESIDING COMMISSIONER SAWYER:  Okay.  Do

3    you -- do you correspond with your wife and your

4    -- You talk to her on the phone or do you --

5          INMATE CAYABO:  Yes.

6          PRESIDING COMMISSIONER SAWYER:  Do you

7    write back and forth?

8          INMATE CAYABO:  I talk to her in the

9    phone, Sir.

10          PRESIDING COMMISSIONER SAWYER:  In the

11   phones.  How about your children?

12          INMATE CAYABO:  The same thing, Sir.

13          PRESIDING COMMISSIONER SAWYER:  Okay.

14   You plan to work for a farm labor contractor,

15   Jose Lobong, L-O-B-O-N-G, Orosi.

16          INMATE CAYABO:  Yes.

17          PRESIDING COMMISSIONER SAWYER:  And I saw

18   a letter to that effect.  And you have numerous

19   letters of support from your family.  And let's

20   take a look.  We do have some letters of

21   opposition.  I have a letter from Philip J.

22   Kline, District Attorney of the County of

23   Tulare, dated April 21, 2006, saying he's not

24   sending a representative to attend the parole

25   hearings, instead ask you to consider this

26   letter and urge you once again to deny parole to

27   inmate Cayabo.  He talks about the -- found

20

1    guilty of second degree murder and a firearm

2    allegation was true, sentenced to 17 to life for

3    murder of his brother-in-law Mr. Lozano.   Murder

4    was particularly cold and calculated in that he

5    approached him from behind and without

6    hesitation shot him in the back of the head at

7    close range, then got back in his vehicle, drove

8    away.   Reason for committing the murder was that

9    the victim had not asked Cayabo's permission

10   before marrying his sister, violating a Pilipino

11   custom.   However, he stated the reason for

12   carrying the loaded gun was for protection when

13   gambling with friends.   That's what you told me

14   too.   It says that they recognize the fact that

15   you're sorry for what happened and that you were

16   angry with the victim and the victim did to my

17   -- what the victim did to my family was wrong.

18          "There's a concern by this office

19          that inmate Cayabo has not taken

20          full responsibility for the brutal

21          murder rather than rationalizing

22          and condoning his behavior based

23          on a custom.   In civilized society

24          Inmate Cayabo's motive for the

25          murder is both abhorrent and

26          unacceptable.   And absent any

27          evidence that he would come to

21

1    realize this, the People maintain

2    the release of inmate Cayabo would

3    pose great risk to society.

4    Nineteen -- Two thousand five

5    evaluation report contends that

6    his violence potential is

7    estimated to be no greater than

8    the average citizen in the

9    community provided that he

10   continues to actively attend

11   Alcoholics Anonymous and abstain

12   from alcohol.  The report also

13   recommends that the -- that he

14   upgrade vocationally.  However,

15   once released from the controlled

16   environment of prison, there's no

17   guarantee that inmate Cayabo would

18   not abuse alcohol.  There's no

19   evidence that inmate Cayabo has

20   participated in therapy in order

21   to deal with and fully understand

22   the causative factors that led to

23   the commitment of the murder.  And

24   since alcohol was involved in the

25   commitment offense as well as

26   anger with the victim,

27   reintroducing him to society at

22

1          this time would involve

2          unacceptable risks.  Therefore, --

3          asking the Board to protect

4          society by denying him parole at

5          this time."

6    Signed by Carol. B. Turner, T-U-R-N-E-R,

7    assistant district attorney.  And I have a

8    letter also from the sheriff's office, April 7,

9    2006.

10         "Tulare County Sheriff's

11         Department and the citizens of

12         Tulare strongly oppose the release

13         of Mr. Cayabo from prison.  He's

14         convicted of murder second degree

15         and justice would not be served

16         unless he serves his entire

17         sentence.  Because of the

18         seriousness nature -- serious

19         nature of this crime, we

20         respectfully request you keep

21         Cayabo incarcerated for his crime

22         as long as legally possible."

