# EXHIBIT 1
# Part 2 of 2

30

1   opportunity to have some input on that and we'll

2   get that on the record as well.  Okay.

3           INMATE CAYABO:  All right.

4           DEPUTY COMMISSIONER YACONO:  First of all

5   Commissioner asked me a question.  I was going

6   to answer that from my C-File review.  As of

7   August 22, 2005 they -- formerly United States

8   Immigration Service, now I'm not sure who they

9   are, they no longer have an interest in our

10  inmate.

11          PRESIDING COMMISSIONER SAWYER:  Okay.

12          DEPUTY COMMISSIONER YACONO:  So he does

13  not have a parole or an INS hold him at this

14  point.

15          PRESIDING COMMISSIONER SAWYER:  Okay.

16  That was a question I asked him earlier.

17          DEPUTY COMMISSIONER YACONO:  And that

18  goes into what I'm reviewing is your Central

19  File, as well as the life prisoner evaluation

20  report prepared for the September '05 calendar

21  by Correctional Counselor R. Lee.  He signed off

22  on 6-17-2005.  He also prepared the

23  post-conviction progress report for the period

24  of January of '04 through June 17, '05.  And

25  also a psychological evaluation prepared -- I

26  have bits of two.  One is January of '03, the

27  other one is June 12, 2003 by Dr. Hewchuk,

1    H-E-W-C-H-U-K, Ph.D.  Excuse me.  Let me go back

2    over that.  That's the January -- for the

3    January '03 calendar that's signed off 6-12-03.

4    I'll go through it in some of these parts since

5    I've already confused myself on that.  It is for

6    the January of '03 lifer calendar but it's dated

7    June 11, 2003.  That's kind of backwards, but

8    okay.  In regards to psychological evaluation,

9    I'm showing only two Axis.  Number one is No

10   Contributory Clinical Disorder and Axis II, No

11   Contributory Personality Disorder.  The noted

12   assessment of dangerousness in an institution

13   setting is minimal relative to the inmate

14   population.  No significant CDC 115's, in total

15   compliance with institutional requirements and

16   standards.

17        "His behavior and institutional

18        record over the past 18 years

19        places him in a very low risk

20        category.  If released to the

21        community, violence potential

22        estimated to be no greater than

23        that of the average citizen in the

24        community with the proviso that he

25        continue to actively attend

26        Alcoholics Anonymous program in

27        the community and abstain from

32

1           alcohol use."

2   Okay.  Now they've given me several psychiatric

3   evaluations and the only one that I pulled

4   anything out of goes all the way back to June 6,

5   '97.  At that time it was a little different

6   because it showed me Axis I as Alcohol Abuse

7   Episodic In Remission.  Axis II, Adjustment

8   Disorder With Disturbance of Conduct Resolved.

9   Axis III, No Contributory Personality Disorder

10  and Axis -- excuse me.  Did two again.  I'm

11  sorry.  Axis I is part one and two.  Axis II, No

12  Contributory Personality Disorder.  Axis III, No

13  Contributory Physical Disorder.  Okay.  So what

14  I'm then looking at is this is the seventh

15  subsequent parole consideration hearing.  The

16  last was 9-28-2004, '89 and '92 doc hearings.

17  First hearing in '94, two year denial.

18  Ninety-six, one year.  Ninety-seven, two year.

19  Several postponements.  Then in 2000, one year.

20  Again some postponements.  On '02 denial for one

21  year.  Then finally in '03 one year.  So never

22  denied more than two years and most of these

23  were one year denials.  Oops, I forgot the '03.

24  Routinely, the recommendations were to remain

25  disciplinary-free, participate in self-help and

26  obtain positive chronos.  Noting classification

27  score upon entry was 72 points but it's been at

1    minimal, either zero or 19 by CDC standards from
2    what I can tell at least since '92.  Presently
3    in general population, Medium A.  No enemies or
4    gang noted.  No confidential as we said.  I'm
5    seeing a dry cleaning certificate of completion.
6    And I've got the form but it doesn't give me a
7    date.  And then most recently for this
8    particular period I'm showing silkscreen and
9    cutting table certificates of accomplishment
10   dated 1-3-06.  Do you remember what year you got
11   your dry cleaning certificate?

12            INMATE CAYABO:  I think that was '97 or
13   '98.

14            DEPUTY COMMISSIONER YACONO:  Okay.  Have
15   you gotten any other vocational certificates of
16   completion?

17            INMATE CAYABO:  No.

18            DEPUTY COMMISSIONER YACONO:  And the dry
19   -- excuse me.  The silkscreen and the cutting
20   table, you're still going through that or --

21            INMATE CAYABO:  Yes, I still go to that.
22   That's under PIA.

23            DEPUTY COMMISSIONER YACONO:  Right.  But
24   they train you to do this job?

25            INMATE CAYABO:  Yes, Sir.

26            DEPUTY COMMISSIONER YACONO:  Okay.  We
27   talked about the academic education.  We have at

34

1    reception an IQ of 88 but a reading level of

2    13.7 with an overall average of 9.4.   You're

3    noted with high school and college attendance,

4    University of Manila.   And then PIA for work.

5    PIA textiles, sewing machine mechanic,

6    satisfactory and above satisfactory evaluation.

7    Last one I could find was 2-12-2005.   And this

8    is what your -- Okay.   How long did you do that

9    or is that in addition to the silk screening?

10         INMATE CAYABO:   That's in addition to the

11    silkscreen.

12         DEPUTY COMMISSIONER YACONO:   So you're

13    still working textile?

14         INMATE CAYABO:   Yes.

15         DEPUTY COMMISSIONER YACONO:   And you

16    repair the sewing machines?

17         INMATE CAYABO:   Yes, Sir.

18         DEPUTY COMMISSIONER YACONO:   Okay.   I see

19    no psychiatric treatment during this timeframe.

20    I haven't actually seen any specific treatment.

21    And then self-help.   Looking at Alcoholics

22    Anonymous for this period.   A little bit before,

23    I'm looking at July 2, '04, October 4, '04,

24    12-30-04.   And then I'm not seeing anything but

25    there's reference in another chrono of

26    participation for third and fourth quarter of

27    2005.   That's dated January of '06.   So I'm

1   missing the first and second quarter of 2005 and

2   then 2006 I haven't seen anything. Are you

3   still attending?

