# EXHIBIT 3
# Part 1 of 2

MC-275

Name **Rizalino Cayabo**

Address **Correctional Training Facility**

**P.O. Box 705**

**Soledad, CA 93960**

CDC or ID Number **D-09912**

## APPELLATE COURT OF CALIFORNIA
### FIFTH APPELLATE DISTRICT
(Court)

|  |  |
|---|---|
| **RIZALINO CAYABO,** <br> Petitioner <br> vs. <br> **ARNOLD SCHWARZENEGGER, Governor of the state of California,** <br> Respondent | **PETITION FOR WRIT OF HABEAS CORPUS** <br><br> No. _____ <br> *(To be supplied by the Clerk of the Court)* |

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal

This petition concerns:

☐ A conviction

☐ A sentence

☐ Jail or prison conditions

☐ Parole

☐ Credits

☒ Prison discipline

☒ Other (specify): __Governor's decision to reverse suitability for parole__

1. Your name: __Rizalino Guerrero Cayabo__

2. Where are you incarcerated? __Correctional Training Facility, Soledad, Calif.__

3. Why are you in custody?   ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   __Second degree murder w/use of a firearm__

   b. Penal or other code sections: __187 / 12022.5__

   c. Name and location of sentencing or committing court: __Superior Court of California, County of Tulare, in Vasalia, California__

   d. Case number: __22849__

   e. Date convicted or committed: _____

   f. Date sentenced: __July 1, 1985__

   g. Length of sentence: __15 years to life plus 2 years for firearm__

   h. When do you expect to be released? __When the Court rules in my favor__

   i. Were you represented by counsel in the trial court?   ☐ Yes.   ☐ No.   If yes, state the attorney's name and address:
      __N/A__

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☒ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6. GROUNDS FOR RELIEF
Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four For additional grounds, make copies of page four and number the additional grounds in order.)*

_____ PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6 _____

_____

_____

_____

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim )*

PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6(a)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

PLEASE SEE APPENDIX "B" STARTING AT PAGE 12 FOR ANSWERS TO 6(b)

_____

_____

_____

MC 275 [Rev January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS
- 2 -

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.   If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):   N/A

_____

b. Result: _____   c. Date of decision: _____

d. Case number or citation of opinion, if known: _____

e. Issues raised:   (1) _____

(2) _____

(3) _____

f. Were you represented by counsel on appeal? ☐ Yes. ☐ No   If yes, state the attorney's name and address, if known:
N/A

_____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.   If yes, give the following information:
N/A

a. Result: _____   b. Date of decision: _____

c. Case number or citation of opinion, if known: _____

d. Issues raised:   (1) _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
N/A

_____

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

THERE IS NO ADMINISTRATIVE REVIEW

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*  N/A

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  [X] Yes. If yes, continue with number 13.  [ ] No. If no, skip to number 15.

13 a   (1) Name of court **Superior Court of California, County of** **TULARE**

    (2) Nature of proceeding (for example, "habeas corpus petition"): **Habeas Corpus**

    (3) Issues raised:  (a)    **SAME AS RAISED HEREIN**

        (b) _____

    (4) Result (Attach order or explain why unavailable): **DENIED (see ATTACHMENT A after exhibits)**
**The decision was unreasonable in light of the facts and passage of time, failing**
**how Cayabo is a CURRENT threat to public safety.**
    (5) Date of decision: **11/30/2006**

  b.  (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised:  (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
**No delay**

_____

16. Are you presently represented by counsel?  [ ] Yes.  [X] No.  If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  [X] Yes.  [ ] No.  If yes, explain:
**Federal habeas corpus challenging the Board of Prison Terms finding of unsuitability**

**for parole in 2005, which is now moot.**

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
**Denied by trail court.**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date **1-11-07**                                    ▶  _____
                                              (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]                    PETITION FOR WRIT OF HABEAS CORPUS
                                                      - 4 -

A P P E N D I X  "A"

Answer to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION WHEN THE GOVERNOR OF THE
STATE OF CALIFORNIA REVERSED PETITIONER'S FINDING OF
SUITABILITY FOR PAROLE, SOLELY ON THE COMMITMENT OFFENSE
OVER TWO DECADES IN THE PAST, ABSENT ANY EVIDENCE THAT
PETITIONER IS A CURRENT THREAT TO PUBLIC SAFETY, THE
DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

Answer to 6(a), Supporting facts:

On October 4, 1984, Rizalino Cayabo (hereafter Petitioner)

murdered his brother-in-law, Medaro Lozano.  After committing the

offense, Petitioner drove to a Tulare County Sheriff's Office and

turned himself in.  After a trial by judge, being found guilty of

second degree murder in violation of Penal Code § 187[1]/ and personal

use of a firearm in violation of Penal Code § 12022.5, on July 1,

1985, Petitioner was sentenced to an indeterminate sentence of 15

years to life pursuant to Penal Code § 190, and two years for the

use of a firearm, to run consecutive to the 15 years to life.

The facts of Petitioner's commitment offense are taken from

the Probation Officer's Report (EXHIBIT 1, at p. 4).  The facts of

the offense and Petitioner's statement are in agreement, accept

Petitioner's statement provides more detail, so other than motivation

for committing the instant offense was Petitioner feeling that his

brother-in-law "had betrayed him and violated Filipino custom, by

not asking his permission to marry his, Cayabo's sister" (EXHIBIT

---

1.  All statutes and regulations are California, unless otherwise noted.

1, p. 4), facts are taken from Petitioner's statement and are as

follows:

"[Petitioner] stated that he shot Lozano because Lozano had not apologized to him for not asking permission to marry his sister. Cayabo indicated that on the evening of the shooting, he decided to go to his friend's house to gamble. He indicated he had not been with his friend's house for an extended period of time because he knew that Lozano would be there gambling. He had stayed away from his friends, as he did not want to confront Lozano. Cayabo stated that approximately one month earlier, he had purchased a handgun from an unknown subject in Orosi. He indicated he purchased the gun for protection while gambling because some of the men who gambled became angry and he felt he needed protection.

"Cayabo stated that he needed to be with his friends, therefore, he went to Rosario's home. Upon arrival, he saw Lozano and decided not to stop. He indicates he drove around for approximately one hour, getting more and more upset. He drank approximately one-half pint of vodka and orange juice during that hour's period of time. He indicates he had heard rumors that Lozano had been saying things about him, regarding the fact that he, Lozano, had not asked permission to marry his sister. He then returned to Rosario's, took the .38 caliber pistol from the glove compartment of his vehicle, walked up behind Lozano, and shot him one time in the head.

"Cayabo indicates that this crime would never have occurred, if Lozano had come to him and apologized, as was Filipino custom."

Under mitigating circumstances in the POR, the Probation Officer

found "[t]he crime was committed due to unusual circumstances, which

is unlikely to recur" (EXHIBIT 1, p. 5).

In preparation for sentencing of Petitioner, a psychological

evaluation was prepared by Jose Icasiano, Ph.D, dated May 6, 1985

(EXHIBIT 2). Dr. Icasiano is a forensic expert in Filipino culture.

Dr. Icasiano explained how Pilipino customs motivated Petitioner

to commit the instant offense. Dr. Icasiano observed that

Petitioner's "behavior in the events of his life that he narrated

manifested a reaction typical to Pilipino culture, with a motivation

characteristic of the Pilipino personality" (EXHIBIT 2, p. 1).

Dr. Icasiano's statement, "[t]o a non-Pilipino, Mr. Cayabo's behavior

and its motivation in this tragic incident present a puzzle" (Id.)

proved to be true. It is respectfully requested that Your Honor

read Dr. Icasiano's report in full to better understand the cultural dynamics behind this tragic offense.  Petitioner will refer to relevant factors from Dr. Icasiano's report more fully in his arguments as they relate to the Governor's decision.

The psychological evaluation prepared by the Board of Parole Hearings (hereafter Board) relied on in determining Petitioner's suitability for parole was prepared by the Board's own forensic experts, E.W. Hewchuk, Ph.D., and B. Zika, Ph.D. (EXHIBIT 3).  Under review of the life crime (EXHIBIT 3, p. 3), in relevant part, Dr. Hewchuk writes: Petitioner "has become fully cognizant of the impact and gravity of his actions, not only for the victim's family, but also his own.  He now admits that his misplaced sense of duty and responsibility to protect his sister's honor did not justify the taking of a human life.  He is remorseful, and deeply regrets that he is unable to undo the consequences of his former behavior."

Most importantly, under "assessment of dangerousness" Dr. Hewchuk concludes that Petitioner's "violence potential within a controlled institutional setting is considered to be minimal relative to the total inmate population" (EXHIBIT 3, p. 3).  Dr. Hewchuk basis Petitioner's threat to public safety, inter alia, on the fact that "[t]he instant offense itself involved an unfortunate juxtaposition of cultural variables, a misplaced sense of responsibility, and impulsivity fueled by the excessive use of alcohol.  Inmate Cayabo has addressed these issues through active institutional programming..." (Id.).  Dr. Hewchuk concluded Petitioner's threat to public safety "is estimated to be no greater than that of the average citizen in the community" (EXHIBIT 3, p. 4).  Under Dr.

Hewchuk's comments and recommendations, he concluded "[i]n view of inmate Cayabo's low risk factors, this inmate is an excellent candidate for parole consideration" (Id.).

On May 9, 2006, twenty-two years after the commitment offense, the Board of Parole Hearings, presenting its findings in a twenty page decision, found Petitioner suitable for parole (EXHIBIT 4, HT 49:18-68:9,[2] incorporated herein by reference).