23   And this is signed by Sergeant Eric Velasquez,

24   V-E-L-A-S-Q-U-E-Z, violent crimes unit.  Then I

25   have a letter from Mr. Lobong, farm labor

26   contractor, Orosi, California.  Indicates in

27   here that he resides in Orosi, permanent citizen

1   of the United States, owner of his labor

2   contracting services, employs over 100

3   individuals annually on a seasonal basis.

4   Length of employment of individual depends on

5   crops in the San Joaquin Valley.  In the state

6   of California average season of employment lasts

7   approximately eight -- ten months a year,

8   pruning, thinning, picking and packing of fruit

9   trees and vines.  "I submit this letter as a

10  bona fide offer of employment for Mr. Cayabo

11  born September 4, 1945."  And gives this address

12  in Soledad.  "He will be paid by the hour at

13  6.75."  Does your wife work?

14          INMATE CAYABO:  Yes, Sir.

15          PRESIDING COMMISSIONER SAWYER:  What does

16  she do?

17          INMATE CAYABO:  She work in -- meat

18  packing house.

19          PRESIDING COMMISSIONER SAWYER:  Packing?

20          INMATE CAYABO:  Yes, Sir.

21          PRESIDING COMMISSIONER SAWYER:  Meat

22  packing?

23          INMATE CAYABO:  Yes.  Poultry.

24          PRESIDING COMMISSIONER SAWYER:  Poultry?

25          INMATE CAYABO:  Yes.

26          PRESIDING COMMISSIONER SAWYER:  For what

27  company?

24

1    INMATE CAYABO:  Forgot the name of the

2    company, Sir, but she's working (indiscernible)

3    chickens.  That's where she work at.

4        PRESIDING COMMISSIONER SAWYER:  Where

5    they kill and pack chickens?

6        INMATE CAYABO:  I think the butchering --

7    They don't kill it but somebody's killing them.

8        PRESIDING COMMISSIONER SAWYER:  Butcher

9    -- Butchered.

10       INMATE CAYABO:  Yeah, (indiscernible).

11       PRESIDING COMMISSIONER SAWYER:  They get

12   them when they're dead?

13       INMATE CAYABO:  Yes.

14       PRESIDING COMMISSIONER SAWYER:  Okay.  It

15   wouldn't be Tyson?  Would it be Tyson?  Trying

16   to remember --

17       INMATE CAYABO:  No, it's --

18       PRESIDING COMMISSIONER SAWYER:  It's not

19   Foster Farms.

20       INMATE CAYABO:  Some kind of Japanese

21   name.  I think it's -- I don't know if that's a

22   private -- forgot the name of it.

23       PRESIDING COMMISSIONER SAWYER:  And how

24   long as she worked there?

25       INMATE CAYABO:  She's been working there

26   for -- since I come to prison.

27       PRESIDING COMMISSIONER SAWYER:  Really?

25

1        INMATE CAYABO: Yes.

2        PRESIDING COMMISSIONER SAWYER: Okay. I

3    have a letter from July 8, 2005 from San Jose.

4    This is from Robin S. Cayabo. This is your

5    daughter. "I'm writing in hopes of his return

6    home. Since I was five-years-old, my father's

7    been incarcerated. I've written letters in the

8    past to help my father. I love my father and

9    miss him very much." She talks about going to

10   church and talks about praying for you and

11   hoping that you come home.

12            "Been in prison since 1985, it's

13            now 2005 and he's been away from

14            me and my mother and my sister and

15            my brother for too long. Only

16            have memories of him when I was a

17            child. He's a loving father and

18            husband. Writes me letters. His

19            biggest dream is to visit the

20            Philippines with my brother

21            Dexter. Everybody in the family

22            wants him to come home. I know

23            God's forgiven him for the crime

24            he's committed because God loves

25            him. He deserves to come home and

26            we'll be waiting and praising the

27            Lord that our prayers have been

26

1          heard."

2     Very nice letter.  She lives in San Jose.  What

3     does she do?  Does she work?

4          INMATE CAYABO:  Yes.

5          PRESIDING COMMISSIONER SAWYER:  She

6     married?

7          INMATE CAYABO:  No, not yet.

8          PRESIDING COMMISSIONER SAWYER:  Not yet.

9          INMATE CAYABO:  But she have a boyfriend

10    that -- living with.