4        INMATE CAYABO: Yes, Sir.

5        DEPUTY COMMISSIONER YACONO: Okay. So

6   we're just missing --

7        INMATE CAYABO: Right now there's nobody

8   running AA over there at north right now and

9   that's why we have no meeting at this time.

10       DEPUTY COMMISSIONER YACONO: Why aren't

11  you running it? You're a college educated man.

12  You've been doing this for decades.

13       ATTORNEY TARDIFF: I don't think -- North

14  facility is almost on a continuous lockdown.

15       DEPUTY COMMISSIONER YACONO: Yeah, and

16  unfortunately it went back again last night.

17  Okay.

18       ATTORNEY TARDIFF: Also, can I add that,

19  you know, the last Board -- the Board report is

20  dated September of '05 which really does the --

21       DEPUTY COMMISSIONER YACONO: Right.

22       ATTORNEY TARDIFF:  -- the inmate a

23  disservice.

24       DEPUTY COMMISSIONER YACONO: We've got

25  some gaps and that's where I'll take input if

26  we've got anything else. I realize that we've

27  got quite a period of time. Especially

36

1  considering you got a one year denial in

2  September.  And we had --

3      ATTORNEY TARDIFF:  Actually there's a

4  chrono in the back of our packet, in the very

5  back section toward where the most recent    .

6  chronos are.  January '06 AA chrono.

7      DEPUTY COMMISSIONER YACONO:  Yeah, that

8  refers to the third and fourth quarter of '05.

9  Okay.  And there was something that took us from

10  September '04 because we're -- we look like

11  we're six months late on this but there was

12  something else.

13      ATTORNEY TARDIFF:  There was a Project

14  Change in November of '04.  But that would be

15  obviously since his last -- after his last --

16  before his last hearing.

17      DEPUTY COMMISSIONER YACONO:  Okay.  Let

18  me do a couple of laudatories.  The one I can

19  find during this timeframe, 11-15-2005, for his

20  Holiday Children's Christmas Festival

21  fundraising participation.  And then finally you

22  have zero 115's.  Never got one, right?.

23      INMATE CAYABO:  No, Sir.

24      DEPUTY COMMISSIONER YACONO:  And then we

25  had three 128's, but we're talking one in 1988

26  and two in '92.  Right?  Nothing since?

27      INMATE CAYABO:  Nothing since.

37

1      DEPUTY COMMISSIONER YACONO:  Okay.  Okay.

2  Counsel, anything else I missed?

3      ATTORNEY TARDIFF:  Yeah, I guess we need

4  to add Project Change because it's dated

5  November 9, '04 and his last hearing was

6  September of '04.

7      INMATE CAYABO:  I think it's

8  September 29.

9      ATTORNEY TARDIFF:  And the Project Change

10  is 44 weeks, quite a long period of time.

11      DEPUTY COMMISSIONER YACONO:  You have a

12  chrono for that?

13      ATTORNEY TARDIFF:  It's in the --

14      DEPUTY COMMISSIONER YACONO:  I got it.

15      ATTORNEY TARDIFF:  Yeah.  It was since

16  his last hearing.

17      DEPUTY COMMISSIONER YACONO:  Yeah, you're

18  right.  I miss calculated the date and saw '04

19  and didn't put it in there.

20      ATTORNEY TARDIFF:  Well because you

21  thought it was just a one year denial.

22      DEPUTY COMMISSIONER YACONO:  So again,

23  because Project Change is pretty substantial, is

24  a 44-week -- dealing with self-esteem,

25  assertiveness, goal setting, anger management,

26  coping skills, stress reduction, drug and

27  alcohol abuse, tolerance, parenting, domestic

38

1    violence, life skills and parole and release.

2    And so duly noted and added, 11-9-2004 chrono,

3    and again emphasizing that's a 44-week program.

4    Okay.  Anything else, counsel?

5         ATTORNEY TARDIFF:  I don't have anything.

6    Any other self-help?

7         INMATE CAYABO:  No.

8         ATTORNEY TARDIFF:  Okay.

9         DEPUTY COMMISSIONER YACONO:  All right.

10   Commissioner.

11        PRESIDING COMMISSIONER SAWYER:  Thank

12   you.  How long have you been in AA?  When did

13   you start AA?

14        INMATE CAYABO:  I start when I come to

15   north facility, '94.

16        PRESIDING COMMISSIONER SAWYER:

17   Ninety-four?

18        INMATE CAYABO:  Yes.

19        PRESIDING COMMISSIONER SAWYER:  You know

20   your steps?

21        INMATE CAYABO:  Yes.

22        PRESIDING COMMISSIONER SAWYER:  What's

23   the most important step to you?

24        INMATE CAYABO:  Step number four.

25        PRESIDING COMMISSIONER SAWYER:  And what

26   is that?

27        INMATE CAYABO:  Made a searching and

39

1    fearless moral inventory of ourselves.

2        PRESIDING COMMISSIONER SAWYER:  And do

3    you work the steps?

4        INMATE CAYABO:  Yes.

5        PRESIDING COMMISSIONER SAWYER:  How

6    often?

7        INMATE CAYABO:  All the time.

8        PRESIDING COMMISSIONER SAWYER:  Is it

9    good for you?

10        INMATE CAYABO:  Yes, really work for me.

11        PRESIDING COMMISSIONER SAWYER:  So '94

12    and you've been as regular as you can be?

13        INMATE CAYABO:  Yes, Sir.

14        PRESIDING COMMISSIONER SAWYER:  Until the

15    present.

16        INMATE CAYABO:  Yes.

17        PRESIDING COMMISSIONER SAWYER:  I think

18    you could teach it.  Start your own group.  Do

19    you do any self-study when you can't attend AA?

20    Do you have any documents that you can study

21    yourself?

22        INMATE CAYABO:  Sometimes I go to the

23    library to pick -- some books and read.

24        PRESIDING COMMISSIONER SAWYER:  Have you

25    ever done any book reports for the Board?

26        INMATE CAYABO:  No.

27        PRESIDING COMMISSIONER SAWYER:  You ever

40

1  thought about it?

2      INMATE CAYABO:  I never thought about it,

3  Sir.

4      PRESIDING COMMISSIONER SAWYER:  Okay.

5  There's books on subjects like addiction.  We

6  had a book report in here yesterday, just a one

7  page thing, talked about what it meant reading

8  this book about addiction and how this inmate

9  applied it to his life.  And it was pretty good,

10  wasn't it?