After passing through the scrutiny of the Decision Review Unit of the Board and the Board's determination that Petitioner is not currently a threat to public safety, the Board's determination was forwarded to the Governor's office for the Governor's review of the decision.

On September 28, 2006, exercising his authority under Penal Code § 3041.2, Governor Schwarzenegger reversed the Board's decision to grant Petitioner parole (EXHIBIT 5). The Governor reversed the decision solely on the gravity of the commitment offense, the motive being "trivial and "some level of premeditation." In relevant part (EXHIBIT 5, pp. 1-2):

> The "offense was especially heinous because his stated motive for the crime -- that he felt angry and betrayed because Mr. Lozano did not ask his permission to marry his sister -- is very trivial in relation to the magnitude of the brutal murder he committed. According to Mr. Cayabo's statement in the probation report, he killed Mr. Lozano because he violated Filipino custom by not asking for Mr. Cayabo's permission to marry his sister. Mr. Cayabo further stated that 'this crime would never have occurred, if Lozano had gone to him and apologized, as was Filipino custom.' In addition to the trivial basis for the murder, there is also evidence in the record before me that the murder involved some level of premeditation."

The Governor also took into consideration that Parole was opposed by the Tulare County District Attorney's Office and the Tulare County

---

2. Reference to parole the hearing transcript (EXHIBIT 4) will be indicated by "HT" followed by page number, e.g., (HT 1:1).

Sheriff's Office, "based in part on the gravity of the murder he committed" (EXHIBIT 5, p. 2).

The Governor concluding: "given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Cayabo presently outweighs the positive factors.  Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Cayabo" (EXHIBIT 5, p. 2).

## Claim II

IT WAS A VIOLATION THE FIFTH AMENDMENT GUARANTEE AGAINST
DOUBLE JEOPARDY AND SIXTH AND FOURTEENTH AMENDMENTS
GUARANTEEING DUE PROCESS FOR THE BOARD TO ADD TWO YEARS
FOR THE USE OF A FIREARM WHEN PETITIONER HAD SERVED THAT
ENHANCEMENT CONSECUTIVELY TO THE INDETERMINATE SENTENCE.

On July 1, 1985, Petitioner was sentenced to an indeterminate term of 15 years to life for second degree murder, plus 2 years for the use of a firearm; the enhancement to be served consecutively to the indeterminate term (see EXHIBIT 6).

The Board acknowledged that the two years for the gun use enhancement was served separate to the indeterminate sentence of 15 years to life (HT 1:17-19).

After finding that Petitioner is not a current threat to public safety, in calculating his term, the Board added two years to his sentence for the use of a firearm (HT 62:6-8 ["And adjustment for weapons, because you used a firearm we added two years, 24 months"]).

Moreover, the Board put Petitioner in the wrong matrix, the relationship part being correct, having a prior relationship with the victim, but erred in placing Petitioner in the column of "the

- 9 -

death resulted from severe trauma inflicting -- inflicted with deadly intensity" (HT 61:14-26), fixing the term at 19 years (HT 62:1-4), plus the two years for the weapon (HT 62:6-8), for a total of 252 months.

## C O N C L U S I O N

It that both State and Federal courts have recently held that after 15 or so years the commitment offense has zero predictability on <u>current</u> or future threat to public safety, based on the court records in this case, the foregoing facts, and the accompanying memorandum of law, Petitioner respectfully requests that this Honorable Court issue an Order to Show Cause why relief should not be granted and the Governor's decision vacated and Petitioner released directly to parole; and, why any excess credits for good behavior that exceed Petitioner's legislatively mandated uniform term for the commitment offense should not be accredited to any period of parole Petitioner would otherwise serve if that time would exceed parole and Petitioner therefore discharged.

Date: 1-11-07

Respectfully submitted,

Rizalino Cayabo
Petitioner in pro per

## V E R I F I C A T I O N

I Rizalino Cayabo, hereby declares under penalty of perjury, that I have read the foregoing facts and reviewed the exhibits in support thereof and declare the facts to be true and the exhibits true copies thereof. Doing so this __11__ day of January, 2007, at Soledad, California.

_____
Rizalino Cayabo
Petitioner in pro per

## P R A Y E R   F O R   R E L I E F

I, Rizalino Cayabo, state that I have no other plain or speedy remedy save habeas corpus, and therefore pray that this Honorable Court grant the following:

1. Issue an Order to Show Cause why the writ should not be granted;

2. Appoint counsel to protect the rights of Petitioner;

3. Grant discovery so that Petitioner may obtain additional evidence to support his claims;

4. Grant an evidentiary hearing to determine what is contained in the "executive case summary" (ECS) provided to the Governor by the Board (In re Elkins, supra, 44 Cal.App.4th 475, as it would be "inappropriate for the Governor to rely on Board Investigative Unit Report" (Sanchez v. Kane, supra, 444 F.Supp.2d 1049) and to determine if the reports are one and the same, the Governor thereby abrogating his duty to personally review and make decisions pursuant to Penal Code § 3041.2;

5. Declare the rights of the parties; and

6. Any other relief the Court deems necessary to further the interest of justice and preserve the integrity of the Court.

Date __1-11-07__

Prayerfully submitted

_____
Rizalino Cayabo
Petitioner in pro per

- 11 -

A P P E N D I X   "B"

M E M O R A N D U M   O F   L A W

Answers to 6(b)

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION WHEN THE GOVERNOR OF THE
STATE OF CALIFORNIA REVERSED PETITIONER'S FINDING OF
SUITABILITY FOR PAROLE, SOLELY ON THE COMMITMENT OFFENSE
OVER TWO DECADES IN THE PAST, ABSENT ANY EVIDENCE THAT
PETITIONER IS A <u>CURRENT</u> THREAT TO PUBLIC SAFETY, THE
DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

<u>INTRODUCTION</u>

COMES NOW Rizalino Cayabo (hereafter Petitioner) with his points

and authorities and arguments in support of his claim that the

Governor's decision to reverse the Board of Parole Hearings finding

that Petitioner is not "presently too dangerous to grant a fixed

parole release date" was not supported by any reliable evidence and

therefore arbitrary and an abuse of discretion, the decision not

being in the interest of public safety but rather political safety.

The issue is consistent with the Due Process Clause of the United

States Constitution: Would the state's penological interest be served

by continued imprisonment of an indeterminately sentenced prisoner

when there is no evidence that he is <u>currently</u> a threat to public

safety?

A.  THE STANDARD OF EVIDENCE THE GOVERNOR IS TO USE ON REVIEW OF
    A DECISION BY THE BOARD OF PAROLE HEARINGS IS "A PREPONDERANCE
    OF THE EVIDENCE": JUDICIAL REVIEW IS THE MINIMAL "SOME EVIDENCE."

In 2002 the California Supreme Court, citing <u>In re Powell</u> (1988)

45 Cal.3d 894, 904, which relied on <u>Superintendent v. Hill</u> (1985)

472 U.S. 445, held in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, at

656 that due process requires that the governor's decision to reverse
a finding of suitability by the Board of Parole Hearings (hereafter
Board) need be supported only by "some evidence."

Superintendent v. Hill, supra, 472 U.S. 445, was ambiguous as
to when the "some evidence" standard was to apply, at the
administrative level or upon judicial review?  That ambiguity was
clarified in the recent decision of Hamdi v. Rumsfeld (2004) 542
U.S. 507, 124 S.Ct. 2633, at 2651, the High Court holding that the
"[some evidence]" standard therefore is ill suited to the situation
in which a habeas petitioner has received no prior proceedings before
any tribunal and had no prior opportunity to rebut the Executive's
factual assertions before a neutral decisionmaker."  The Governor
is not a "neutral decisionmaker" who makes his decision of review
with an eye toward public safety, but post Willie Horton makes his
decisions with an eye toward political safety, abusing his authority
under Penal Code § 3041.2.  According to statistics provided by the
Governor's Legal Affairs Secretary, dated June 6, 2006, of the 72
second degree murderers found suitable for parole in 2005, the
Governor reversed 60, or 83 percent, the reversals based on a mere
"some evidence" citing primarily the immutable factors of the
commitment offense.  Indeed, the Governor has "little to gain and
potentially much to lose by granting parole, and accordingly, the
incentive to give only pro forma consideration to the parole decision
is strong" (In re Dannenberg, supra, 34 Cal.4th, at 1105, dissenting
opinion by Moreno, J.).  See also In re Scott II (2005) 133
Cal.App.4th 573, 594 fn. 7 ["in appears that gubernatorial reversals
of Board decisions granting parole are most often based solely or

- 13 -

primarily on the gravity of the inmate' soffense"]).

In reviewing the facts of a case in consideration of parole, "'some evidence' of unsuitability for parole would exists in virtually every [review]" (In re Caswell (2001) 92 Cal.App.4th 1017, 1029). "Some evidene," however, does not mean literally "any evidence," if it did, the protection afforded by due process would be meaningless.  Indeed, as held recently by the Second Appellate District in the cas of In re Wen Lee (2006) ___ Cal.App.4th ___, 2006 DJDAR 13961, at 13963 (10/19/06):

> "The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole denied is prisoner 'will pose an unreasonable risk of danger to society if released from prison']; see e.g. In re Scott (2005) 133 Cal.App.4th 573, 595 ['The commitment offense can negate suitability [for parole] only if circumstances of the crime...rationally indicate that the offender will present an unreasonable public safety risk if released from prison'], but see In re Lowe (2005) 130 Cal.App.4th 1405 [suggested] 'some evidence' applies to the factors, not dangerousness].)  Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Emphasis in original.)