11         PRESIDING COMMISSIONER SAWYER:  Now does

12    he have to ask for permission to marry her?

13         INMATE CAYABO:  No, she don't have to,

14    Sir.

15         PRESIDING COMMISSIONER SAWYER:  Okay.

16    July 1, 2005, Edith Castaneto,

17    C-A-S-T-A-N-E-T-O, from Visalia.  This is your

18    sister.

19          "I was -- murdered to the man --

20          On October 4, 1945 -- 1984 --

21          murdered the man I was married to.

22          My brother has come to realize

23          that it was a senseless murder

24          behind a Pilipino custom that

25          caused my family untold sorrow.

26          It's caused me sorrow.  No young

27          wife should ever have to

27

1       experience this tragedy.  It

2       should have never happened.  I was

3       angry with my brother for many

4       years but I've learned that

5       holding -- that holding that anger

6       is only hurting me so I've learned

7       to let -- let that anger go.  I've

8       forgiven my brother and we have

9       been able to reestablish a good

10      relationship.  Single incident of

11      violence is difficult for us to

12      understand because he's never been

13      a violent person.  I believe that

14      he's proved his non-violent nature

15      over the years by not getting in

16      trouble in prison.  As a surviving

17      victim of his crime, I pray that

18      20 years of punishment is long

19      enough.  My mother is old and

20      needs her son at home to take care

21      of family matters.  Please let my

22      brother come home."

23  And that's signed by her.  You got a pretty good

24  strong bond with her, huh?

25          INMATE CAYABO:  Yes, Sir.

26          PRESIDING COMMISSIONER SAWYER:  Good

27  family bond.  June 30, 2005, a letter from your

28

1    wife, Sylvia.  Talks about how long you've been

2    in prison, 20 years.  "Since my husband left,

3    I've raised our four children without a father.

4    My kids were young at the time.  I didn't know

5    how to raise a family alone."  Talks about .

6    school and the struggle that she's had since

7    you've been gone.  "I miss my husband very much.

8    My husband's served his time.  It's about time

9    for him to come home.  Please let him spend the

10    rest of his life at home surrounded by family --

11    friends."  Signed by your wife Sylvia Cayabo.

12    I'll say it again, I think she's a saint,

13    raising your kids and standing by you.

14            INMATE CAYABO:  Yes.

15            PRESIDING COMMISSIONER SAWYER:  That's

16    pretty powerful.  June 24, 2005, this is from

17    Christine Cayabo Saechao, S-A-E-C-H-A-O.  This

18    is your daughter.

19            INMATE CAYABO:  Yes.

20            PRESIDING COMMISSIONER SAWYER:  Okay.

21    One of your daughters.  Talks about how long

22    you've been down.  She was 10 when this crime

23    occurred.  She's praying for you.  Talks about

24    you being missed.  She's now 29 and married.

25    She plans to have children.  Has she had any

26    children yet?

27            INMATE CAYABO:  No, not yet.

29

1    PRESIDING COMMISSIONER SAWYER:  Not yet.

2    Do you have any grandchildren?

3    INMATE CAYABO:  No.

4    PRESIDING COMMISSIONER SAWYER:  Okay.

5    Talks about you deserving a second chance and

6    please give him the second chance.  We all learn

7    from our mistakes, appreciate your time.  Okay.

8    How long has she been married?

9    INMATE CAYABO:  Last year, since last

10   year, Sir.

11   PRESIDING COMMISSIONER SAWYER:  Okay.

12   Okay.  And that's all the letters.  Do you have

13   any additional letters?

14   INMATE CAYABO:  No, Sir.

15   PRESIDING COMMISSIONER SAWYER:  Okay.

16   Okay.  I'm going to turn it over to the

17   Commissioner.

18   DEPUTY COMMISSIONER YACONO:  Okay.  Sir,

19   I'm going to go through material since your last

20   parole consideration hearing.

21   INMATE CAYABO:  Okay.

22   DEPUTY COMMISSIONER YACONO:  And I'll

23   take input from you.  Because you've been here

24   quite some time, there's some documentation you

25   may want to present.  But you'll have an

26   opportunity to do that as well.  If there's

27   anything wrong, you and your counsel have an