11      DEPUTY COMMISSIONER YACONO:  Yeah.

12      PRESIDING COMMISSIONER SAWYER:  I was

13  impressed by it.  When out of his way on his

14  own.  Have you taken any correspondence courses?

15      INMATE CAYABO:  No, Sir.

16      PRESIDING COMMISSIONER SAWYER:  Do they

17  have the FEMA courses here?  That's a

18  correspondence course --

19      INMATE CAYABO:  Not that I --

20      PRESIDING COMMISSIONER SAWYER:  --

21  through the mail.

22      INMATE CAYABO:  -- Sir.

23      PRESIDING COMMISSIONER SAWYER:  Okay.

24  Okay.  All right.  Very good.  Counsel, do you

25  have any questions?

26      ATTORNEY TARDIFF:  No, I don't.

27      PRESIDING COMMISSIONER SAWYER:  Okay.  Do

41

1    you have any questions?

2              DEPUTY COMMISSIONER YACONO:   No.

3              PRESIDING COMMISSIONER SAWYER:   Okay.   I

4    think this inmate's pretty -- kind of an open

5    book here isn't he?  He's pretty

6    straightforward.   Everything's pretty

7    straightforward, not very complex.   Do you have

8    a closing statement?

9              ATTORNEY TARDIFF:   Yes.   Mr. Cayabo has

10   been incarcerated for 21 years.   Since that time

11   he has been a model inmate.  No 115's.   Only

12   three 128's, the last one was in '92.   He has a

13   dry cleaning vocation and I submit that the PIA

14   is also a vocation at this point.   It's

15   definitely a marketable skill.   He gets

16   satisfactory to above average supervisor's

17   reports and he's quite skilled as a sewing

18   machine repairer.   He has been participating in

19   AA for 12 years and as we found out today he

20   knows his steps and practices them, which many

21   times we don't see even with continuous

22   participation in AA.   He also has completed the

23   Project Change most recently.   His

24   pre-incarceration history, I didn't find any

25   negative history at all -- would be used as a

26   factor of unsuitability.   He has no criminal

27   history.   He appeared to have a stable family

42

1    life.  And he continues to have stable social

2    relationships, which is noted -- which is

3    verified by the letters from his children and

4    his wife and also the victim of the crime, his

5    sister, as well.  His psych reports, the last

6    two have been positive since 2000.  What wasn't

7    addressed I'd like to address.  It's very --

8    briefly that notes that his participation in AA

9    have contributed to his reevaluation and insight

10    into the motivation dynamics of the instant

11    offense.  This is from the '03 psych eval.  It's

12    -- Under the review of the life crime the

13    psychologists states that Mr. Cayabo has gained

14    considerable insight into the instant offense.

15            "As a consequence of his numerous

16            years of incarceration and active

17            participation in institutional

18            programming, specifically the

19            Impact group and AA, he's fully

20            cognizant of the impact and

21            gravity of his actions.  He now

22            admits that his misplaced sense of

23            duty and responsibility to protect

24            his sister's honor did not justify

25            the taking of a human life.  He is

26            remorseful and deeply regrets what

27            he did."

43

1    Under the dangerousness, he does not fit the

2    typical criminal profile.  He's a model inmate,

3    in total compliance with institutional

4    requirements and standards.  And then we have no

5    greater than the average citizen.  The 2000

6    psych eval that was specifically done to -- He

7    was referred for reassessment of his level of

8    dangerousness.  Says his remorse was clearly

9    genuine and appropriate.  Considering his lack

10   of any criminal history, lack of violent

11   criminal history, lack of any CDC 115's, as well

12   as his greater maturity, if released to the

13   community no more than the average citizen.  I

14   found no evidence that his violence potential

15   should be above average at all.  No risk

16   factors.  This Dr. Terrini, T-E-R-R-I-N-I, found

17   -- because -- in terms of the alcohol abuse,

18   seems to have, in his words, quit for good."

19        DEPUTY COMMISSIONER YACONO:  Counsel, can

20   I stop you for a --

21        ATTORNEY TARDIFF:  Sure.

22        [Thereupon, the tape was turned over.]

23        DEPUTY COMMISSIONER YACONO:  Okay.  Go

24   ahead, please.

25        ATTORNEY TARDIFF:  Thank you.  And then

26   just to briefly address the '97, which was

27   brought up, I'd like to note that on the Axis I

44

1    diagnosis the first diagnosis is in remission,

2    it doesn't say institutional remission, it says

3    remission, to me indicates out in the community

4    as well.  And then the adjustment disorder it

5    states was resolved.  His Board reports have

6    been very positive when they were making

7    assessments of dangerousness.  Since 1999 he has

8    received low.  Zero one he received low, '03 he

9    received low and '04 he received low.  And

10   basically they considered him low because of his

11   prior record, his prison adjustment and the

12   majority of those Board reports' opinion is

13   based on the fact that this crime was based on

14   the subject's cultural beliefs and clearly an

15   isolated and situational offense.  The probation

16   officer's report also indicates some mitigating

17   factors in terms of the commitment offense.  The

18   crime was committed due to unusual circumstances

19   which is unlikely to reoccur and that Mr. Cayabo

20   had no prior criminal record.  I'd also submit

21   that there were indications of significant

22   stress based on the -- he had waited a year to

23   receive this apology and that that probably --

24   and they lived in the same town.  He had to

25   avoid his friends because they had the same

26   friends and I think all of this was -- took its

27   toll.  It appears that today Mr. Cayabo now

1  understands that what he did, even in the
2  Philippines, would have been considered a murder
3  regardless of the cultural beliefs.  And I don't
4. think that -- I believe that that issue has been
5  resolved.  And I will refer the Board to the
6  report which was written for the probation --
7  probably his attorney -- at the request of his
8  attorney, that's in the legal section, by Dr. --
9  I will not even attempt to pronounce his name --
10  ICAS -- I-C-A-S-I-A-N-O and that goes into the
11  cultural beliefs, but not using that as a means
12  of excusing his behavior at all.  I'd also like
13  to point out that in the sentencing report the
14  judge at that time stated on page four starting
15  at line four through line nine:
16         "I don't particularly like
17         sentencing this particular
18         defendant since he has no prior
19         record whatsoever except for this
20         one thing.  And I don't
21         particularly like sentencing him
22         to prison.  But I think you know
23         and knew it before the sentencing
24         came up there was no choice and no
25         other way because that is the
26         law."
27  I think that's perfect significant because