"[A]s applied in Rosenkrantz, the 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact" (In re Scott II, supra, 13 Cal.App.4th at 590 fn. 6).  Moreover, the decision must reflect "due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards" and "cannot be arbitrary or capricious" (Id.).

If the Governor's decision only need be supported by "some evidence" (In re Rosenkrantz, supra, 29 Cal.4th, at 656), and judicial review is the "some evidence" standard (Id., at 658), how does the

- 14 -

"some evidence" standard apply itself?  In <u>Hamdi v. Rumsfeld</u> the
"preponderance of the evidence" standard at the administrative level
was applied to terrorist.  If international terrorist who are enemy
combatants of the United States are entitled to "a preponderance
of the evidence" standard at the Executive level, are citizens of
the United States or those who are in our country legally not entitled
to anything less?  Especially when the Board's own regulations call
for "a preponderance of the evidence" standard to support its
decisions (Cal. Code Regs., tit. 15, § 2000(b)(50)).  Whether it
be by "a preponderance of the evidence" or "some evidence," the
Governor's decision was arbitrary, being unsupported by any evidence
that Petitioner is <u>currently</u> a threat to public safety.

B.  AFTER TWENTY-TWO YEARS THE COMMITMENT OFFENSE IS NO LONGER
    RELIABLE EVIDENCE THAT PETITIONER IS <u>CURRENTLY</u> A THREAT TO PUBLIC
    SAFETY.

    The only statutory reason to deny Petitioner parole is the
"timing and gravity" of the offense (Penal Code § 3041(b)).  Our
Supreme Court has taken this to mean an indeterminately sentenced
prisoner is to be granted parole unless the prisoner "is presently
too dangerous to grant a fixed parole release date" (<u>In re Dannenberg</u>
(2005) 34 Cal.4th 1061, 1080), the "abiding concern that the Board
not schedule the release of <u>any</u> life-maximum prisoner who is still
dangerous" (<u>Id.</u>, at 1088).  Although the Governor may be more
stringent in making his determination on review of the Board's
decision, the Governor must consider the same factors the Board
considers (<u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 686).  In case
at bench, although the Governor agreed with all of the Board's finding
weighing in favor of suitability for parole, he nonetheless exercised

- 15 -

his discretion and reversed the Board's decision based on two reasons.
Firstly and primarily, Petitioner commitment offense was "especially
henious"; the motive being "very trivial" and "involved some level
of premeditation" (EXHIBIT 5, p. 2).  Secondly, parole was opposed
by the Tulare County District Attorney's Office and the Tulare County
Sheriff's Department (Id.).

In considering the same factors and criteria as the Board, it
is presumed that the Governor was relying on Cal. Code Regs., tit.
15, § 2402(c)(1)(E), his finding of the motive being "trivial."
["The motive for the crime is inexplicable or very trivial in relation
to the offense."]  The other finding used by the Governor, the murder
"involved some level of premeditation" is not found in the statutes
or regulations (In re Rosenkrantz, supra, 29 Cal.4th, at 654 ["parole
applicants in this state have an expectation that they will be granted
parole unless the Board finds, in the exercise of it's discretion,
that they are unsuitable for parole in light of the circumstances
specified by statute and by regulation"]; In re Scott II, supra,
133 Cal.App.4th, at 590).

The trial court heard all the evidence and weighed and considered
any premeditation involved in case at bench, finding Petitioner guilty
of second degree murder, therefore foreclosing the Governor retrying
the case and substituting his own verdict for that of the trial court.
Presuming, however, the Governor is correct and Petitioner's murder
"was particularly egregious for a second degree murder, it is another
matter whether any evidence would support the same conclusion for
a first degree murder" (In re Rosenkrantz, supra, 29 Cal.4th, at
679, concurring, Moreno, J.).  Justice Moreno continued: "The

- 16 -

significance of the above observation is this: there will come a point, which already may have arrived (and has been surpassed by Petitioner), when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether the offense would still be considered especially egregious for a first degree murder...."

Every crime will have unique facts. Merely reciting those facts, as a prelude to expressions of moral outrage, does not amount to "a preponderance of the evidence" or even "some evidence." While it is true when determining a prisoner parole suitability the Governor considers all relevant and reliable information, including the timing and gravity of the offense, the offense is not to be viewed in a vacuum as though it occurred yesterday, but is to be put into perspective relative to time, "entailing primarily what a man is and what he may become rather than simply what he has done" (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Greenholtz) (1979) 442 U.S. 1, 10). The commitment offense, after 22 years is not "reliable" evidence that Petitioner is a current threat to public safety. Indeed, see In re Scott II, supra, 133 Cal.App.4th, at 595; Biggs v. Terhune (9th Cir. 2003) 334 F.2d 910, 916-917; Irons v. Warden of California State Prison-Solano (E.D. Cal. 2005) 358 F.Supp.2d 942, 947 fn. 2; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1047-1048; Sanchez v. Kane (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2252640, *11; Rosenkrantz v. Marshall (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2327085, *16-17). Rosenkrantz is the guidon from which all second

- 17 -



degree murders can be measured, the facts so well knows they need not be repeated here, and Petitioner's case coming nowhere near to that of Rosenkrantz, and if Rosenkrantz has been paroled after 19 years, then the Governor cannot demonstrate Petitioner is a Current threat to public safety based on the offense alone.

Petitioner request that the Court TAKE JUDICIAL NOTICE of two most recent appellate court decisions: In re Lee, supra, ____ Cal.App.4th ____, 2006 DJDAR 13961, and In re Elkins (2006) ____ Cal.App.4th ____, 2006 DJDAR 14489. In Lee, a case somewhat similar to case at bench in that stress built up over a period of time and Lee went to his victim's place of business with the intent to kill him, after citing several murder cases the Lee court opined at DJDAR, p. 13964-13965:

> "Besides not being especially atrocious, heinous or callous, Lee's crime have little, if any, predictive value for future criminality. Simply from the passing of time, Lee's crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had committed them five or ten years ago. (In re Scott, supra, 133 Cal.App.4th 573, 595 [past crime's value for predicting future crime diminishes over time].) Moreover, Lee's motivation for the shooting—his desperate rage against Soong driving him toward murder and suicide—augurs against any future offenses. As one court explained, a defendant's "'motivation'" for the offense tends to show suitability when it was 'the result of significant stress in his life, especially if the stress has built over a long period of time'" (Id. at p. 596.)."

The Lee court went on, "Instead of being atrocious, Lee's conduct involved no more than the necessary to commit his crimes. (Rosenkrantz, supra, 29 Cal.4th at p. 683 [cannot deny parole based on nature of offenses if defendant's acts were the minimum necessary to commit the offense])." Interestingly, the Lee court opined that Lee would have been in even a better position to argue his case if he would have been convicted of two first degree murders Id.).

Although the governor's use of motive being "very trivial,"

- 18 -

"there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed 'trivail.' The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must 'normally' be given release dates when they approach their minimum eligible parole date" (In re Scott (2004) 119 Cal.App.4th 871, 893). Petitioner does not use motive as an excuse, but if motive is to be a factor, it must be placed in perspective and the significant stress it caused. Moreover, the motive must be viewed as Petitioner thought at the time of the offense and not today. This was not a random killing, but rather an "honor killing." The victim and Petitioner's sister violated cultural Filipino customs by not asking permission to marry; then after violating the custom not coming to Petitioner and apologizing (please see EXHIBIT 2 for the importance of this custom in the Filipino culture). Petitioner was dishonored. To make matters worse, the victim was boasting of what he did and belittling Petitioner to Petitioner's friends. When Petitioner needed his friends and went to see them the sight of the victim being there was too much. The stress that had been weighing on Petitioner for over a year finally overcame him. Petitioner had to regain his honor. Such motive may be foreign and strange to the American culture, and today, currently, Petitioner knows it is not acceptable and would not commit such an act again, knowing how many people he hurt and such actions being unacceptable. Clearly, this was an isolated act of violence in Petitioner's life, the victim giving Petitioner "a once-in-a-lifetime motive to kill" (In re Van Houton (2004) 116 Cal.App.4th 339, 356).

It has been 22 years since the commitment offense. Petitioner

- 19 -

has no previous record of violence, or any criminal record as far
as that goes, and has an "exemplary" postconviction record, the Board
finding that he is not currently a threat to public safety, and
passing the decision review unit, confirming he is not a current
threat to public safety. Just as in In re Scott II, supra, 133
Cal.App.4th, at 595; Biggs v. Terhune, supra, 334 F.2d, at 916-917;
Irons v. Warden of California State Prison-Solano, supra, 358
F.Supp.2d, at 947 fn. 2; Martin v. Marshall, supra, 431 F.Supp.2d,
at 1047-1048; Sanchez v. Kane, supra, ___ F.Supp.2d ___, 2006 WL
2252640, *11; Rosenkrantz v. Marshall, ___ F.Supp.2d ___, 2006 WL
2327085, *16-17; In re Lee, supra, 2006 DJDAR, at 13961; and In re
Elkins, supra, 2006 DJDAR 14489, "[t]he Governor's decision reversing
the Board's grant of parole on the basis of the facts of the offense
lacks "some evidence" that granting parole posed 'an unreasonable
risk of danger to society" (Id., at 14499).

C.  OPPOSITION LETTERS FROM THE DISTRICT ATTORNEY AND POLICE
    DEPARTMENT ARE NOT EVIDENCE SUPPORTING UNSUITABILITY FOR PAROLE.