46

```
 1    that's somebody that sat through the whole
 2    proceedings and obviously had -- was able to
 3    note Mr. Cayabo's behavior at that time as well.
 4    His age I believe is also a factor of
 5    suitability. He's 61-years-old. That reduces
 6    his recidivism rate. I'd like to address the
 7    District Attorney letter. I find this
 8    frequently coming up, particularly because they
 9    don't attend the hearings, where the DA is
10    saying that inmate Cayabo has not taken full
11    responsibility rather than rationalizing and
12    condoning his behavior. Well he doesn't do that
13    and he hasn't done that for quite sometime and
14    that's noted particularly in his most recent
15    psych eval. If they were here, they could have
16    asked him questions if they had concerns about
17    his responsibility or lack of and asked him
18    about the Pilipino customs. However, they
19    declined to attend. They also state that
20    there's no guarantee that he will not abuse
21    alcohol. Well that's true. There is never a
22    guarantee that somebody will not abuse alcohol.
23    Once an alcoholic, always an alcoholic. I mean
24    to me that's a ridiculous argument. There's
25    also no evidence that inmate Cayabo has
26    participated in therapy. That's completely
27    erroneous as we know, particularly with the
```

47

1  Project Change most recently and his continued

2  participation in AA.  He has good parole plans,

3  strong family support.  I would submit that

4  further incarceration of Mr. Cayabo obviously

5  would do nothing to help enhance his suitability

6  since he's done so well and that he is in fact

7  not a threat to society and should be granted a

8  date.  Thank you.

9          **PRESIDING COMMISSIONER SAWYER:**  Thank

10  you.  I'm going to ask a question.  This is a

11  little out of order, but Project Change, when

12  did he complete that?

13          **ATTORNEY TARDIFF:**  November '04.

14          **PRESIDING COMMISSIONER SAWYER:**  Okay.

15  Thank you, counsel.  Mr. Cayabo, this is your

16  opportunity to tell this Board why you feel that

17  you're suitable at this time for parole.

18          **INMATE CAYABO:**  Yes, Sir.  During my

19  incarceration I learned a lot.  I know how to

20  deal with my anger, control my anger.  I never

21  have 115 and I have been disciplinary-free since

22  I've been incarcerated.  I have support letters

23  from my wife and my daughters.  And I have a

24  place to stay and also I have a job offer to

25  start with.  I cannot change what has happened

26  in the past.  I'm responsible for my actions.

27  And I take full responsibility on my behavior.

48

1    I cannot take back what I intentionally or

2    unintentionally did.  But I can change and I

3    will continue.  I'm asking to give me a second

4    chance to become a good law abiding citizen

5    again and be with my family.  And I will

6    guarantee that I will not fail you.  And I'm

7    sorry for what I have done wrong.  Thank you.

8         PRESIDING COMMISSIONER SAWYER:  Thank

9    you, Mr. Cayabo.  It's ten o'clock and we will

10   recess for deliberations.

11                      R E C E S S

12                       --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

49

1         CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3         DEPUTY COMMISSIONER YACONO:  Okay.  We're

4    back on tape.

5         PRESIDING COMMISSIONER SAWYER:  Okay.

6    The time is 20 minutes past ten in the matter of

7    Mr. Yacono.  It's not Yacono.  Wrong guy.

8    Cayabo.

9         ATTORNEY TARDIFF:  That's pretty funny.

10        PRESIDING COMMISSIONER SAWYER:  Well that

11    was a slip.

12        DEPUTY COMMISSIONER YACONO:

13    (Indiscernible) parole for 22 years.

14        PRESIDING COMMISSIONER SAWYER:  No,

15    that's fine.  Okay.

16        DEPUTY COMMISSIONER YACONO:  Want to go

17    back?

18        PRESIDING COMMISSIONER SAWYER:  No,

19    that's fine.  The Panel's reviewed all the

20    information received from the public and relied

21    on the following circumstances in concluding

22    that the prisoner is suitable for parole and

23    would not pose an unreasonable risk of danger to

24    society or a threat to public safety if released

25    from prison.  You've never heard that said

26    before, have you?

27    RIZALINO CAYABO  D-09912  DECISION PAGE 1  5/9/06

50

1          INMATE CAYABO:  No, Sir.

2          PRESIDING COMMISSIONER SAWYER:  Okay.  We

3     feel you're suitable for parole.

4          INMATE CAYABO:  Thank you.  Thank you,

5     Sir.

6          PRESIDING COMMISSIONER SAWYER:  You're

7     welcome.  And we're going to tell -- we're going

8     to tell the Governor why.

9          DEPUTY COMMISSIONER YACONO:  Yeah, it

10    isn't over yet but --

11         PRESIDING COMMISSIONER SAWYER:  This is

12    -- This is step one.  You did well on your job

13    interview today, sir.

14         INMATE CAYABO:  Thank you very much.

15         PRESIDING COMMISSIONER SAWYER:  The

16    prisoner has no juvenile record of assaulting --

17    Has no juvenile record or adult record as far as

18    that's concerned.  No previous record of any

19    crimes up and to the offense.  While he did have

20    a stable social history and a stable

21    relationship and had a good -- what we can see

22    -- had a good family up and to the offense,

23    there was a couple of areas that were unstable

24    and I'm going to bring them right out because

25    it's all wound together.  And that was drinking

26    and he was carrying a weapon.  Okay.

27    RIZALINO CAYABO  D-09912  DECISION PAGE 2  5/9/06

51

1          INMATE CAYABO:  Yes.

2          PRESIDING COMMISSIONER SAWYER:  While in

3    prison has enhanced his ability to function

4    within the law upon release through

5    participation in programming and work and job

6    assignments.  You've been -- You've been

7    repairing sewing machines for over six years.

8    Is that correct?

9          INMATE CAYABO:  Yes, Sir.

10         PRESIDING COMMISSIONER SAWYER:  In PIA.

11         INMATE CAYABO:  Yes.

12         PRESIDING COMMISSIONER SAWYER:  Would you

13   call that a skill?

14         INMATE CAYABO:  Yes.

15         PRESIDING COMMISSIONER SAWYER:  Okay.  It

16   probably beats working in the fields.  Don't you

17   think?

18         INMATE CAYABO:  I can work in the field

19   at the same time, Sir.