     While it is true that letters in opposition to parole may be
submitted by the district attorney or other interested parties (Penal
Code § 3042(a)(f)(3) and the Governor may consider such letters
(In re Dannenberg, supra, 34 Cal.4th, at 1085), it is not within
the statutes or regulations as a factor upon which parole can be
denied.

     Firstly, like opposition to parole from a victim, the district
attorney and police department added no "new and significant adverse
information" about the offense (Bono v. Benov (9th Cir. 1999) 197
F.3d 409, 421). Secondly, as one appellate court opined, "[w]e find
nowhere in the statutes or regulations where it states that parole

- 20 -

should be granted or denied based on the position of the District
Attorney's office.   The decision to grant parole rests on the
guidelines listed in section 2400 et seq and Penal Code section 3041.
(<u>Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th at p. 658 [there must be 'some
evidence in the record before the Board [that] supports the decision
to deny parole, <u>based upon the factors specified by statute and
regulation</u>' (italics added)])" (<u>In re Samble</u>, 2006 WL 401282 (Cal.App.
6 Dist. 2/21/06); see also <u>Rosenkrantz v. Marshall</u>, <u>supra</u>, ___
F.Supp.2d ___, 2006 WL 2327085, *12 fn. 14 [evidence <u>from these</u>
agencies was merely "cumulative" to the Governor's opinion and added
no new evidence]). If the decision to grant or deny parole were
to be influenced by the district attorney or some other agency, then
all grants or denials of parole would be arbitrary because of the
changing opinions of these agencies, as clearly evidenced in
<u>Rosenkrantz v. Marshall</u> where the Dstrict Attorney flipped flopped
back and forth, and the Board and Governor denies parole when opposed
by the above agencies, they also grant parole when opposed by the
same, resulting in an arbitrary use of the statute.

Claim II

IT WAS A VIOLATION THE FIFTH AMENDMENT GUARANTEE AGAINST
DOUBLE JEOPARDY AND SIXTH AND FOURTEENTH AMENDMENTS
GUARANTEEING DUE PROCESS FOR THE BOARD TO ADD TWO YEARS
FOR THE USE OF A FIREARM WHEN PETITIONER HAD SERVED THAT
ENHANCEMENT CONSECUTIVELY TO THE INDETERMINATE SENTENCE.

Cal. Code Regs., tit. 15, § 2406, et seq., controls time
calculations for enhancements. Cal. Code Regs., tit. 15, § 2406(b)
cogently states, "Punishment Imposed by the Court. If the court
imposed the consecutive punishment for the enhancement, the board
shall not add an additional adjustment for using a deadly or dangerous

- 21 -

weapon, being armed with a firearm, using a firearm...."

The language is mandatory, "shall," creating a liberty interest in not being punished twice for the same behavior.  In that the Board added two years for the gun use when Petitioner had already served two years, it not only violates Petitioner's right to due process and to be free from double jeopardy, but does violence to the Board's own regulations.

Moreover, pursuant to Cal. Code Regs., tit. 15, § 2403(c)(C), "severe trauma," is, "e.g., beating, clubbing, stabbing, strangulation...."  Petitioner fits more appropriately in column B: "Death was almost immediate or resulted at least partially from contributing factors from the victim."  Thus Petitioner's time was not fixed according to the individual circumstances of his offense, again violating his right to due process.

Petitioner's term should have been fixed at 18 years, "prior relationship" to the victim and "death was almost immediate or resulted at least partially from contributing factors from the victim" (Cal. Code Regs., tit. 15, § 2403(c)(II-B)).  This comes out to be 218 months for the life offense, minus 82 months for good behavior credits (HT 62:8-14).  Petitioner's total term is not 252 months as calculated by the Board (HT 62:16), then subtracting 82 months for good behavior reducing Petitioner's total period of confinement to 170 months (HT 52:16-18), but is actually 216 months, then substracting 82 months for good behavior for a total adjusted period of confinement of 134 months, or 11 years 2 months.  In that Petitioner has exceeded his legislatively mandated uniform term for the offense by 106 months as of the date of this habeas petition,

- 22 -

the life offense beginning approximately July of 1986, and his parole
is to be for a period subject to discharge in 7 years, exceeding
that by 2 months, the excess credits are to be deducted from any
period of parole Petitioner would have otherwise served (Cal. Code
Regs., tit. 15, § 2345 [If any custody credits remain after deducting
it from the offense to which it applies, the remaining credit shall
be deducted from the parole period"], citing In re Sosa (1980) 102
Cal.App.3d 1002; In re Ballard (1981) 115 Cal.App.3d 647).  See also
In re Scott, supra, 133 Cal.App.4th, at 604; Sanchez v. Kane, supra,
___ F.Supp.2d ___, 2006 WL 2252640, *12; In re Elkins, supra, ___
Cal.App.4th ___, 2006 DJDAR, at 14499; McQuillion v. Duncan (9th
Cir. 2003) 342 F.3d 1012, 1016; affirming district order for discharge
(McQuillion v. Duncan (C.D. Cal. 2003) 253 F.Supp.2d 1131, carrying
out the intent of the Ninth Circuit remand in McQuillion v. Duncan
(9th Cir. 2002) 306 F.3d 895.

### C O N C L U S I O N

The Governor's decision was not only fixated on immutable factors
but the Governor presented no contravening evidence to the
psychological forensic experts finding that Petitioner would not
pose a threat to public safety if released from prison at this time,
nor did the Governor make any rational connections between his
findings and Petitioner's present threat to public safety.

WHEREFORE, it is respectfully requested that this Court grant
the writ and order the Governor's decision vacated, grant of parole
reinstated, and the California Department of Corrections and
Rehabilitation immediately calculate Petitioner's term as instructed
by the Court, and, apply excess conduct credits to any time of parole

Petitioner may serve.

Date: _1-11-07_

Respectfully submitted,

Rizalino Cayabo
Petitioner in pro per

- 24 -

E

**E X H I B I T   1**

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF TULARE

THE PEOPLE OF THE STATE OF CALIFORNIA
Plaintiff

COURT NUMBER 22849

—vs—

RIZALINO GUERRERO CAYABO

Defendant

**FILED**
**TULARE COUNTY**

JUN 24 1985

JAY C. BAYLESS, CLERK
BY _Jennie Vogt_ DEPUTY

REPORT AND RECOMMENDATION
OF THE PROBATION OFFICER

Probation No. A-12789

CII  7 778 622

SO ID 137016

FBI  Unknown

SS # 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

TO THE HONORABLE JUDGE OF ABOVE ENTITLED COURT:   DAVID L. ALLEN

Pursuant to the statutes and at the direction of the Court, your Probation Officer hereby respectfully submits the following report and recommendation as to the above-named defendant after ( XXX ) conviction in court trial (____) verdict in jury trial (_____) plea:

| 1715 Rd. 136, Orosi, CA | 9-4-45 | 39 | Philippines |
|---|---|---|---|
| Address | DOB | Age | Birthplace |

Felony, to wit:  Violation of Section 187 of the Penal Code - Murder, 2nd Degree, with Special Allegation of Section 12022.5 of the Penal Code - Personally Using a Firearm.

Charge(s)

| 10-4-84 | 10-4-84 | 49 days | 7-1-85 |
|---|---|---|---|
| Date of Offense | Date of Arrest | Time in Custody | Date of Sentencing |

| Public Defender | David L. Allen | #4 |
|---|---|---|
| Attorney | Judge | Dept. |

## SUMMARY OF FACTS:

October 4, 1984, this defendant murdered 31 year old, Medardo Lozano, shooting him in the head with a .38 caliber handgun.

REPORT OF THE PROBATION OFFICER
RIZALINO GUERRERO CAYABO

SOCIAL HISTORY:

This defendant indicates that he is in good physical health and
suffers no handicaps. He does report problems with hay fever and
takes prescribed medication. He has never been involved in mental
health counseling. He reports he has no particular hobby and simply
enjoys being with his family. He is of the Catholic faith and
attends services approximately one time per month. He reports that
he completed two years of college and last attended school at the
University of Manila, in 1967. He has never served in the Military.
He reports he came to the United States on October 9, 1971, and
obtained his citizenship in 1978.

The defendant married Sylvia Cayabo, nee Siagen, age 30 years, in
1972, in Reno, Nevada. Thereafter, they were married at a church
wedding. Four children, ages 3 to 12 years, have been born of this
relationship.

FAMILY HISTORY:

The defendant's father, Fernando Cayabo, died in 1981, at age 55, due
to multiple sclerosis.

The natural mother is Marina Cayabo, nee Guerrero, age 52. She
resides in Grover City, California. She is employed as a farm
laborer.

The defendant reports that his parents had been separated for more
than ten years prior to the father's death. They were married
approximately 30 years prior to the separation. This defendant is
the oldest of seven children born to the natural parents. The
youngest child, age 17, resides with the mother. The defendant
reports that one brother died at age 27 years, as the result of stab
wounds, in the Philippines. This brother was killed over a money
debt.

EMPLOYMENT HISTORY:

This defendant indicates that he has been unemployed since his
release from custody on November 21, 1984. At the time of his
arrest, he was employed by Prestolite and had been for ten years,
earning $8.00 per hour. He reports the Company would not rehire him
after his release from custody. He has had no income since this
crime occurred. He reports that he previously worked as a laborer at
a turkey ranch and has done seasonal labor. The defendant further
reports that he held no employment until he was 27 years of age, when
he came to the United States, as he attended school full time until
then.