20         PRESIDING COMMISSIONER SAWYER:  He's

21   going to work --

22         INMATE CAYABO:  Just to start with.

23         PRESIDING COMMISSIONER SAWYER:  Okay.

24   You know, I understand.  You also have

25   vocational dry cleaning.  Correct?

26         INMATE CAYABO:  Yes, Sir.

27   RIZALINO CAYABO  D-09912  DECISION PAGE 3  5/9/06

52

1             PRESIDING COMMISSIONER SAWYER:  And you

2  also know how to silkscreen.

3             INMATE CAYABO:  Yes.

4             PRESIDING COMMISSIONER SAWYER:  Okay.  So

5  you've got certainly some marketable skills as

6  well as a job offer to work in the fields at

7  $6.57 an hour, which isn't -- isn't a livable

8  wage quite frankly.  What are you making

9  repairing sewing machines?  How much do you

10  make?

11             INMATE CAYABO:  Right now I make 75 cents

12  an hour.

13             PRESIDING COMMISSIONER SAWYER:  Okay.

14  Well I guess it's six dollars more than you're

15  making now.

16             DEPUTY COMMISSIONER YACONO:  Room, board

17  and seventy-five cents.

18             PRESIDING COMMISSIONER SAWYER:  Well,

19  that's right.  Your self-help programs, you've

20  been in AA since 1994 and you've indicated to us

21  that you understand that you have to continue in

22  AA.  That'll be one of your conditions of parole

23  as well.

24             INMATE CAYABO:  Yes, Sir.

25             PRESIDING COMMISSIONER SAWYER:  And you

26  know your steps.  I was impressed by that or at

27  RIZALINO CAYABO  D-09912  DECISION PAGE 4  5/9/06

53

```
1    least you know step four.  I didn't ask you all
2    the steps but I assume that you do since you've
3    been in for over -- since you've been in since
4    1994.  You've gone through the 14-week Impact
5    program.
6              ATTORNEY TARDIFF:  Forty-four weeks.
7              PRESIDING COMMISSIONER SAWYER:  This is
8    the Impact.
9              ATTORNEY TARDIFF:  Impact, I'm sorry.
10              PRESIDING COMMISSIONER SAWYER:  Thank
11    you, counsel, I'll conduct this hearing.
12    Fourteen week Impact program.  You've been
13    through the Inmate Employability program.
14    You've been through as of -- You've completed on
15    November 4 Project Change.  That's a 44-week
16    program.  And it's a major program.  When I say
17    major, it has a lot of components, everything
18    from 12-step, anger management and so on.  Is
19    that correct, sir?
20              INMATE CAYABO:  Yes.
21              PRESIDING COMMISSIONER SAWYER:  Okay.
22    You have volunteered and you've got a laudatory
23    chrono for the Holiday Children's program as
24    well as you were a volunteer in the Operation
25    Courage collecting clothes for our people in the
26    service.  Is that correct?
27    RIZALINO CAYABO  D-09912  DECISION PAGE 5  5/9/06
```

54

1          INMATE CAYABO:  I donate some -- a little

2     bit of money, Sir.

3          PRESIDING COMMISSIONER SAWYER:  You

4     raised some money?

5          INMATE CAYABO:  No, myself.

6          PRESIDING COMMISSIONER SAWYER:  You

7     donated money?

8          INMATE CAYABO:  Yes.

9          PRESIDING COMMISSIONER SAWYER:  Okay.

10     Thank you.  It wasn't clear in the chrono.

11     Something that -- Well, so your -- your

12     self-help, particularly AA, your vocational

13     programs, your education programs and your

14     institutional job assignments, and I must say

15     that you've gotten good work reports in those

16     institutional job assignments as well.  You lack

17     any criminal history, as I mentioned before, of

18     violent crime or any crime.  You have matured.

19     You're 60-years-old going on 61 this year.  And

20     we feel because of the maturation, growth and

21     greater understanding of yourself and what had

22     happened here has reduced the probability of

23     recidivism.  You have realistic parole plans too

24     and a job offer, certainly family support.

25     There's several areas that are particularly

26     impressive.  One is Sylvia's still there for

27     RIZALINO CAYABO  D-09912  DECISION PAGE 6  5/9/06

55

1    you.

2            INMATE CAYABO:  Yes.

3            PRESIDING COMMISSIONER SAWYER:  And I'm

4    serious.  She's got to be a very strong woman

5    and that's to your credit.  And we're going to

6    depend on her to make sure she helps you make

7    proper decisions when you're out.

8            INMATE CAYABO:  Yes, Sir.

9            PRESIDING COMMISSIONER SAWYER:  And so

10   that's a great -- that's a great person to take

11   care of you once you get out of here.  Now, you

12   do have your children.  And they are going on

13   with their lives and they miss you and you've

14   been maintaining a relationship with them.

15   That's good, that's a plus.  And then probably

16   the most notable was the letter from the

17   victim's wife, your sister.  Is that correct?

18           INMATE CAYABO:  Yes, Sir.

19           PRESIDING COMMISSIONER SAWYER:  And she

20   has forgiven you for this.

21           INMATE CAYABO:  Yes.

22           PRESIDING COMMISSIONER SAWYER:  And wants

23   to get on with her life.  She's no longer angry

24   with you.  She was angry for awhile but she felt

25   that that was hurting both her and you.  So

26   you've maintained close family ties while in

27   RIZALINO CAYABO  D-09912  DECISION PAGE 7  5/9/06

56

1  prison and they've come to visit you and you've

2  corresponded with them and so you've kept --

3  you've kept an option open to you, a line open

4  to you to the outside. So you still know what's

5  going on on the outside. You haven't -- You're

6  not totally isolated here. And that will help

7  you reintegrate into society. Your positive

8  institutional behavior. You have -- You've been

9  down over 20 years and you've had no 115's.

10  You've had three 128's, the last being in 1992.

11  Certainly that shows that you've got positive

12  self-control while in the institution. That's

13  hard to do. That's hard to do. We don't see

14  this -- We don't see zero on 115's from people

15  that come through looking for a date. And so

16  you're to be congratulated for that.

17         INMATE CAYABO:  Thank you.

18         PRESIDING COMMISSIONER SAWYER:  And

19  that's an indicator, that's a positive indicator

20  that you'll perform well when you get outside

21  because that makes us nervous, releasing a

22  person from prison to the outside world. And we

23  feel comfortable with you, sir.