REPORT OF THE PROBATION OFFICER
RIZALINO GUERRERO CAYABO


FINANCIAL STATUS:

The defendant reports he is purchasing a double-wide mobile home,
which he values at approximately $20,000.00.  He owes approximately
$8,000.00 on that home.  Additionally, he owns a 1978 GMC van, which
he values at $2,000.00.  The major debt is $134.33 per month payments
on the mobile home.


USE OF ALCOHOL/CONTROLLED SUBSTANCES:

The defendant reports that prior to the present incident, he consumed
intoxicants on weekends and usually drank to the point of feeling
good.  He maintains that since this incident, he has not consumed any
type of alcoholic beverages.  He denies contact with illegal drugs.


PRIOR RECORD:

A check of the usual sources reveals no prior arrests for this
defendant.


CIRCUMSTANCES:

On May 20, 1985, this defendant was convicted by Court trial, of a
felony, to wit:  Violation of Section 187 of the Penal Code - Murder,
2nd Degree, with the Special Allegation of Personal Use of a Firearm
within the meaning of Section 12022.5 of the Penal Code.  Judgment
and pronouncement of sentence is scheduled for July 1, 1985.


OFFENSE:

On October 4, 1984, Tulare County Sheriff's Deputies responded to a
reported shooting at 40971 Road 144, Orosi.  Investigation revealed
that 31 year old Medardo Lozano, had been shot in the back of the
head.  Witnesses advised that Rizalino Cayabo, brother-in-law of the
victim, had driven his vehicle up to the carport area where the
victim and others were watching T.V..  Cayabo exited his vehicle,
walked up behind Lozano, and shot him one time in the back of the
head at close range.  Cayabo then returned to his vehicle and drove
away.

Shortly after the shooting, Cayabo surrendered himself at the Tulare
County Sheriff's Office, in Visalia.

Cayabo was contacted by Sheriff's Detectives.  Cayabo admitted the
shooting of Midardo Lozano.  He admitted shooting the victim in the
back of the head with a .38 caliber revolver.  Cayabo indicated he

REPORT OF THE PROBATION OFFICER
RIZALINO GUERRERO CAYABO

shot Lozano because he, Lozano, had betrayed him and violated Filipino custom, by not asking his permission to marry his Cayabo's, sister. Cayabo advised that since his father was deceased, he had become the man of the family and that Lozano should have spoken to him before taking his sister away.

Cayabo indicated he drove to Narcisco Rosario's home, but doesn't remember who was there. He saw Lozano, sitting outside with other men. He drove up, exited his vehicle and produced a handgun from his waistband. He walked up behind Lozano and shot him in the head. Cayabo indicated he did not usually carry a gun and could not explain why he had the gun this particular evening. Cayabo indicated he disposed of the gun by throwing it out the window of his vehicle shortly after the shooting. He indicated he had purchased the gun approximately one month earlier from an unknown subject in Orosi.

Cayabo indicated he was sorry for what he had done, but was angry at Lozano and his sister, for what they had done.

DEFENDANT'S STATEMENT:

This defendant was interviewed at the Tulare County Probation Center. He admits the killing of Medardo Lozano. The defendant stated that he shot Lozano because Lozano had not apologized to him for not asking permission to marry his sister. Cayabo indicated that on the evening of the shooting, he decided to go to his friend's house to gamble. He indicated he had not been with his friends for an extended period of time because he knew that Lozano would be there gambling. He had stayed away from his friends, as he did not want to confront Lozano. Cayabo stated that approximately one month earlier, he had purchased a handgun from an unknown subject in Orosi. He indicated he purchased the gun for protection while gambling because some of the men who gambled became angry and he felt he needed protection.

Cayabo stated that he needed to be with his friends, therefore, he went to Rosario's home. Upon arrival, he saw Lozano and decided not to stop. He indicates he drove around for approximately one hour, getting more and more upset. He drank approximately one-half pint of vodka and orange juice during that hour's period of time. He indicates he had heard rumors that Lozano had been saying things about him, regarding the fact that he, Lozano, had not asked permission to marry his sister. He then returned to Rosario's, took the .38 caliber pistol from the glove compartment of the vehicle, walked up behind Lozano, and shot him one time in the head.

Cayabo indicates that this crime would never have occurred, if Lozano had come to him and apologized. as was Filipino custom. Cayabo admits that if he was in the Philippines, he would be prosecuted for murder and could have faced a death penalty.

The defendant indicates that prior to the crime, he had not spoken with his sister, wife of the victim, in over one year. He further

REPORT OF THE PROBATOFFICER
RIZALINO GUERRERO CAYABO

claims that throughout this year's period of time, he had not thought
about killing the victim.  He offers no explanation as to why he
resorted to the drastic measures which resulted in the death of the
victim.


INVESTIGATION:

Edita Lozano, wife of the victim and sister of this defendant, has
been contacted.  She indicates that she resided in Pismo Beach,
California, when she and Medardo Lozano eloped.  They had dated
several months previously.  She left her mother's home around
November 14, 1983, and moved to Orosi, with Medardo.  They were
subsequently married on December 10, 1983.  Prior to that time,
Medardo's father went to Rizalino Cayabo, to ask permission for his
son to marry Edita.  This permission was also requested of Edita's
mother and neither Rizalino or the mother, gave permission.

Edita indicated that Medardo never said anything bad about Rizalino.
She indicates that the reason Medardo never went to Rizalino to seek
forgiveness, was because he was ashamed.

Ms. Lozano realizes the sentence that will be imposed on her brother.
She feels that since she and her family are now in the United States,
that Filipino customs should not have been considered by her brother,
and that she intends to live as an American, and not under Filipino
custom.

On May 6, 1985, this defendant was interviewed by Jose Icasiano,
M.D..  The Court is respectfully referred to the report from
Mr. Icasiano.  This report explains the Filipino custom that perhaps
prompted this defendant to commit the crime now before the Court.

Victims/Witness services have been provided to Ms. Lozano.
Eligibility for financial assistance has yet to be determined.


CIRCUMSTANCES IN MITIGATION:

The crime was committed due to unusual circumstances, which is
unlikely to recur.  (Rule 423(a)(3)).

The defendant has no prior criminal record.  (Rule 423(b)(1)).


CIRCUMSTANCES IN AGGRAVATION:

The crime involved great violence, viciousness, and callousness,
whether or not charged or chargeable as an enhancement under Section
12022.7 of the Penal Code.  (Rule 421(a)(1)).

REPORT OF THE PROBAT⃝ OFFICER
RIZALINO GUERRERO CAYABO

The victim was particularly vulnerable.  The defendant came from
behind the victim and shot him in the head.  The victim was given no
opportunity to defend himself.  (Rule 421(a)(3)).

The defendant has engaged in conduct which indicates he is a serious
danger to society.  (Rule 421(b)(1)).


FACTORS AFFECTING PROBATION:


There are statutory provisions prohibiting the grant of probation.
(Rule 414(a)).

The nature, seriousness, and circumstances of the crime.
(Rule 414(c)(1)).

The vulnerability of the victim and the degree of harm to the victim.
(Rule 414(c)(2)).

The defendant was armed with and personally used a weapon.
(Rule 414(c)(3)).

The defendant inflicted great injury that caused the death of the
victim.  (Rule 414(c)(4)).

The defendant has no prior criminal record.  (Rule 414(d)(2)).

It is unknown what effect imprisonment will have on this defendant
and his dependents.  (Rule 414(d)(7)).

The defendant expresses remorse.  (Rule 414(d)(9)).


RESTITUTION/RESTITUTION FINE:


Since it will be recommended that the defendant be committed to the
State Prison, a restitution fine pursuant to Section 13967 of the
Government Code, is recommended.


ANALYSIS:


Appearing before the Court for judgment and pronouncement of
sentence, is 39 year old Rizalino Cayabo.  He has been convicted by
Court trial, of a felony, to wit:  Violation of Section 187 of the
Penal Code - Murder, 2nd Degree, with the Special Allegation of
Personal Use of a Firearm.

In this matter, this defendant murdered his brother-in-law, by
shooting him in the head with a .38 caliber revolver.  The victim was
extremely vulnerable, as the defendant approached the victim from
behind and shot him without the victim knowing the defendant was



REPORT OF THE PROBATION OFFICER
RIZALINO GUERRERO CAYABO

present.  The defendant explained his behavior by indicating the
victim had shamed him by not seeking forgiveness for marrying the
defendant's sister without asking his permission.  This was in
violation of Filipino custom.

From all indications, this defendant had lived with the fact that the
victim had not sought forgiveness for over one year.  On the date of
this crime, this defendant had at his disposal, a .38 caliber
revolver, and upon seeing the victim, decided to right the wrong that
he felt had been done.  When interviewed by Sheriff's Detectives, the
defendant could give no reason for having the gun with him the day of
the crime.  In the interview with this writer, he claimed he had
purchased the gun for protection that he felt was necessary, when he
gambled with his friends.  On the day of the crime, he had the weapon
and the victim was present, and apparently it was time to restore his
honor and therefore, he committed this totally unprovoked crime of
murder.

The defendant's reasons for committing this crime are totally
unacceptable.  If we are to live in a civilized society, this type of
crime cannot be condoned or justified by the reasons provided by the
defendant.  He committed the crime, knowing the consequences, and now
the defendant must face these consequences.


CUSTODY:

| FACILITY | DATES | ACTUAL TIME SERVED | 4019 CREDITS | TOTAL |
|---|---|---|---|---|
| Tulare Co Jail | 10-4-85 to 11-21-85 | 49 days | 13 days good time 12 days work time | 74 days |


CRIME:

Felony, to wit:  Violation of Section 187 of the Penal Code - Murder,
2nd Degree, with the Special Allegation of 12022.5 of the Penal Code-
Personal Use of a Firearm, to wit: Handgun.