24         INMATE CAYABO:  Thank you.

25         PRESIDING COMMISSIONER SAWYER:  You show

26  signs of remorse and indicate you understand the

27  RIZALINO CAYABO  D-09912  DECISION PAGE 8  5/9/06

57

1  nature and magnitude of the offense and accepts

2  responsibility for the criminal behavior and has

3  a desire to change towards good citizenship.  We

4  got that from you.  I asked you some questions

5  about, you know, would it be -- is that what --

6  is this a Pilipino cultural thing that if they

7  don't ask permission from the father, or in this

8  case the brother to marry, is it okay to kill

9  that person in the Philippines and you said it

10  wasn't.  So it's not okay there.  It's not okay

11  here.  And it's certainly not justifiable to

12  take another -- a life because of a cultural

13  issue like this.

14       INMATE CAYABO:  Yes, I agree.

15       PRESIDING COMMISSIONER SAWYER:  Okay.

16  Okay.  I'm going to turn this over to

17  Commissioner Yacono to talk about the

18  psychological reports.

19       DEPUTY COMMISSIONER YACONO:  And I'm going

20  to refer to a couple of the reports.  And again,

21  we've covered this and your counsel's covered

22  this but just the emphasis again that from the

23  June 11, 2003, the substance abuse history,

24  because you have admitted again that you've got

25  an issue here with alcohol.  The psychiatrist

26  said that for the past six years you've been

27  RIZALINO CAYABO  D-09912  DECISION PAGE 9  5/9/06

58

```
 1    active in Alcoholics Anonymous.  I think it's
 2    longer than that if we're starting from '94.
 3    But it's been pretty consistent and long term.
 4    It says contributing to his reevaluation and
 5    insight into the motivational dynamics of the
 6    instant offense.  Fancy words for you realize
 7    you were drinking hard on that particular day
 8    and that had a lot to do with creating the
 9    situation.  Again, the diagnostic impressions,
10    really there is no contributory clinical
11    disorder or personality disorder that's being
12    noted.  I did quote from a prior eval, but even
13    those that were cited had been in remission or
14    resolved.  And that's pretty significant.  The
15    review of life crime, emphasis again, gaining
16    considerable insight into the instant offense
17    and active participation in AA.  Fully cognizant
18    of the impact and gravity of the actions, admits
19    misplaced sense of duty and responsibility,
20    remorseful and deeply regrets what he cannot
21    undo.  Over the past few years sister, the
22    victim's wife, has reconciled with inmate and
23    greatly facilitating the healing process.  The
24    dangerousness assessment, does not fit the
25    typical criminal profile, no history, juvenile
26    or adult, prior to this.  And I think you were
27    RIZALINO CAYABO  D-09912  DECISION PAGE 10  5/9/06
```

59

1    45 when this occurred?

2            ATTORNEY TARDIFF:  How old were you at

3    the time of the crime?

4            INMATE CAYABO:  Thirty-nine.

5            ATTORNEY TARDIFF:  Thirty-nine.

6            DEPUTY COMMISSIONER YACONO:  Which is not

7    a typical hotheaded kid.

8            INMATE CAYABO:  Thirty-eight.

9            DEPUTY COMMISSIONER YACONO:  Okay.

10           INMATE CAYABO:  Thirty-eight, 39.

11           DEPUTY COMMISSIONER YACONO:  You weren't

12   22.

13           INMATE CAYABO:  No.

14           DEPUTY COMMISSIONER YACONO:  Okay.  Let's

15   go on.  Model inmate, no 115's, total compliance

16   with institutional requirements and standards.

17   Institutional record over the last 18 years

18   places him in a very low risk category and if

19   released to the community no greater than the

20   average citizen.  And then some points from the

21   March 8, 2000 evaluation.  Referred for

22   assessment of level of dangerousness.  Remorse

23   was clearly genuine and appropriate.  Lack of

24   criminal history, lack of violent criminal

25   history, lack of 115's.  No violence and greater

26   maturity.  So his violence potential in the

27   RIZALINO CAYABO  D-09912  DECISION PAGE 11  5/9/06

60

1    controlled setting considerably -- is considered

2    to be significantly below average.  And in the

3    community no more than the average citizen,

4    found no evidence his violence potential should

5    be above average at all.  One thing I disagree

6    with a little bit, but no risk factors, although

7    the admission of being intoxicated during the

8    commitment of this crime but seems to have in

9    his words quit for good, and I presume that

10   means alcohol consumption.  And if I might, one

11   issue here.  You made us a guarantee.  I hear

12   that --

13        INMATE CAYABO:  Yes, Sir.

14        DEPUTY COMMISSIONER YACONO:   --

15   occasionally, that I guarantee that --

16        INMATE CAYABO:  I promise that I will be

17   --

18        DEPUTY COMMISSIONER YACONO:   --

19   (indiscernible).

20        INMATE CAYABO:   -- a productive, good,

21   law-abiding citizen.

22        DEPUTY COMMISSIONER YACONO:  Okay.  Well

23   you're going to be on parole.  If you get

24   through this process, you're going to be on

25   parole for five years.  I guarantee you,

26   nobody's going to discharge you for that five

27   RIZALINO CAYABO  D-09912   DECISION PAGE 12  5/9/06

1  year timeframe, so you're going -- we're going

2  to watch you quite clearly when we get through

3  this so -- And the Commissioner and I have other

4  concerns about putting yourself in situations.

5  Since gambling was part of this routine and it

6  so serious you figured you had to carry a gun to

7  go to gamble as well, there'll be other issues.

8  Other than that, I'm done, Sir.

9        PRESIDING COMMISSIONER SAWYER:  Thank

10  you.  We'll go to base term of confinement.  The

11  base life offense which the prisoner's been

12  convicted is murder in the second degree, Penal

13  Code section 187.  The offense occurred on

14  10-4-1987 -- 1987, that's right.  The term is

15  derived from the matrix located in the

16  California Code of Regulations, Title 15 at

17  2403(c), second degree murder, offense committed

18  on or after 11-8-1978.  The Panel finds that

19  Category II(c) is appropriate in that there was

20  a prior relationship.  The victim was involved

21  in a prior relationship with the prisoner as a

22  family member, as a brother-in-law, which

23  contributed to the motivation for the act

24  resulting in death.  And also, the death

25  resulted from severe trauma inflicting --

26  inflicted with deadly intensity.  He was shot in

27  RIZALINO CAYABO   D-09912   DECISION PAGE 13   5/9/06

1    the back of the head.   In the matrix it gives a

2    choice of three -- three choices, 18, 19 or 20

3    years.  We chose the middle term and that we

4    assess 228 months for the base offense.  And the

5    calculation goes this way.  The base life

6    offense is 228.  And adjustment for weapons,

7    because you used a firearm we added two years,

8    24 months.  Post-conviction credits.  This is

9    four months a year that you get credit for, for

10   being 115 free.  So every year that went by,

11   which in your case is your entire term, you

12   ended up with 82 months of good time because of

13   your behavior or lack -- or because of your good

14   behavior or lack of bad behavior.  It's all the

15   same.  So we subtract 82 months from the total.