SUGGESTED TERM:

| MITIGATED | AGGRAVATED | BASE TERM | SENTENCING RANGE | ENHANCEMENTS | TOTAL |
|---|---|---|---|---|---|
| No | Yes | 15 years to Life | 15 years to Life | 2 years | 17 years to Life |

REPORT OF THE PROBATION OFFICER
RIZALINO GUERRERO CAYABO

RECOMMENDATION:

It is therefore RESPECTFULLY RECOMMENDED that this defendant's
Application for Probation be DENIED, and that he be committed to the
STATE PRISON for the total term of SEVENTEEN (17) YEARS to LIFE.
That he receive credit for 49 days served awaiting sentence, plus 13
days good conduct credit and 12 days work time credit.

It is further RECOMMENDED that the defendant be advised that pursuant
to Sections 1168 and 3000.1(a) of the California Penal Code, he will
be placed on parole for a period ranging from five years to the
remainder of his life, subject to the determination of the Board of
Prison Terms.

The defendant pay a Restitution Fine pursuant to Section 13967 of the
Government Code, in the amount of $5,000.00.

Respectfully submitted,

JOSEPH C. JIMENEZ
CHIEF PROBATION OFFICER


BY _____
    HAROLD D. MORROW
    PROBATION OFFICER II

DATED:   July 1, 1985
HDM:mm
6-24-85

Read and Approved:


BY _____
    RICHARD W. HOUTS
    SUPERVISING PROBATION OFFICER


Pursuant to the Provisions of Section 1203 of the Penal Code, I have
read and considered the Report and Recommendation of the Probation
Officer on file.

_____
JUDGE OF THE SUPERIOR COURT

EXHIBIT 2

EXHIBIT 2

REPORT

At the request of Atty. David M. Liebowitz of the Tulare County Public Defender's Office, I interviewed Mr. Rizalino Guerfero Cayabo at my home in San Jose, California on April 21, 1985.

The interview, which started at 1:00 p.m. and lasted for about 45 minutes, was for the purpose of evaluating the dynamics of Mr. Cayabo's personality. The interview was conducted in the Pilipino language.

We immediately established cultural rapport. Throughout the session, Mr. Cayabo appeared relaxed and comfortable, speaking openly, without hesitation. His behavior in the events of his life that he narrated manifested a reaction typical to Pilipino culture, with a motivation characteristic of the Pilipino personality.

To a non-Pilipino, Mr. Cayabo's behavior and its motivation in this tragic incident present a puzzle. How could a man with such human sensitivity be capable of such a violent act? And it does not help much either to hear him, while expressing deep sorrow and regret, often repeat, as if trying to explain: "I can not understand why he did not come to me to ask for forgiveness. If he did not like to approach me, he could have come to my mother."

For to a Pilipino, the course of action was simple and determined. Pilipino custom dictates that the man go to the woman's parents ("mamanhik") to ask for her hand in marriage, but in case of elopement it becomes necessary for the couple to come to the woman's parents to beg forgiveness. Why the victim did not do this, since he was a fellow Pilipino, Mr. Cayabo could not understand. For if he had only done this, the unfortunate consequence would not have occured.

The violation of this Pilipino custom "mamanhik", although expected to cause very strained relationship, does not always lead to violence. But in this case, other culturally determined factors precipitated the tragic outcome. We shall now deal with these cultural forces and re-enforcing circumstances that made this tragic "confrontation" inevitable.

The closely knit Filipino family has for its center the child. Because it is child-centered, care and protection are its most important values. The wife's faithfulness as well as the woman's honor is then considered priceless. Out of instinct, a Pilipino will confront death if necessary to defend his woman's honor or protect his family from great, imminent harm. The father, when the harm is done, will then feel obliged to seek redress.

When their father died, Mr. Cayabo assumed according to Pilipino custom the responsibility of caring for and protecting his siblings. Feeling naturally less secure than the father in his status, the oldest brother tends to be even more protective and authoritative than the father he has replaced. Besides, Edita, nicknamed "Bubot" (very unripe fruit) was most vulnerable. When Mr. Cayabo went back for a visit to the Philippines in 1977 after many years of absence, it was seeing Bubot, who had grown into pubescence, that was one of the fondest memories he brought back to Visalia.

Unlike her younger sisters who went to study in Manila, Bubot stayed and
lived in the province.

In the Pilipino culture, a woman's virtue or honor is considered as precious
as it is fragile. Mr. Cayabo was only too aware of the dangers to purity
that a young woman, with traditional Pilipino upbringing, would be exposed
to in U.S. When therefore he petitioned for the coming to U.S. of Edita,
he felt the double obligation of protecting her from harm. And when the
victim, without courting Edita at her home according to Pilipino custom,
succeeded in taking her out and getting her pregnant, Mr. Cayabo felt that
he had failed in protecting Edita from being robbed of her womanly virtue
and honor. Although there was eventual marriage for which the victim's
father came to ask for Edita's hand, the victim himself never came to Mr.
Cayabo nor to Edita's mother.

Even Edita did not come. The family had lost her. With their close family
ties, and with the feeling of gratitude ("utang-na-loob") that Edita must
have in her heart for everything her family and especially her brother had
done for her Mr. Cayabo could only explain her conduct by thinking that she
was given no choice in the matter. Mr. Cayabo waited for a year: neither
came to ask forgiveness. The only explanation that seemed to make sense
was Edita was probably drugged and the victim had feelings of guilt. From
friends Mr. Cayabo learned that the victim stayed out until late at night
drinking, which made him even more concerned about his sister. He felt
very agrieved and hurt by what the victim had already done and was conti-
nuing to do to his family.

Besides family protection and care, another very significant Pilipino
cultural trait involved in the motivation of this tragic act was "hiya"
or extreme concern about being embarrassed. Mr. Cayabo said that his
friends, who were also the friends of the victim, were laughing at him in
his back ("pinagtatawanan") for his inability to do anything about his
grievance: he himself felt that he was cowardly. Besides, according to
Mr. Cayabo, the victim was "pasikat" (showing off) about treating him as if
he was nothing ("bale wala"). In the dynamics of the Pilipino personality,
"hiya", when serious enough, is adequate motivation for violence.

The Pilipino personality is oriented to feeling-person rather than to object-
achievement. This orientation is involved in the development of "hiya" and
the reinforcement of family protection. Born and reared in a child-centered
family, the Pilipino is immersed in love and develops great awareness of
feelings as well as high self-regard. "Pakikisama" or harmonious human-
emotional relations becomes very important to him. He carefully avoids
any situation that will hurt his or other's feelings and disturb this
harmony. He shies away from disagreements, arguments and any kind of con-
frontation that will cause hurt feelings or even excite anger- thus appear-
ing to be non-assertive, indifferent to his personal rights and even co-
wardly. But, he's really just trying to avoid getting angry.

Anger brings us to the very core of the dynamics that motivated or pre-
cipitated this violent, tragic event. Mr. Cayabo was so scared of his

- 2 -

anger, as a true Pilipino is. The Pilipino always tries to inhibit his
anger, controling consciously or unconsciously its expression or release.
Anger builds up like steam through continued inhibition-until the critical
explosion force is reached. Anger then shatters the containing boiler and
escape with destructive violence. The fear of this violent release creates
the need to inhibit anger which inhibition in turn brings about the explosion.
Paradoxically, the Pilipino's fear of anger makes anger even more fearful.

Mr. Cayabo, as we stated was scared of his anger. For one year he avoided
a confrontation. The victim continued to fuel Mr. Cayabo's anger. They
both lived in the same town, having the same friends and haunts. Mr. Cayabo
was forced to avoid his friends and the labor camp for fear of meeting the
victim and having to confront him. As his anger built up, he waited for
the victim-still hoping that he would come and ask forgiveness. The victim's
approach would be to make peace – Mr. Cayabo's can only be a confrontation,
a war.

That fateful day, because of a special need for friends to talk to, Mr.
Cayabo decided to go to the labor camp. When he arrived in his pick-up,
he saw the victim. He did not go down, trying to avoid a confrontation.
He drove away and for an hour waited for the victim to leave. The victim
was made aware by a friend of Mr. Cayabo's arrival. He was warned of the
trouble – the victim did not leave – he said he didn't care. When Mr.
Cayabo came back after an hour and the victim was still there, the critical
point of explosion was reached. Mr. Cayabo's whole awareness was on the
victim – he was no longer aware of their friends who were there. It was
like a volcanic erruption that is beyond the human power to control.

For the Pilipino personality can be symbolized by Mayon volcano, the most
perfectly cone shaped volcano in the world – beautiful, but very destructive
when it explodes.

Jose Icasiano, Ph.D.
May 6, 1985
San Jose, California

**E X H I B I T   3**

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JANUARY 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 11, 2003

This is a psychological evaluation for the Board of Prison Terms on inmate Rialino Cayabo, CDC# D-09912. This report is based on a personal clinical interview of the inmate on 06/11/03. Additionally, in preparation for this review, the Central file and unit health records were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Cayabo is a 57-year-old, married male of Filipino descent. His date of birth is 09/04/45. He is an American citizen, and a Catholic. No obvious unusual physical characteristics were observed, and he denied the use of any nicknames or aliases.

II.    DEVELOPMENTAL HISTORY:

Inmate Cayabo had no significant developmental history landmarks. There is no indication of cruelty to animals, or predisposition to arson, and he denied any childhood history of physical or sexual abuse, as either a perpetrator or a victim.