16   Our total was 252.  And we subtract 82 months

17   which gives you a total period of confinement,

18   170 months, and you're well beyond that of _.

19   course with your going over 20 years and 10

20   months at this time.

21          DEPUTY COMMISSIONER YACONO:   Can I take a

22   brief recess and just pause for one second.

23                  [Off the record]

24          DEPUTY COMMISSIONER YACONO:   Okay.  We're

25   back on tape.

26          PRESIDING COMMISSIONER SAWYER:   The

27   RIZALINO CAYABO  D-09912  DECISION PAGE 14  5/9/06

1   purpose of the recess, the Deputy Commissioner

2   noted that I made a mistake.  I took some numbers

3   from the Board report that were inaccurate to

4   note that the crime occurred 10-4-1984 not 1987.

5   As I was doing the calculations on the base term

6   of confinement I read the base life offense for

7   which the prisoner's convicted is murder, PC 187.

8   The offense occurred and it should be 10-4-84.

9   This does not, however, change the calculations

10  that I'm referring -- that I've been referring to

11  and I'm finishing up now.  The total period of

12  confinement is still 170 months.  Special

13  conditions of parole.  Do not possess -- Do not

14  use or possess alcoholic beverages.  Do you

15  understand that?

16        INMATE CAYABO:  Yes, Sir.

17        DEPUTY COMMISSIONER YACONO:  I'm sorry.

18  I'm going to pause for one second here.

19                  [Off the record]

20        DEPUTY COMMISSIONER YACONO:  All right.

21  We're back on tape.

22        PRESIDING COMMISSIONER SAWYER:  It's an

23  important day for you and I'm sorry we keep

24  getting interrupted here.  We were interrupted by

25  a video conferencing that's coming in for the

26  next hearing.  Do not possess -- use or possess

27  RIZALINO CAYABO  D-09912  DECISION PAGE 15  5/9/06

64

1    alcoholic beverages.  You understand that?

2              INMATE CAYABO:  Yes, Sir.

3              PRESIDING COMMISSIONER SAWYER:   Never,

4    ever again.

5              INMATE CAYABO:  Yes.

6              PRESIDING COMMISSIONER SAWYER:   You

7    understand?

8              INMATE CAYABO:  Yes.

9              PRESIDING COMMISSIONER SAWYER:   You okay

10   with that?

11             INMATE CAYABO:  Yes, Sir, I'm really okay

12   with that.

13             PRESIDING COMMISSIONER SAWYER:  You're

14   going to have to submit to alcohol testing.

15             INMATE CAYABO:  Okay, Sir.

16             PRESIDING COMMISSIONER SAWYER:  We're

17   also going -- since you're submitting to testing

18   we're also going to do the same thing with

19   anti-narcotic testing, THC testing, which is

20   marijuana, and to participate in a substance --

21   you're going to have participate in substance

22   abuse programs such as AA.

23             INMATE CAYABO:  Okay, Sir.

24             PRESIDING COMMISSIONER SAWYER:   You okay

25   with that?

26             INMATE CAYABO:  Yes.

27   RIZALINO CAYABO   D-09912   DECISION PAGE 16   5/9/06

65

1          PRESIDING COMMISSIONER SAWYER:  Report to

2    the parole outpatient client for evaluation.

3    Attend the parole outpatient clinic and this

4    will be driven by your parole officer.  They'll

5    determine what you need to do in terms of your

6    parole at the local level.  Do you understand?

7          INMATE CAYABO:  Okay.   Yes.

8          PRESIDING COMMISSIONER SAWYER:  Okay.

9    And in addition, do not gamble.

10         INMATE CAYABO:  Okay.

11         PRESIDING COMMISSIONER SAWYER:  Okay.

12         INMATE CAYABO:  Yes.

13         PRESIDING COMMISSIONER SAWYER:  Or attend

14   or be in an area where gambling is taking place.

15         INMATE CAYABO:  Okay.  Yes, Sir.

16         PRESIDING COMMISSIONER SAWYER:  Because

17   around gambling is drinking and around gambling

18   is guns.  And that's what got you into this in

19   the first place.  So we want to try to keep you

20   as far as away from anything that would stress

21   you out into doing something that you might

22   regret in the future.

23         INMATE CAYABO:  Okay.

24         PRESIDING COMMISSIONER SAWYER:  Do you

25   agree to those, sir?

26         INMATE CAYABO:  Yes, Sir.

27   RIZALINO CAYABO  D-09912  DECISION PAGE 17  5/9/06

66

1        PRESIDING COMMISSIONER SAWYER:   Those

2    special conditions?

3        INMATE CAYABO:   Yes.

4        PRESIDING COMMISSIONER SAWYER:   Okay.

5    Now, in the meantime, you need to stay

6    discipline-free.   You know how to do that.

7        INMATE CAYABO:   Yes, Sir.

8        PRESIDING COMMISSIONER SAWYER:   Continue

9    to work.   Continue doing what you're doing.

10   Because this is going to take four or five

11   months.

12       INMATE CAYABO:   Okay.

13       PRESIDING COMMISSIONER SAWYER:   It's got

14   to go through decision review at my headquarters

15   in Sacramento.   They're going to look at it and

16   make sure we did everything right.   Okay.   So it

17   goes through decision review.   Then it goes to

18   the Governor's office and the Governor's people

19   review it.   And they make a determination

20   whether it's okay or not.   Do you understand

21   what I'm saying?

22       INMATE CAYABO:   Yes, Sir.

23       PRESIDING COMMISSIONER SAWYER:   Okay.

24   There's going to be some time.   I would advise

25   you -- We would advise you at this point not to

26   go out saying I got a date and I'll see you guys

27   RIZALINO CAYABO  D-09912  DECISION PAGE 18  5/9/06

1    later.  Because the Governor can reverse it.  You

2    understand that, you've probably heard that.