III.    EDUCATIONAL HISTORY:

Inmate Cayabo completed elementary and high school in the Philippines, and subsequently completed two years at the University of Manila. During his incarceration for the instant offense, he completed a vocational program in dry cleaning, and for the past four years has been working in PIA, repairing sewing machines.

IV.    FAMILY HISTORY:

Inmate Cayabo states that he was raised in a warm and supportive family environment. None of his family has problems with drug or alcohol addiction, and he denied any history of criminality in either his immediate or extended family.

CAYABO        D-09912        CTF-NORTH        06/12/03        gmj

CAYABO, RIALINO
CDC NUMBER: D-09912
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Cayabo is a heterosexual male. There is no history high-risk sexual behavior, sexual aggression, or fantasy.

VI.   MARITAL HISTORY:

Inmate Cayabo was married in 1971, and has four children.

VII.  MILITARY HISTORY:

Inmate Cayabo has no history of military service.

VIII. EMPLOYMENT/INCOME HISTORY:

Prior to the instant offense, inmate Cayabo was employed by the Presto Light Battery Company in Visalia, California, for a period of ten years.

Currently, inmate Cayabo works in PIA as a sewing machine repair technician.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Cayabo denies any history of significant drug or alcohol problems. However, immediately prior to the instant offense, he acknowledges a period of heavy alcohol use, contributing to the dynamics of the instant offense. For the past six years, inmate Cayabo has been active in Alcoholics Anonymous, contributing to his re-evaluation, and insight into the motivational dynamics of the instant offense.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Cayabo denies any history of mental illness. He has never been hospitalized for a psychiatric disorder, and states that he has never sustained a serious head injury. There is no history of seizure or other neurological conditions. He currently is taking no significant medications.

XI.   PLANS IF GRANTED RELEASE:

When granted release, inmate Cayabo intends to return to his wife and children, and look for a job. The Central file documentation indicates that he has already been offered a job from a private labor contractor to do agricultural work.

CAYABO, RIALINO
CDC NUMBER: D-09912
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## CLINICAL ASSESSMENT

XII.  **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

During the clinical interview, inmate Cayabo was calm, pleasant, and cooperative. He was alert and oriented as to person, place, and time. His speech was articulate and contextually meaningful.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

AXIS I:      No Contributory Clinical Disorder.
AXIS II:     No Contributory Personality Disorder.

XIII. **REVIEW OF LIFE CRIME:**

The clinical interview suggested that inmate Cayabo has gained considerable insight into the instant offense as a consequence of his numerous years of incarceration, and active participation in institutional programming, specifically the Impact Group and Alcoholics Anonymous. He has become fully cognizant of the impact and gravity of his actions, not only for the victim's family, but also his own. He now admits that his misplaced sense of duty and responsibility to protect his sister's honor did not justify the taking of a human life. He is remorseful, and deeply regrets that he is unable to undo the consequences of his former behavior.

Over the past few years, his sister, the victim's wife, has reconciled with inmate Cayabo, greatly facilitating the healing process.

XIV.  **ASSESSMENT OF DANGEROUSNESS:**

A.  Inmate Cayabo's violence potential within a controlled institutional setting is considered to be minimal relative to the total inmate population. This conclusion is based on several factors.

Inmate Cayabo does not fit the typical criminal profile. There is no history of either juvenile or adult criminality prior to the instant offense. Throughout his lengthy incarceration, he has been a model inmate. The Central file documents no significant CDC-115 violations throughout his incarceration history, and total compliance with institutional requirements and standards.

The instant offense itself involved an unfortunate juxtaposition of cultural variables, a misplaced sense of responsibility, and impulsivity fueled by the excessive use of alcohol. Inmate Cayabo has addressed these issues through active institutional programming, participating in the Impact Group and Alcoholics Anonymous. Actuarially, his behavior and institutional record over the past 18 years places him in a very low risk category.

CAYABO, RIALINO
CDC NUMBER: D-09912
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

   B. If released to the community, inmate Cayabo's violence potential is estimated
      to be no greater than that of the average citizen in the community, with the
      proviso that he continues to actively attend Alcoholics Anonymous
      programming in the community, and abstains from the use of alcohol.

XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

   A. Inmate Cayabo is competent and responsible for his behavior. He has the
      capacity to abide by institutional standards, and has demonstrated this capacity
      over his numerous years of incarceration.

   B. Inmate Cayabo does not have a mental disorder which would necessitate
      treatment either during his incarceration or following parole.

   C. If paroled, it is recommended that inmate Cayabo continue to attend AA
      programming on a regular basis, and agree to abstain from the use of alcohol.

   D. In view of inmate Cayabo's low risk factors, this inmate is an excellent
      candidate for parole consideration.

E. W. HEWCHUK, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

EWH/gmj

D: 06/12/03
T: 06/13/03

CAYABO        D-09912        CTF-NORTH        06/12/03        gmj

**E X H I B I T   4**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )        CDC Number D-09912
Hearing of:                  )
                             )
RIZALINO CAYABO              )
_____)

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2006

9:05 A.M.

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DAVID YACONO, Deputy Commissioner

OTHERS PRESENT:

RIZALINO CAYABO, Inmate
MARY ANN TARDIFF, Attorney for Inmate
CORRECTIONAL OFFICER, Unidentified

PENDING REVIEW
AND APPROVAL

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No          See Review of Hearing
_____    Yes         Transcript Memorandum

Marsha Mees, Peters Shorthand Reporting

1

1        P R O C E E D I N G S

2             DEPUTY COMMISSIONER YACONO:    Tape is

3    rolling.

4             PRESIDING COMMISSIONER SAWYER:    Okay.

5    This is a subsequent parole consideration

6    hearing for Rizalino?

7             INMATE CAYABO:    Yes.

8             PRESIDING COMMISSIONER SAWYER:    Rizalino?

9             INMATE CAYABO:    Yes.

10            PRESIDING COMMISSIONER SAWYER:    Rizalino,

11   R-I-Z-A-L-I-N-O, Cayabo, C-A-Y-A-B-O.    CDC

12   number D as in David 09912.    Today's date is the

13   ninth of May 2006.    We're located at the

14   Correctional Training Facility in Soledad.    Date

15   received was 7-8-1985 from the County of Tulare.

16   The offense was murder in the second degree with

17   the use of a firearm, case number 22849.    Count

18   number one, 187 and 12022.5 of the Penal Code.

19   The term is 15 to life plus two years.    And the

20   minimum eligible parole date was 8-28-1995.    And

21   it's five minutes past nine in the morning.

22   This hearing is being tape recorded.    And for

23   the purpose of voice identification each of us

24   is required to state our first and last name,

25   spelling our last name.    And when it comes to

26   your turn, as you recall, we also want you --

27   want your CDC number.    I'll start.    Tom Sawyer,

2

1   S-A-W-Y-E-R, Commissioner.

2       DEPUTY COMMISSIONER YACONO:  David

3   Yacono, that's Y-A-C-O-N-O, Deputy Commissioner.

4       ATTORNEY TARDIFF:  Mary Ann Tardiff,

5   T-A-R-D-I double F, attorney for Mr. Cayabo.

6       INMATE CAYABO:  Rizalino Cayabo,

7   C-A-Y-A-B-O, D-09912.

8       PRESIDING COMMISSIONER SAWYER:  Thank

9   you.  The record reflects, Mr. Cayabo, that you

10  signed a BPT Form 1073, which is the reasonable

11  accommodation notice, on 5-13-05 and you

12  indicate -- actually you don't indicate anything

13  on this.  The boxes aren't checked.  Did you --

14  Would you point out to him that he needs to

15  check one of these boxes.  Do you have anything

16  that would prevent you, disability wise, from

17  participating in today's hearing?

18      INMATE CAYABO:  No, Sir.

19      PRESIDING COMMISSIONER SAWYER:  Okay.  As

20  he pulls his glasses out --

21      ATTORNEY TARDIFF:  Yeah, right.

22      PRESIDING COMMISSIONER SAWYER:  Okay.

23      DEPUTY COMMISSIONER YACONO:  Third time

24  in a row.

25      PRESIDING COMMISSIONER SAWYER:  Yeah.

26  You need glass sir --

27      INMATE CAYABO:  Yes.

3

1      PRESIDING COMMISSIONER SAWYER:    -- to

2   read?

3      INMATE CAYABO:  To read, yes.

4      PRESIDING COMMISSIONER SAWYER:  Okay.

5   Okay.  That's a disability.  But overall --

6   There's a box right above your signature that

7   needs to be checked.

8      ATTORNEY TARDIFF:  Right here.

9      INMATE CAYABO:  Yes, this one.

10      PRESIDING COMMISSIONER SAWYER:  If you

11   need anything for your -- Okay.  That box's been

12   checked by his attorney, Ms. Tardiff.  Very

13   good.  Thank you.  Is that information current

14   and correct?

15      INMATE CAYABO:  Yes.

16      PRESIDING COMMISSIONER SAWYER:  Thank

17   you.  Okay.  We have a copy of the scripts for

18   the accommodation for disability.  Counsel, did

19   you talk to Mr. Cayabo about the disability

20   script?

21      ATTORNEY TARDIFF:  I did.

22      PRESIDING COMMISSIONER SAWYER:  And all

23   the issues that we talk about?

24      ATTORNEY TARDIFF:  Yes.

25      PRESIDING COMMISSIONER SAWYER:  And the

26   outline of the hearing procedure, the inmate's

27   rights and the confidential material?