3         INMATE CAYABO:  Yes, I heard that, Sir,

4    how true it is.

5         PRESIDING COMMISSIONER SAWYER:  Okay.  So

6    I don't get many of mine reversed.  I'm serious.

7    I don't get many of mine reversed that I know

8    about.  I've had two in the last 10 months come

9    back to the Board out of the number of dates, I

10   don't know how many dates I've given, but I've

11   only had two come back from the Governor's

12   office in 10 months.  And so I think that's

13   probably pretty good because I try to do a good

14   solid case.  So there you have it.  Do you have

15   any questions or concerns?

16        DEPUTY COMMISSIONER YACONO:  No, I think

17   we've covered pretty much everything.

18        PRESIDING COMMISSIONER SAWYER:  Okay.  Do

19   you have any questions?

20        INMATE CAYABO:  No, Sir.

21        PRESIDING COMMISSIONER SAWYER:  All

22   right.  Well good luck to you, sir.

23        INMATE CAYABO:  Thank you very much, Sir.

24        PRESIDING COMMISSIONER SAWYER:  You're

25   welcome.

26   DEPUTY COMMISSIONER YACONO:  Don't let us

27   RIZALINO CAYABO  D-09912  DECISION PAGE 19  5/9/06

68

1    down.  You guaranteed it.

2            INMATE CAYABO:  I guarantee --

3            DEPUTY COMMISSIONER YACONO:  Your word is

4    your bond.

5            INMATE CAYABO:  Yes.

6            PRESIDING COMMISSIONER SAWYER:  Okay.

7            ATTORNEY TARDIFF:  Okay.  We need his

8    pink copy.

9                              --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22                                    PENDING REVIEW

23    PAROLE GRANTED                   AND APPROVAL

24    THIS DECISION WILL BE FINAL ON _____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    RIZALINO CAYABO  D-09912  DECISION PAGE 20  5/9/06

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that
I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1 - 68,
and which recording was duly recorded at
CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of RIZALINO CAYABO,
CDC No. D-09912 on MAY 9, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated June 19, 2006 at Sacramento County,
California.


_Marsha Mees_
Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**RIZALINO CAYABO, D-09912**
**SECOND-DEGREE MURDER**

AFFIRM:                    _____

MODIFY:                    _____

REVERSE:                        X_____

On October 4, 1984, Rizalino Cayabo shot to death his sister's husband, 31-year-old Medaro Lozano. According to the probation report, Tulare County Sheriff's Deputies responded to a reported shooting and learned that Mr. Lozano had been shot in the back of the head. Witnesses advised that Mr. Cayabo drove his vehicle up to the carport area where Mr. Lozano and others were watching television. Mr. Cayabo exited his vehicle, walked up behind Mr. Lozano and shot him once in the back of the head at close range. Mr. Cayabo then returned to his vehicle and drove away. Mr. Lozano died from his gunshot wound.

Mr. Cayabo was arrested later that day. He was 39 years old at the time of the murder and had no prior criminal record. Following a court trial, he was convicted of second-degree murder with the use of a firearm. He was sentenced to 15 years to life in prison for murder, plus a consecutive two-year term for use of a firearm. The judgment was affirmed on appeal.

I have considered various positive factors in reviewing whether Mr. Cayabo is suitable for parole at this time. Although he was counseled three times for minor misconduct, Mr. Cayabo managed to remain discipline-free throughout his incarceration and he made efforts to enhance his ability to function within the law upon release. He completed vocational training in dry cleaning, and received additional training in sewing machine repair, mill and cabinet work and data processing. He also held institutional jobs in the kitchen, yard crew and in prison industry textiles, among other things. He availed himself of such self-help and therapy as Alcoholics Anonymous, Life Skills Program, Impact Program and Inmate Employability Program, and he completed a 44-week self-enhancement course. And he received some positive evaluations from mental-health and correctional professionals over the years. In addition, he maintains seemingly supportive relationships with family and friends, including his sister, who in recent years wrote support letters stating that she forgives Mr. Cayabo for murdering her husband. He also made plans upon his release to live with his wife in Tulare County, his county of last residence, and to work as a farm laborer.

Despite the positive factors I have considered, the second-degree murder for which Mr. Cayabo was convicted was especially heinous because his stated motive for the crime — that he felt angry and betrayed because Mr. Lozano did not ask his permission to marry his sister — is very trivial in relation to the magnitude of the brutal murder he committed. According to Mr. Cayabo's statement in the probation report, he killed Mr. Lozano because he violated Filipino custom by not asking for Mr. Cayabo's permission to marry his sister. Mr. Cayabo

Rizalino Cayabo, D-09912
Second-Degree Murder
Page 2

further stated that "this crime would never have occurred, if Lozano had gone to him and apologized, as was Filipino custom." In addition to the trivial basis for the murder, there is also evidence in the record before me that the murder involved some level of premeditation. Mr. Cayabo told the probation officer that prior to the offense he drove to his friend's house to gamble, but he left when he realized Mr. Lozano was there. Mr. Cayabo drove around for approximately one hour, drinking alcohol and "getting more and more upset." He then returned to his friend's house, took the .38 caliber pistol from the glove compartment of the vehicle, walked up behind Mr. Lozano and shot him one time in the head. The probation officer noted that "[t]he victim was extremely vulnerable, as the defendant approached the victim from behind and shot him without the victim knowing the defendant was present. … On the day of the crime, he had the weapon and the victim was present, and apparently it was time to restore his honor and therefore, he committed this totally unprovoked crime of murder." Mr. Cayabo's actions also exposed several additional people to the risk of death or serious injury. Mr. Cayabo told the probation officer that other men were sitting with Mr. Lozano when he shot him. The gravity of the second-degree murder committed by Mr. Cayabo is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk. The Tulare County District Attorney's Office and the Tulare County Sheriff's Office both expressed to the 2006 Board their opposition to Mr. Cayabo's parole, based in part on the gravity of the murder he committed.

At age 61 now, after being incarcerated for 22 years, Mr. Cayabo says he accepts responsibility for the murder and is remorseful for his actions. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Cayabo presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Cayabo.

Decision Date: 9-28-2006

ARNOLD SCHWARZENEGGER
Governor, State of California