4

1          ATTORNEY TARDIFF:  Yes.

2          PRESIDING COMMISSIONER SAWYER:  Okay.

3     And I have a document that's signed.  Do you

4     wish to waive the reading of those scripts?

5          ATTORNEY TARDIFF:  I do.

6          PRESIDING COMMISSIONER SAWYER:  Thank

7     you.  Signed and dated by both.  I will mark

8     that Exhibit One and leave it in the file.  Is

9     there any confidential material that will be

10    used today, sir?

11         DEPUTY COMMISSIONER YACONO:  No, Sir.

12         PRESIDING COMMISSIONER SAWYER:  Okay.

13    Would you pass the hearing checklist marked

14    Exhibit Two over to Ms. Tardiff.  You can check

15    that against your documents.

16         ATTORNEY TARDIFF:  I have these

17    documents.  I have nothing further to add.

18         PRESIDING COMMISSIONER SAWYER:  Okay.

19    You have no additional documents to --

20         ATTORNEY TARDIFF:  No, I don't.

21         PRESIDING COMMISSIONER SAWYER:  --

22    submitted today?  Are there any preliminary

23    objections, counsel?

24         ATTORNEY TARDIFF:  No.

25         PRESIDING COMMISSIONER SAWYER:  Okay.

26    Will the inmate be speaking with the Panel?

27         ATTORNEY TARDIFF:  Yes.

5

1        PRESIDING COMMISSIONER SAWYER:  He will

2  be talking about the crime?

3        ATTORNEY TARDIFF:  Yes.

4        PRESIDING COMMISSIONER SAWYER:  Okay.

5  Would you raise your right hand, sir?  Do you

6  solemnly swear or affirm the testimony you're

7  about to give in this hearing will be the truth,

8  the whole truth and nothing by the truth?

9        INMATE CAYABO:  Yes, I do.

10       PRESIDING COMMISSIONER SAWYER:  Thank

11  you.  Okay.  I'm going to be reading from the

12  August '04 calendar, that's the -- There is a

13  September '05 calendar but they refer back to

14  the '04 calendar, page one, summary of the

15  crime.  On 10-4-1987 Tulare County sheriff's

16  Office deputies responded to a shooting on --

17  doesn't give the road.  What road number was

18  that?  I have an address and it says road and

19  number 144, Orosi.

20       INMATE CAYABO:  I forgot the name of the

21  road already, Sir.

22       PRESIDING COMMISSIONER SAWYER:  Okay.

23  Well I can -- We'll just reference it to 40971

24  Road, number 144.  Is that -- apartment?  Is

25  that an apartment?

26       INMATE CAYABO:  No, Sir.

27       PRESIDING COMMISSIONER SAWYER:  Or it's a

6

1    --

2         INMATE CAYABO:  It's just like -- labor

3    camp.

4         PRESIDING COMMISSIONER SAWYER:  Labor

5    camp.  Okay.

6         "Investigation revealed that

7         Medaro, M-E-D-A-R-O, Lozano,

8         L-O-Z-A-N-O, had been shot in the

9         back of the head.  The witnesses

10        -- The witnesses advised

11        investigators that Mr. Cayabo,

12        brother-in-law of the victim, had

13        driven his vehicle up to the

14        carport area where the victim and

15        others were watching TV.  Cayabo

16        exited his vehicle, walked behind

17        Lozano and shot him at close range

18        in the back of the head.  Cayabo

19        returned to his vehicle and drove

20        away.  Victim Lozano died at the

21        scene.  Cayabo surrendered a short

22        time later after the shooting at

23        the Tulare County Sheriff's Office

24        in Visalia, California.  Sheriff's

25        detectives interviewed Cayabo.  He

26        admitted to shooting Mr. Lozano in

27        the back of the head with a .38

7

1    caliber revolver. Cayabo claims

2    to have shot the victim because he

3    had violated Pilipino custom by

4    not asking his permission to marry

5    Cayabo's sister. Cayabo felt that

6    since his father was deceased,

7    Lozano should have spoken to him

8    before eloping with his sister.

9    Cayabo indicated that he was sorry

10    for what he'd done but was angry

11    at the victim."

12    And the source of that was the probation

13    officer's report. And as far as his version is

14    concerned: "He is very sorry for what happened.

15    However, there's nothing I can do now. What he

16    did to my family was wrong." You're still

17    feeling the same way, that what he did was

18    wrong?

19        INMATE CAYABO: No, Sir, not anymore.

20        PRESIDING COMMISSIONER SAWYER: Not

21    anymore?

22        INMATE CAYABO: No, Sir.

23        PRESIDING COMMISSIONER SAWYER: Why were

24    you feeling that way at the time of this crime

25    in 1987?

26        INMATE CAYABO: Because by the time I

27    think -- I'm drinking that day too when I went

8

1  to the labor camp.  And I think I drink maybe

2  that's the one that triggered me --

3          PRESIDING COMMISSIONER SAWYER:  Okay.

4          INMATE CAYABO:  -- to do this crime.

5          PRESIDING COMMISSIONER SAWYER:  Let's

6  talk about your addiction.  How much had you had

7  to drink?

8          INMATE CAYABO:  I drink half pint of

9  Vodka with orange juice.

10          PRESIDING COMMISSIONER SAWYER:  And so

11  you feel that that --

12          INMATE CAYABO:  I think that's the one

13  that triggered me because I don't mean to harm

14  him, Sir.

15          PRESIDING COMMISSIONER SAWYER:  Tell me

16  this, if you -- if you hadn't been drinking, do

17  you think this would have happened?

18          INMATE CAYABO:  No, Sir.

19          PRESIDING COMMISSIONER SAWYER:  What

20  would you have done?

21          INMATE CAYABO:  Maybe I just shine him

22  on.  I just get out from there and I don't go

23  back to that area.

24          PRESIDING COMMISSIONER SAWYER:  After you

25  killed your sister's husband, your

26  brother-in-law.

27          INMATE CAYABO:  Yes.

9

1      PRESIDING COMMISSIONER SAWYER:  Right?

2      INMATE CAYABO:  Yes, Sir.

3      PRESIDING COMMISSIONER SAWYER:  Did you

4  -- What did your sister say to you?

5      INMATE CAYABO:  She didn't spoke for me

6  for awhile.  She's mad at me.

7      PRESIDING COMMISSIONER SAWYER:  She was

8  mad at you at the time?

9      INMATE CAYABO:  Yes.  Yes.

10     PRESIDING COMMISSIONER SAWYER:  I saw a

11  letter that she's not mad at you anymore.

12     INMATE CAYABO:  Yes, Sir.

13     PRESIDING COMMISSIONER SAWYER:  But --

14     INMATE CAYABO:  She was forgiven me.

15     PRESIDING COMMISSIONER SAWYER:  She has

16  forgiven you?

17     INMATE CAYABO:  Yes.

18     PRESIDING COMMISSIONER SAWYER:  Had you

19  been drinking a lot up to this point in time of

20  your life?

21     INMATE CAYABO:  Occasionally, Sir.

22     PRESIDING COMMISSIONER SAWYER:  Was this

23  a weekend?

24     INMATE CAYABO:  Yes.

25     PRESIDING COMMISSIONER SAWYER:  What,

26  Saturday or Sunday night?

27     INMATE CAYABO:  Saturday, Sunday or

10

1    there's a party, christening or wedding,

2    birthday party or something like that.

3         PRESIDING COMMISSIONER SAWYER:    That's

4    what you --

5         INMATE CAYABO:    Only time I drink.

6         PRESIDING COMMISSIONER SAWYER:    That's

7    what -- when did this -- Did this occur on a

8    weekend or during the week?

9         INMATE CAYABO:    I think it's close to

10   weekend. I think it's Friday or Thursday.

11   Something like that.

12        PRESIDING COMMISSIONER SAWYER:    Okay.

13        INMATE CAYABO:    Friday.

14        PRESIDING COMMISSIONER SAWYER:    Did you

15   work that day?

16        INMATE CAYABO:    Yes, Sir.

17        PRESIDING COMMISSIONER SAWYER:    And what

18   time of the day was this, did the shooting go

19   down?

20        INMATE CAYABO:    Probably about six

21   o'clock or seven o'clock.    I'm not really sure

22   what time it is.

23        PRESIDING COMMISSIONER SAWYER:    So you

24   were doing some speed drinking after work,

25   between work and this crime?

26        INMATE CAYABO:    Yeah, because I stop by

27   the liquor store and buy a pint of vodka and I

11

1    drink and then I went to -- labor camp.  Because

2    there's gambling going on there and I want to go

3    gamble, to play.  And I see Medaro and all of a

4    sudden I get mad, what he's doing over here, and

5    so --

6            PRESIDING COMMISSIONER SAWYER:  He didn't

7    live there?

8            INMATE CAYABO:  No, I don't live there,

9    Sir.

10           PRESIDING COMMISSIONER SAWYER:  No, he

11   didn't?

12           INMATE CAYABO:  No, he did not.

13           PRESIDING COMMISSIONER SAWYER:  Okay.  So

14   you just ran into him?  You weren't going there

15   specifically to kill him?

16           INMATE CAYABO:  No, Sir.

17           PRESIDING COMMISSIONER SAWYER:  This was

18   just something that happened after you got

19   there?

20           INMATE CAYABO:  It's not my intention,

21   Sir.  It just happened that he was there and I

22   went there too.

23           PRESIDING COMMISSIONER SAWYER:  And you

24   carried a gun with you?

25           INMATE CAYABO:  Yes, Sir.

26           PRESIDING COMMISSIONER SAWYER:  You had

27   your .38 with you?