# EXHIBIT 3
# Part 2 of 2

12

1    INMATE CAYABO: Yes, Sir.

2    PRESIDING COMMISSIONER SAWYER: And why

3    did you carry a gun?

4    INMATE CAYABO: Because you know what's

5    going on there, there's gambling going on and

6    sometimes they have little bit argument and I

7    feel that I need something to protect me.

8    PRESIDING COMMISSIONER SAWYER: Did

9    everybody have guns?

10   INMATE CAYABO: Some of them.

11   PRESIDING COMMISSIONER SAWYER: Now what

12   kind of gambling was going on?

13   INMATE CAYABO: They have -- They playing

14   mahjong. And they call it -- Pilipino game,

15   they call it pepito (phonetic), just like

16   Russian poker.

17   PRESIDING COMMISSIONER SAWYER: Ever go

18   to a cock fight?

19   INMATE CAYABO: Sometimes.

20   PRESIDING COMMISSIONER SAWYER: Yeah.

21   Did you have a permit for this gun?

22   INMATE CAYABO: No.

23   PRESIDING COMMISSIONER SAWYER: So you

24   were carrying a gun illegally?

25   INMATE CAYABO: Yes.

26   PRESIDING COMMISSIONER SAWYER: You know

27   it was against the law, right?

13

1          INMATE CAYABO:  Yes.

2          PRESIDING COMMISSIONER SAWYER:  To have a

3  loaded gun without a permit?

4          INMATE CAYABO:  Yes.

5          PRESIDING COMMISSIONER SAWYER:  On your

6  person or in your car?

7          INMATE CAYABO:  Yes.

8          PRESIDING COMMISSIONER SAWYER:  So how

9  are you feeling about this?  Taking this man's

10  life?  Was it worth it?

11          INMATE CAYABO:  No, Sir.  I feel really,

12  really bad about it.  It should not happen.

13          PRESIDING COMMISSIONER SAWYER:  Yeah.

14  Did he have a family, other than your -- other

15  than your sister?

16          INMATE CAYABO:  Yes.  I have a wife and I

17  have a --

18          PRESIDING COMMISSIONER SAWYER:  Does he

19  have a family?

20          INMATE CAYABO:  Yes.

21          PRESIDING COMMISSIONER SAWYER:  Does he

22  have a mother and sisters and brothers?

23          INMATE CAYABO:  Yes.

24          PRESIDING COMMISSIONER SAWYER:  Nieces

25  and nephews?

26          INMATE CAYABO:  Yes, Sir.

27          PRESIDING COMMISSIONER SAWYER:  Okay.  It

14

1    says you have no juvenile or adult record of

2    crime.

3            INMATE CAYABO:  No, Sir.

4            PRESIDING COMMISSIONER SAWYER:  You've

5    never been arrested for anything?

6            INMATE CAYABO:  Never, Sir.

7            PRESIDING COMMISSIONER SAWYER:  You were

8    born in -- on 9-4-1945.

9            INMATE CAYABO:  Yes.

10           PRESIDING COMMISSIONER SAWYER:  So are

11   you 61 now?

12           INMATE CAYABO:  Sixty.

13           PRESIDING COMMISSIONER SAWYER:  Sixty

14   now.  Yeah, you'll be 61 this year.

15           INMATE CAYABO:  September.

16           PRESIDING COMMISSIONER SAWYER:  And to

17   the union of Maria Marina is your mother.

18           INMATE CAYABO:  Yes.

19           PRESIDING COMMISSIONER SAWYER:  And

20   Fernando Cayabo.

21           INMATE CAYABO:  Yes.

22           PRESIDING COMMISSIONER SAWYER:  The

23   oldest of four children raised by your natural

24   parents in the Philippines.  Father died in 1981

25   due to multiple sclerosis.  You completed two

26   years of college at the University of Manila in

27   1967, came to the United States in 1972.  Is

15

1    that correct?

2            INMATE CAYABO:  Yes, Sir.

3            PRESIDING COMMISSIONER SAWYER:  And what

4    kind of work -- Well, let me ask you this.  What

5    kind of college did you have?  You have two

6    years of college.  I assume you graduated from

7    high school?

8            INMATE CAYABO:  Yes, Sir.

9            PRESIDING COMMISSIONER SAWYER:  And what

10   was your course of study in college?

11           INMATE CAYABO:  Taking Bachelor of Arts,

12   pre-law.

13           PRESIDING COMMISSIONER SAWYER:  Pre-law?

14           INMATE CAYABO:  Yes, Sir.

15           PRESIDING COMMISSIONER SAWYER:  Now let

16   me -- I'm trying to understand this -- the

17   cultural issue here.  Was it acceptable to -- If

18   a person married and did not ask for permission

19   in the Philippines, not here, was it -- was it a

20   cultural offense and the remedy was to kill them

21   in -- Philippines?

22           INMATE CAYABO:  No, Sir.

23           PRESIDING COMMISSIONER SAWYER:  Okay.  So

24   what would -- what would happen in the

25   Philippines if the same thing happened?  If your

26   sister -- If he came along and married your

27   sister in the Philippines and did not ask for

16

1   permission from the family, what would -- what

2   would happen to him?

3           INMATE CAYABO:  The family get mad.

4           PRESIDING COMMISSIONER SAWYER:  He what?

5           INMATE CAYABO:  The family get mad at him

6   and they just shine him on.  They don't want him

7   to go to their residence.

8           PRESIDING COMMISSIONER SAWYER:  He

9   wouldn't be invited to the parties?

10          INMATE CAYABO:  Not at all, Sir.

11          PRESIDING COMMISSIONER SAWYER:  Okay.

12   But he wouldn't be murdered?

13          INMATE CAYABO:  No.

14          PRESIDING COMMISSIONER SAWYER:  Okay.  So

15   this was something you took upon yourself to do

16   and it's not cultural in a sense.  I'm trying to

17   understand the culture --

18          INMATE CAYABO:  No, it's not --

19          PRESIDING COMMISSIONER SAWYER:  -- from

20   another county.

21          INMATE CAYABO:  No, Sir, the killing, no.

22          PRESIDING COMMISSIONER SAWYER:  Okay.

23   Your future plans, you plan to reside with your

24   wife, Sylvia.

25          INMATE CAYABO:  Yes.

26          PRESIDING COMMISSIONER SAWYER:  And

27   children.  Was it on Road -- it's the same.

17

1    They just give the address and road, number 36.

2    Does she live in an apartment?

3          INMATE CAYABO:  No, we have a residence.

4    That's a residential area.  Road 136.

5          PRESIDING COMMISSIONER SAWYER:  Road 136.

6          INMATE CAYABO:  Yes.

7          PRESIDING COMMISSIONER SAWYER:  Okay.

8          INMATE CAYABO:  We have a double wide

9    mobile him.

10         PRESIDING COMMISSIONER SAWYER:  Mobile --

11         INMATE CAYABO:  Yeah, live with -- And my

12   wife father, he gave them -- he gave her two

13   acres of land.  That's where we put that mobile

14   home.

15         PRESIDING COMMISSIONER SAWYER:  I see.

16   Okay.  And was this your wife at the time of the

17   offense?

18         INMATE CAYABO:  Yes.

19         PRESIDING COMMISSIONER SAWYER:  You've

20   been married all these years?

21         INMATE CAYABO:  Yes, Sir.

22         PRESIDING COMMISSIONER SAWYER:  And she

23   stayed by you?

24         INMATE CAYABO:  Yes, Sir.

25         PRESIDING COMMISSIONER SAWYER:  She's a

26   saint.  Don't you think?  You being away in

27   prison --

'18

1          INMATE CAYABO:  For the sake of my

2     children too.

3          PRESIDING COMMISSIONER SAWYER:  For the

4     sake of your children.  Okay.

5          INMATE CAYABO:  Yes, Sir.

6          PRESIDING COMMISSIONER SAWYER:  Okay.

7     Well that's what I mean.  She could have done a

8     lot of things, but she stayed with you.  Does

9     she visit with you?

10          INMATE CAYABO:  Yes, Sir.

11          PRESIDING COMMISSIONER SAWYER:  How

12     often?

13          INMATE CAYABO:  During my family -- When

14     we still have our family visits, I always have a

15     family visit.

16          PRESIDING COMMISSIONER SAWYER:  And who

17     visits you?

18          INMATE CAYABO:  My wife and my childrens.

19          PRESIDING COMMISSIONER SAWYER:  How many

20     children do you have?

21          INMATE CAYABO:  I have three daughters

22     and one son.

23          PRESIDING COMMISSIONER SAWYER:  And do

24     they all visit?

25          INMATE CAYABO:  Yes.

26          PRESIDING COMMISSIONER SAWYER:  Okay.

27     Does your sister come and visit too?

19

1    INMATE CAYABO:  Sometimes.

2    PRESIDING COMMISSIONER SAWYER:  Okay.  Do

3    you -- do you correspond with your wife and your

4    -- You talk to her on the phone or do you --

5    INMATE CAYABO:  Yes.

6    PRESIDING COMMISSIONER SAWYER:  Do you

7    write back and forth?

8    INMATE CAYABO:  I talk to her in the

9    phone, Sir.

10    PRESIDING COMMISSIONER SAWYER:  In the

11    phones.  How about your children?

12    INMATE CAYABO:  The same thing, Sir.

13    PRESIDING COMMISSIONER SAWYER:  Okay.

14    You plan to work for a farm labor contractor,

15    Jose Lobong, L-O-B-O-N-G, Orosi.

16    INMATE CAYABO:  Yes.

17    PRESIDING COMMISSIONER SAWYER:  And I saw

18    a letter to that effect.  And you have numerous

19    letters of support from your family.  And let's

20    take a look.  We do have some letters of

21    opposition.  I have a letter from Philip J.

22    Kline, District Attorney of the County of

23    Tulare, dated April 21, 2006, saying he's not

24    sending a representative to attend the parole

25    hearings, instead ask you to consider this

26    letter and urge you once again to deny parole to

27    inmate Cayabo.  He talks about the -- found

20

1    guilty of second degree murder and a firearm

2    allegation was true, sentenced to 17 to life for

3    murder of his brother-in-law Mr. Lozano.  Murder

4    was particularly cold and calculated in that he

5    approached him from behind and without

6    hesitation shot him in the back of the head at

7    close range, then got back in his vehicle, drove

8    away.  Reason for committing the murder was that

9    the victim had not asked Cayabo's permission

10    before marrying his sister, violating a Pilipino

11    custom.  However, he stated the reason for

12    carrying the loaded gun was for protection when

13    gambling with friends.  That's what you told me

14    too.  It says that they recognize the fact that

15    you're sorry for what happened and that you were

16    angry with the victim and the victim did to my

17    -- what the victim did to my family was wrong.

18         "There's a concern by this office

19          that inmate Cayabo has not taken

20          full responsibility for the brutal

21          murder rather than rationalizing

22          and condoning his behavior based

23          on a custom.  In civilized society

24          Inmate Cayabo's motive for the

25          murder is both abhorrent and

26          unacceptable.  And absent any

27          evidence that he would come to

21

1    realize this, the People maintain

2    the release of inmate Cayabo would

3    pose great risk to society.

4    Nineteen -- Two thousand five

5    evaluation report contends that

6    his violence potential is

7    estimated to be no greater than

8    the average citizen in the

9    community provided that he

10   continues to actively attend

11   Alcoholics Anonymous and abstain

12   from alcohol.  The report also

13   recommends that the -- that he

14   upgrade vocationally.  However,

15   once released from the controlled

16   environment of prison, there's no

17   guarantee that inmate Cayabo would

18.  not abuse alcohol.  There's no

19   evidence that inmate Cayabo has

20   participated in therapy in order

21   to deal with and fully understand

22   the causative factors that led to

23   the commitment of the murder.  And

24   since alcohol was involved in the

25   commitment offense as well as

26   anger with the victim,

27   reintroducing him to society at

22

1          this time would involve

2          unacceptable risks.  Therefore, --

3          asking the Board to protect

4          society by denying him parole at

5          this time."

6   Signed by Carol. B. Turner, T-U-R-N-E-R,

7   assistant district attorney.  And I have a

8   letter also from the sheriff's office, April 7,

9   2006.

10          "Tulare County Sheriff's

11          Department and the citizens of

12          Tulare strongly oppose the release

13          of Mr. Cayabo from prison.  He's

14          convicted of murder second degree

15          and justice would not be served

16          unless he serves his entire

17          sentence.  Because of the

18          seriousness nature -- serious

19          nature of this crime, we

20          respectfully request you keep

21          Cayabo incarcerated for his crime

22          as long as legally possible."

23   And this is signed by Sergeant Eric Velasquez,

24   V-E-L-A-S-Q-U-E-Z, violent crimes unit.  Then I

25   have a letter from Mr. Lobong, farm labor

26   contractor, Orosi, California.  Indicates in

27   here that he resides in Orosi, permanent citizen

23

1    of the United States, owner of his labor

2    contracting services, employs over 100

3    individuals annually on a seasonal basis.

4    Length of employment of individual depends on

5    crops in the San Joaquin Valley.  In the state

6    of California average season of employment lasts

7    approximately eight -- ten months a year,

8    pruning, thinning, picking and packing of fruit

9    trees and vines.  "I submit this letter as a

10    bona fide offer of employment for Mr. Cayabo

11    born September 4, 1945."  And gives this address

12    in Soledad.  "He will be paid by the hour at

13    6.75."  Does your wife work?

14          INMATE CAYABO:  Yes, Sir.

15          PRESIDING COMMISSIONER SAWYER:  What does

16    she do?

17          INMATE CAYABO:  She work in -- meat

18    packing house.

19          PRESIDING COMMISSIONER SAWYER:  Packing?

20          INMATE CAYABO:  Yes, Sir.

21          PRESIDING COMMISSIONER SAWYER:  Meat

22    packing?

23          INMATE CAYABO:  Yes.  Poultry.

24          PRESIDING COMMISSIONER SAWYER:  Poultry?

25          INMATE CAYABO:  Yes.

26          PRESIDING COMMISSIONER SAWYER:  For what

27    company?

24

1        INMATE CAYABO:  Forgot the name of the

2   company, Sir, but she's working (indiscernible)

3   chickens.  That's where she work at.

4        PRESIDING COMMISSIONER SAWYER:   Where

5   they kill and pack chickens?

6        INMATE CAYABO:  I think the butchering --

7   They don't kill it but somebody's killing them.

8        PRESIDING COMMISSIONER SAWYER:   Butcher

9   -- Butchered.

10        INMATE CAYABO:  Yeah, (indiscernible).

11        PRESIDING COMMISSIONER SAWYER:   They get

12   them when they're dead?

13        INMATE CAYABO:  Yes.

14        PRESIDING COMMISSIONER SAWYER:   Okay.  It

15   wouldn't be Tyson?  Would it be Tyson?  Trying

16   to remember --

17        INMATE CAYABO:  No, it's --

18        PRESIDING COMMISSIONER SAWYER:   It's not

19   Foster Farms.

20        INMATE CAYABO:  Some kind of Japanese

21   name.  I think it's -- I don't know if that's a

22   private -- forgot the name of it.

23        PRESIDING COMMISSIONER SAWYER:   And how

24   long as she worked there?

25        INMATE CAYABO:  She's been working there

26   for -- since I come to prison.

27        PRESIDING COMMISSIONER SAWYER:   Really?

25

1    INMATE CAYABO:  Yes.

2         PRESIDING COMMISSIONER SAWYER:  Okay.  I

3    have a letter from July 8, 2005 from San Jose.

4    This is from Robin S. Cayabo.  This is your

5    daughter.:  "I'm writing in hopes of his return

6    home.  Since I was five-years-old, my father's

7    been incarcerated.  I've written letters in the

8    past to help my father.  I love my father and

9    miss him very much."  She talks about going to

10   church and talks about praying for you and

11   hoping that you come home.

12            "Been in prison since 1985, it's

13            now 2005 and he's been away from

14            me and my mother and my sister and

15            my brother for too long.  Only

16            have memories of him when I was a

17            child.  He's a loving father and

18            husband.  Writes me letters.  His

19            biggest dream is to visit the

20            Philippines with my brother

21            Dexter.  Everybody in the family

22            wants him to come home.  I know

23            God's forgiven him for the crime

24            he's committed because God loves

25            him.  He deserves to come home and

26            we'll be waiting and praising the

27            Lord that our prayers have been

26

1       heard."

2     Very nice letter. She lives in San Jose. What

3     does she do? Does she work?

4           INMATE CAYABO:  Yes.

5           PRESIDING COMMISSIONER SAWYER:  She

6     married?

7           INMATE CAYABO:  No, not yet.

8           PRESIDING COMMISSIONER SAWYER:  Not yet.

9           INMATE CAYABO:  But she have a boyfriend

10    that -- living with.

11         PRESIDING COMMISSIONER SAWYER:  Now does

12    he have to ask for permission to marry her?

13         INMATE CAYABO:  No, she don't have to,

14    Sir.

15         PRESIDING COMMISSIONER SAWYER:  Okay.

16    July 1, 2005, Edith Castaneto,

17    C-A-S-T-A-N-E-T-O, from Visalia. This is your

18    sister.

19         "I was -- murdered to the man --

20         On October 4, 1945 -- 1984 --

21         murdered the man I was married to.

22         My brother has come to realize

23         that it was a senseless murder

24         behind a Pilipino custom that

25         caused my family untold sorrow.

26         It's caused me sorrow. No young

27         wife should ever have to

27

1    experience this tragedy.  It

2    should have never happened.  I was

3    angry with my brother for many

4    years but I've learned that

5    holding -- that holding that anger

6    is only hurting me so I've learned

7    to let -- let that anger go.  I've

8    forgiven my brother and we have

9    been able to reestablish a good

10   relationship.  Single incident of

11   violence is difficult for us to

12   understand because he's never been

13   a violent person.  I believe that

14   he's proved his non-violent nature

15   over the years by not getting in

16   trouble in prison.  As a surviving

17   victim of his crime, I pray that

18   20 years of punishment is long

19   enough.  My mother is old and

20   needs her son at home to take care

21   of family matters.  Please let my

22   brother come home."

23   And that's signed by her.  You got a pretty good

24   strong bond with her, huh?

25       INMATE CAYABO:  Yes, Sir.

26       PRESIDING COMMISSIONER SAWYER:  Good

27   family bond.  June 30, 2005, a letter from your

28

1  wife, Sylvia. Talks about how long you've been

2  in prison, 20 years. "Since my husband left,

3  I've raised our four children without a father.

4  My kids were young at the time. I didn't know

5  how to raise a family alone." Talks about

6  school and the struggle that she's had since

7  you've been gone. "I miss my husband very much.

8  My husband's served his time. It's about time

9  for him to come home. Please let him spend the

10  rest of his life at home surrounded by family --

11  friends." Signed by your wife Sylvia Cayabo.

12  I'll say it again, I think she's a saint,

13  raising your kids and standing by you.

14          INMATE CAYABO: Yes.

15          PRESIDING COMMISSIONER SAWYER: That's

16  pretty powerful. June 24, 2005, this is from

17  Christine Cayabo Saechao, S-A-E-C-H-A-O. This

18  is your daughter.

19          INMATE CAYABO: Yes.

20          PRESIDING COMMISSIONER SAWYER: Okay.

21  One of your daughters. Talks about how long

22  you've been down. She was 10 when this crime

23  occurred. She's praying for you. Talks about

24  you being missed. She's now 29 and married.

25  She plans to have children. Has she had any

26  children yet?

27          INMATE CAYABO: No, not yet.

29

1          PRESIDING COMMISSIONER SAWYER:  Not yet.

2    Do you have any grandchildren?

3          INMATE CAYABO:  No.

4          PRESIDING COMMISSIONER SAWYER:  Okay.

5    Talks about you deserving a second chance and

6    please give him the second chance.  We all learn

7    from our mistakes, appreciate your time.  Okay.

8    How long has she been married?

9          INMATE CAYABO:  Last year, since last

10   year, Sir.

11         PRESIDING COMMISSIONER SAWYER:  Okay.

12   Okay.  And that's all the letters.  Do you have

13   any additional letters?

14         INMATE CAYABO:  No, Sir.

15         PRESIDING COMMISSIONER SAWYER:  Okay.

16   Okay.  I'm going to turn it over to the

17   Commissioner.

18         DEPUTY COMMISSIONER YACONO:  Okay.  Sir,

19   I'm going to go through material since your last

20   parole consideration hearing.

21         INMATE CAYABO:  Okay.

22         DEPUTY COMMISSIONER YACONO:  And I'll

23   take input from you.  Because you've been here

24   quite some time, there's some documentation you

25   may want to present.  But you'll have an

26   opportunity to do that as well.  If there's

27   anything wrong, you and your counsel have an

30

1    opportunity to have some input on that and we'll

2    get that on the record as well.  Okay.

3              INMATE CAYABO:  All right.

4              DEPUTY COMMISSIONER YACONO:  First of all

5    Commissioner asked me a question.  I was going

6    to answer that from my C-File review.  As of

7    August 22, 2005 they -- formerly United States

8    Immigration Service, now I'm not sure who they

9    are, they no longer have an interest in our

10   inmate.

11             PRESIDING COMMISSIONER SAWYER:  Okay.

12             DEPUTY COMMISSIONER YACONO:  So he does

13   not have a parole or an INS hold him at this

14   point.

15             PRESIDING COMMISSIONER SAWYER:  Okay.

16   That was a question I asked him earlier.

17             DEPUTY COMMISSIONER YACONO:  And that

18   goes into what I'm reviewing is your Central

19   File, as well as the life prisoner evaluation

20   report prepared for the September '05 calendar

21   by Correctional Counselor R. Lee.  He signed off

22   on 6-17-2005.  He also prepared the

23   post-conviction progress report for the period

24   of January of '04 through June 17, '05.  And

25   also a psychological evaluation prepared -- I

26   have bits of two.  One is January of '03, the

27   other one is June 12, 2003 by Dr. Hewchuk,

31

1   H-E-W-C-H-U-K, Ph.D. Excuse me. Let me go back

2   over that. That's the January -- for the

3   January '03 calendar that's signed off 6-12-03.

4   I'll go through it in some of these parts since

5   I've already confused myself on that. It is for

6   the January of '03 lifer calendar but it's dated

7   June 11, 2003. That's kind of backwards, but

8   okay. In regards to psychological evaluation,

9   I'm showing only two Axis. Number one is No

10  Contributory Clinical Disorder and Axis II, No

11  Contributory Personality Disorder. The noted

12  assessment of dangerousness in an institution

13  setting is minimal relative to the inmate

14  population. No significant CDC 115's, in total

15  compliance with institutional requirements and

16  standards.

17          "His behavior and institutional

18          record over the past 18 years

19          places him in a very low risk

20          category. If released to the

21          community, violence potential

22          estimated to be no greater than

23          that of the average citizen in the

24          community with the proviso that he

25          continue to actively attend

26          Alcoholics Anonymous program in

27          the community and abstain from

32

1      alcohol use."

2    Okay. Now they've given me several psychiatric

3    evaluations and the only one that I pulled

4    anything out of goes all the way back to June 6,

5    '97. At that time it was a little different

6    because it showed me Axis I as Alcohol Abuse

7    Episodic In Remission. Axis II, Adjustment

8    Disorder With Disturbance of Conduct Resolved.

9    Axis III, No Contributory Personality Disorder

10   and Axis -- excuse me. Did two again. I'm

11   sorry. Axis I is part one and two. Axis II, No

12   Contributory Personality Disorder. Axis III, No

13   Contributory Physical Disorder. Okay. So what

14   I'm then looking at is this is the seventh

15   subsequent parole consideration hearing. The

16   last was 9-28-2004, '89 and '92 doc hearings.

17   First hearing in '94, two year denial.

18   Ninety-six, one year. Ninety-seven, two year.

19   Several postponements. Then in 2000, one year.

20   Again some postponements. On '02 denial for one

21   year. Then finally in '03 one year. So never

22   denied more than two years and most of these

23   were one year denials. Oops, I forgot the '03.

24   Routinely, the recommendations were to remain

25   disciplinary-free, participate in self-help and

26   obtain positive chronos. Noting classification

27   score upon entry was 72 points but it's been at

33

1  minimal, either zero or 19 by CDC standards from

2  what I can tell at least since '92. Presently

3  in general population, Medium A. No enemies or

4  gang noted. No confidential as we said. I'm

5  seeing a dry cleaning certificate of completion.

6  And I've got the form but it doesn't give me a

7  date. And then most recently for this

8  particular period I'm showing silkscreen and

9  cutting table certificates of accomplishment

10  dated 1-3-06. Do you remember what year you got

11  your dry cleaning certificate?

12          INMATE CAYABO:  I think that was '97 or

13  '98.

14          DEPUTY COMMISSIONER YACONO:  Okay. Have

15  you gotten any other vocational certificates of

16  completion?

17          INMATE CAYABO:  No.

18          DEPUTY COMMISSIONER YACONO:  And the dry

19  -- excuse me. The silkscreen and the cutting

20  table, you're still going through that or --

21          INMATE CAYABO:  Yes, I still go to that.

22  That's under PIA.

23          DEPUTY COMMISSIONER YACONO:  Right. But

24  they train you to do this job?

25          INMATE CAYABO:  Yes, Sir.

26          DEPUTY COMMISSIONER YACONO:  Okay. We

27  talked about the academic education. We have at

34

1    reception an IQ of 88 but a reading level of

2    13.7 with an overall average of 9.4.  You're

3    noted with high school and college attendance,

4    University of Manila.  And then PIA for work.

5    PIA textiles, sewing machine mechanic,

6    satisfactory and above satisfactory evaluation.

7    Last one I could find was 2-12-2005.  And this

8    is what your -- Okay.  How long did you do that

9    or is that in addition to the silk screening?

10           INMATE CAYABO:  That's in addition to the

11   silkscreen.

12           DEPUTY COMMISSIONER YACONO:  So you're

13   still working textile?

14           INMATE CAYABO:  Yes.

15           DEPUTY COMMISSIONER YACONO:  And you

16   repair the sewing machines?

17           INMATE CAYABO:  Yes, Sir.

18           DEPUTY COMMISSIONER YACONO:  Okay.  I see

19   no psychiatric treatment during this timeframe.

20   I haven't actually seen any specific treatment.

21   And then self-help.  Looking at Alcoholics

22   Anonymous for this period.  A little bit before,

23   I'm looking at July 2, '04, October 4, '04,

24   12-30-04.  And then I'm not seeing anything but

25   there's reference in another chrono of

26   participation for third and fourth quarter of

27   2005.  That's dated January of '06.  So I'm

35

1    missing the first and second quarter of 2005 and

2    then 2006 I haven't seen anything.  Are you

3    still attending?

4        INMATE CAYABO:  Yes, Sir.

5        DEPUTY COMMISSIONER YACONO:  Okay.  So

6    we're just missing --

7        INMATE CAYABO:  Right now there's nobody

8    running AA over there at north right now and

9    that's why we have no meeting at this time.

10       DEPUTY COMMISSIONER YACONO:  Why aren't

11   you running it?  You're a college educated man.

12   You've been doing this for decades.

13       ATTORNEY TARDIFF:  I don't think -- North

14   facility is almost on a continuous lockdown.

15       DEPUTY COMMISSIONER YACONO:  Yeah, and

16   unfortunately it went back again last night.

17   Okay.

18       ATTORNEY TARDIFF:  Also, can I add that,

19   you know, the last Board -- the Board report is

20   dated September of '05 which really does the --

21       DEPUTY COMMISSIONER YACONO:  Right.

22       ATTORNEY TARDIFF:  -- the inmate a

23   disservice.

24       DEPUTY COMMISSIONER YACONO:  We've got

25   some gaps and that's where I'll take input if

26   we've got anything else.  I realize that we've

27   got quite a period of time.  Especially

36

1   considering you got a one year denial in

2   September. And we had --

3        ATTORNEY TARDIFF:  Actually there's a

4   chrono in the back of our packet, in the very

5   back section toward where the most recent

6   chronos are.  January '06 AA chrono.

7        DEPUTY COMMISSIONER YACONO:  Yeah, that

8   refers to the third and fourth quarter of '05.

9   Okay. And there was something that took us from

10  September '04 because we're -- we look like

11  we're six months late on this but there was

12  something else.

13       ATTORNEY TARDIFF:  There was a Project

14  Change in November of '04.  But that would be

15  obviously since his last -- after his last --

16  before his last hearing.

17       DEPUTY COMMISSIONER YACONO:  Okay. Let

18  me do a couple of laudatories. The one I can

19  find during this timeframe, 11-15-2005, for his

20  Holiday Children's Christmas Festival

21  fundraising participation.  And then finally you

22  have zero 115's. Never got one, right?

23       INMATE CAYABO:  No, Sir.

24       DEPUTY COMMISSIONER YACONO:  And then we

25  had three 128's, but we're talking one in 1988

26  and two in '92.  Right?  Nothing since?

27       INMATE CAYABO:  Nothing since.

37

1        DEPUTY COMMISSIONER YACONO:  Okay.  Okay.

2   Counsel, anything else I missed?

3        ATTORNEY TARDIFF:  Yeah, I guess we need

4   to add Project Change because it's dated

5   November 9, '04 and his last hearing was

6   September of '04.

7        INMATE CAYABO:  I think it's

8   September 29.

9        ATTORNEY TARDIFF:  And the Project Change

10  is 44 weeks, quite a long period of time.

11       DEPUTY COMMISSIONER YACONO:  You have a

12  chrono for that?

13       ATTORNEY TARDIFF:  It's in the --

14       DEPUTY COMMISSIONER YACONO:  I got it.

15       ATTORNEY TARDIFF:  Yeah.  It was since

16  his last hearing.

17       DEPUTY COMMISSIONER YACONO:  Yeah, you're

18  right.  I miss calculated the date and saw '04

19  and didn't put it in there.

20       ATTORNEY TARDIFF:  Well because you

21  thought it was just a one year denial.

22       DEPUTY COMMISSIONER YACONO:  So again,

23  because Project Change is pretty substantial, is

24  a 44-week -- dealing with self-esteem,

25  assertiveness, goal setting, anger management,

26  coping skills, stress reduction, drug and

27  alcohol abuse, tolerance, parenting, domestic

38

1    violence, life skills and parole and release.

2    And so duly noted and added, 11-9-2004 chrono,

3    and again emphasizing that's a 44-week program.

4    Okay.. Anything else, counsel?

5            ATTORNEY TARDIFF:  I don't have anything.

6    Any other self-help?

7            INMATE CAYABO:  No.

8            ATTORNEY TARDIFF:  Okay.

9            DEPUTY COMMISSIONER YACONO:  All right.

10   Commissioner.

11           PRESIDING COMMISSIONER SAWYER:  Thank

12   you.  How long have you been in AA?  When did

13   you start AA?

14           INMATE CAYABO:  I start when I come to

15   north facility, '94.

16           PRESIDING COMMISSIONER SAWYER:

17   Ninety-four?

18         . INMATE CAYABO:  Yes.

19           PRESIDING COMMISSIONER SAWYER:  You know

20   your steps?

21           INMATE CAYABO:  Yes..

22           PRESIDING COMMISSIONER SAWYER:  What's

23   the most important step to you?

24           INMATE CAYABO:  Step number four.

25           PRESIDING COMMISSIONER SAWYER:  And what

26   is that?

27           INMATE CAYABO:  Made a searching and

39

1   fearless moral inventory of ourselves.

2        PRESIDING COMMISSIONER SAWYER:   And do

3   you work the steps?

4        INMATE CAYABO:   Yes.

5        PRESIDING COMMISSIONER SAWYER:   How

6   often?

7        INMATE CAYABO:   All the time.

8        PRESIDING COMMISSIONER SAWYER:   Is it

9   good for you?

10        INMATE CAYABO:   Yes, really work for me.

11        PRESIDING COMMISSIONER SAWYER:   So '94

12   and you've been as regular as you can be?

13        INMATE CAYABO:   Yes, Sir.

14        PRESIDING COMMISSIONER SAWYER:   Until the

15   present.

16        INMATE CAYABO:   Yes.

17        PRESIDING COMMISSIONER SAWYER:   I think

18   you could teach it.   Start your own group.   Do

19   you do any self-study when you can't attend AA?

20   Do you have any documents that you can study

21   yourself?

22        INMATE CAYABO:   Sometimes I go to the

23   library to pick -- some books and read.

24        PRESIDING COMMISSIONER SAWYER:   Have you

25   ever done any book reports for the Board?

26        INMATE CAYABO:   No.

27        PRESIDING COMMISSIONER SAWYER:   You ever

40

1    thought about it?

2        INMATE CAYABO:  I never thought about it,

3    Sir.

4        PRESIDING COMMISSIONER SAWYER:  Okay.

5    There's books on subjects like addiction.  We

6    had a book report in here yesterday, just a one

7    page thing, talked about what it meant reading

8    this book about addiction and how this inmate

9    applied it to his life.  And it was pretty good,

10   wasn't it?

11       DEPUTY COMMISSIONER YACONO:  Yeah.

12       PRESIDING COMMISSIONER SAWYER:  I was

13   impressed by it.  When out of his way on his

14   own.  Have you taken any correspondence courses?

15       INMATE CAYABO:  No, Sir.

16       PRESIDING COMMISSIONER SAWYER:  Do they

17   have the FEMA courses here?  That's a

18   correspondence course --

19       INMATE CAYABO:  Not that I --

20       PRESIDING COMMISSIONER SAWYER:  --

21   through the mail.

22       INMATE CAYABO:  -- Sir.

23       PRESIDING COMMISSIONER SAWYER:  Okay.

24   Okay.  All right.  Very good.  Counsel, do you

25   have any questions?

26       ATTORNEY TARDIFF:  No, I don't.

27       PRESIDING COMMISSIONER SAWYER:  Okay.  Do

41

1    you have any questions?

2              DEPUTY COMMISSIONER YACONO:   No.

3              PRESIDING COMMISSIONER SAWYER:   Okay.   I

4    think this inmate's pretty -- kind of an open

5    book here isn't he?   He's pretty

6    straightforward.   Everything's pretty

7    straightforward, not very complex.   Do you have

8    a closing statement?

9    - - -   ATTORNEY TARDIFF:   Yes.   Mr. Cayabo has

10   been incarcerated for 21 years.   Since that time

11   he has been a model inmate.   No 115's.   Only

12   three 128's, the last one was in '92.   He has a

13   dry cleaning vocation and I submit that the PIA

14   is also a vocation at this point.   It's

15   definitely a marketable skill.   He gets

16   satisfactory to above average supervisor's

17   reports and he's quite skilled as a sewing

18   machine repairer.   He has been participating in

19   AA for 12 years and as we found out today he

20   knows his steps and practices them, which many

21   times we don't see even with continuous

22   participation in AA.   He also has completed the

23   Project Change most recently.   His

24   pre-incarceration history, I didn't find any

25   negative history at all -- would be used as a

26   factor of unsuitability.   He has no criminal

27   history.   He appeared to have a stable family

42

1    life.  And he continues to have stable social

2    relationships, which is noted -- which Is

3    verified by the letters from his children and

4    his wife and also the victim of the crime, his

5    sister, as well.  His psych reports, the last

6    two have been positive since 2000.  What wasn't

7    addressed I'd like to address.  It's very --

8    briefly that notes that his participation in AA

9    have contributed to his reevaluation and insight

10   into the motivation dynamics of the instant

11   offense.  This is from the '03 psych eval.  It's

12   -- Under the review of the life crime the

13   psychologists states that Mr. Cayabo has gained

14   considerable insight into the instant offense.

15            "As a consequence of his numerous

16            years of incarceration and active

17            participation in institutional

18            programming, specifically the

19            Impact group and AA, he's fully

20            cognizant of the impact and

21            gravity of his actions.  He now

22            admits that his misplaced sense of

23            duty and responsibility to protect

24            his sister's honor did not justify

25            the taking of a human life.  He is

26            remorseful and deeply regrets what

27            he did."

43

1    Under the dangerousness, he does not fit the

2    typical criminal profile. He's a model inmate,

3    in total compliance with institutional

4    requirements and standards. And then we have no

5    greater than the average citizen. The 2000

6    psych eval that was specifically done to -- He

7    was referred for reassessment of his level of

8    dangerousness. Says his remorse was clearly

9    genuine and appropriate. Considering his lack

10   of any criminal history, lack of violent

11   criminal history, lack of any CDC 115's, as well

12   as his greater maturity, if released to the

13   community no more than the average citizen. I

14   found no evidence that his violence potential

15   should be above average at all. No risk

16   factors. This Dr. Terrini, T-E-R-R-I-N-I, found

17   -- because -- in terms of the alcohol abuse,

18   seems to have, in his words, quit for good."

19        DEPUTY COMMISSIONER YACONO: Counsel, can

20   I stop you for a --

21        ATTORNEY TARDIFF: Sure.

22        [Thereupon, the tape was turned over.]

23        DEPUTY COMMISSIONER YACONO: Okay. Go

24   ahead, please.

25        ATTORNEY TARDIFF: Thank you. And then

26   just to briefly address the '97, which was

27   brought up, I'd like to note that on the Axis I

44

1   diagnosis the first diagnosis is in remission,

2   it doesn't say institutional remission, it says

3   remission, to me indicates out in the community

4   as well. And then the adjustment disorder it

5   states was resolved.  His Board reports have

6   been very positive when they were making

7   assessments of dangerousness.  Since 1999 he has

8   received low.  Zero one he received low, '03 he

9   received low and '04 he received low.  And

10  basically they considered him low because of his

11  prior record, his prison adjustment and the

12  majority of those Board reports' opinion is

13  based on the fact that this crime was based on

14  the subject's cultural beliefs and clearly an

15  isolated and situational offense.  The probation

16  officer's report also indicates some mitigating

17  factors in terms of the commitment offense.  The

18  crime was committed due to unusual circumstances

19  which is unlikely to reoccur and that Mr. Cayabo

20  had no prior criminal record.  I'd also submit

21  that there were indications of significant

22  stress based on the -- he had waited a year to

23  receive this apology and that that probably --

24  and they lived in the same town.  He had to

25  avoid his friends because they had the same

26  friends and I think all of this was -- took its

27  toll.  It appears that today Mr. Cayabo now

45

1    understands that what he did, even in the

2    Philippines, would have been considered a murder

3    regardless of the cultural beliefs.  And I don't

4    think that -- I believe that that issue has been

5    resolved.  And I will refer the Board to the

6    report which was written for the probation --

7    probably his attorney -- at the request of his

8    attorney, that's in the legal section, by Dr. --

9    I will not even attempt to pronounce his name --

10   ICAS -- I-C-A-S-I-A-N-O and that goes into the

11   cultural beliefs, but not using that as a means

12   of excusing his behavior at all.  I'd also like

13   to point out that in the sentencing report the

14   judge at that time stated on page four starting

15   at line four through line nine:

16            "I don't particularly like

17            sentencing this particular

18            defendant since he has no prior

19            record whatsoever except for this

20            one thing.  And I don't

21            particularly like sentencing him

22            to prison.  But I think you know

23            and knew it before the sentencing

24            came up there was no choice and no

25            other way because that is the

26            law."

27   I think that's perfect significant because

46

1    that's somebody that sat through the whole

2    proceedings and obviously had -- was able to

3    note Mr. Cayabo's behavior at that time as well.

4    His age I believe is also a factor of

5    suitability.  He's 61-years-old.  That reduces

6    his recidivism rate.  I'd like to address the

7    District Attorney letter.  I find this

8    frequently coming up, particularly because they

9    don't attend the hearings, where the DA is

10   saying that inmate Cayabo has not taken full

11   responsibility rather than rationalizing and

12   condoning his behavior.  Well he doesn't do that

13   and he hasn't done that for quite sometime and

14   that's noted particularly in his most recent

15   psych eval.  If they were here, they could have

16   asked him questions if they had concerns about

17   his responsibility or lack of and asked him

18   about the Pilipino customs.  However, they

19   declined to attend.  They also state that

20   there's no guarantee that he will not abuse

21   alcohol.  Well that's true.  There is never a

22   guarantee that somebody will not abuse alcohol.

23   Once an alcoholic, always an alcoholic.  I mean

24   to me that's a ridiculous argument.  There's

25   also no evidence that inmate Cayabo has

26   participated in therapy.  That's completely

27   erroneous as we know, particularly with the

47

1    Project Change most recently and his continued

2    participation in AA.  He has good parole plans,

3    strong family support.  I would submit that

4    further incarceration of Mr. Cayabo obviously

5    would do nothing to help enhance his suitability

6    since he's done so well and that he is in fact

7    not a threat to society and should be granted a

8    date.  Thank you.

9          PRESIDING COMMISSIONER SAWYER:  Thank

10   you.  I'm going to ask a question.  This is a

11   little out of order, but Project Change, when

12   did he complete that?

13         ATTORNEY TARDIFF:  November '04.

14         PRESIDING COMMISSIONER SAWYER:  Okay.

15   Thank you, counsel.  Mr. Cayabo, this is your

16   opportunity to tell this Board why you feel that

17   you're suitable at this time for parole.

18         INMATE CAYABO:  Yes, Sir.  During my

19   incarceration I learned a lot.  I know how to

20   deal with my anger, control my anger.  I never

21   have 115 and I have been disciplinary-free since

22   I've been incarcerated.  I have support letters

23   from my wife and my daughters.  And I have a

24   place to stay and also I have a job offer to

25   start with.  I cannot change what has happened

26   in the past.  I'm responsible for my actions.

27   And I take full responsibility on my behavior.

48

1   I cannot take back what I intentionally or

2   unintentionally did.  But I can change and I

3   will continue.  I'm asking to give me a second

4   chance to become a good law abiding citizen

5   again and be with my family.  And I will

6   guarantee that I will not fail you.  And I'm

7   sorry for what I have done wrong.  Thank you.

8           PRESIDING COMMISSIONER SAWYER:  Thank

9   you, Mr. Cayabo.  It's ten o'clock and we will

10  recess for deliberations.

11                      R E C E S S

12                      --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

49

1           CALIFORNIA BOARD OF PAROLE HEARINGS

2                        D E C I S I O N

3           DEPUTY COMMISSIONER YACONO:  Okay.  We're

4    back on tape.

5           PRESIDING COMMISSIONER SAWYER:  Okay.

6    The time is 20 minutes past ten in the matter of

7    Mr. Yacono.  It's not Yacono.  Wrong guy.

8    Cayabo.

9           ATTORNEY TARDIFF:  That's pretty funny.

10          PRESIDING COMMISSIONER SAWYER:  Well that

11   was a slip.

12          DEPUTY COMMISSIONER YACONO:

13   (Indiscernible) parole for 22 years.

14          PRESIDING COMMISSIONER SAWYER:  No,

15   that's fine.  Okay.

16          DEPUTY COMMISSIONER YACONO:  Want to go

17   back?

18          PRESIDING COMMISSIONER SAWYER:  No,

19   that's fine.  The Panel's reviewed all the

20   information received from the public and relied

21   on the following circumstances in concluding

22   that the prisoner is suitable for parole and

23   would not pose an unreasonable risk of danger to

24   society or a threat to public safety if released

25   from prison.  You've never heard that said

26   before, have you?

27   RIZALINO CAYABO  D-09912  DECISION PAGE 1  5/9/06

50

1     INMATE CAYABO:  No, Sir.

2     PRESIDING COMMISSIONER SAWYER:  Okay.  We

3   feel you're suitable for parole.

4     INMATE CAYABO:  Thank you.  Thank you,

5   Sir.

6     PRESIDING COMMISSIONER SAWYER:  You're

7   welcome.  And we're going to tell -- we're going

8   to tell the Governor why.

9     DEPUTY COMMISSIONER YACONO:  Yeah, it

10  isn't over yet but --

11     PRESIDING COMMISSIONER SAWYER:  This is

12  -- This is step one.  You did well on your job

13  interview today, sir.

14     INMATE CAYABO:  Thank you very much.

15     PRESIDING COMMISSIONER SAWYER:  The

16  prisoner has no juvenile record of assaulting --

17  Has no juvenile record or adult record as far as

18  that's concerned.  No previous record of any

19  crimes up and to the offense.  While he did have

20  a stable social history and a stable

21  relationship and had a good -- what we can see

22  -- had a good family up and to the offense,

23  there was a couple of areas that were unstable

24  and I'm going to bring them right out because

25  it's all wound together.  And that was drinking

26  and he was carrying a weapon.  Okay.

27  RIZALINO CAYABO  D-09912  DECISION PAGE 2  5/9/06

51

1    INMATE CAYABO:  Yes.

2    PRESIDING COMMISSIONER SAWYER:  While in

3  prison has enhanced his ability to function

4  within the law upon release through

5  participation in programming and work and job

6  assignments.  You've been -- You've been

7  repairing sewing machines for over six years.

8  Is that correct?

9    INMATE CAYABO:  Yes, Sir.

10    PRESIDING COMMISSIONER SAWYER:  In PIA.

11    INMATE CAYABO:  Yes.

12    PRESIDING COMMISSIONER SAWYER:  Would you

13  call that a skill?

14    INMATE CAYABO:  Yes.

15    PRESIDING COMMISSIONER SAWYER:  Okay.  It

16  probably beats working in the fields.  Don't you

17  think?

18    INMATE CAYABO:  I can work in the field

19  at the same time, Sir.

20    PRESIDING COMMISSIONER SAWYER:  He's

21  going to work --

22    INMATE CAYABO:  Just to start with.

23    PRESIDING COMMISSIONER SAWYER:  Okay.

24  You know, I understand.  You also have

25  vocational dry cleaning.  Correct?

26    INMATE CAYABO:  Yes, Sir.

27  RIZALINO CAYABO  D-09912  DECISION PAGE 3  5/9/06

52

1      PRESIDING COMMISSIONER SAWYER:  And you

2  also know how to silkscreen.

3      INMATE CAYABO:  Yes.

4      PRESIDING COMMISSIONER SAWYER:  Okay.  So

5  you've got certainly some marketable skills as

6  well as a job offer to work in the fields at

7  $6.57 an hour, which isn't -- isn't a livable

8  wage quite frankly.  What are you making

9  repairing sewing machines?  How much do you

10  make?

11     INMATE CAYABO:  Right now I make 75 cents

12  an hour.

13     PRESIDING COMMISSIONER SAWYER:  Okay.

14  Well I guess it's six dollars more than you're

15  making now.

16     DEPUTY COMMISSIONER YACONO:  Room, board

17  and seventy-five cents.

18     PRESIDING COMMISSIONER SAWYER:  Well,

19  that's right.  Your self-help programs, you've

20  been in AA since 1994 and you've indicated to us

21  that you understand that you have to continue in

22  AA.  That'll be one of your conditions of parole

23  as well.

24     INMATE CAYABO:  Yes, Sir.

25     PRESIDING COMMISSIONER SAWYER:  And you

26  know your steps.  I was impressed by that or at

27  RIZALINO CAYABO  D-09912  DECISION PAGE 4  5/9/06

53

1    least you know step four.  I didn't ask you all

2    the steps but I assume that you do since you've

3    been in for over -- since you've been in since

4    1994.  You've gone through the 14-week Impact

5    program.

6            ATTORNEY TARDIFF:  Forty-four weeks.

7            PRESIDING COMMISSIONER SAWYER:  This is

8    the Impact.

9            ATTORNEY TARDIFF:  Impact, I'm sorry.

10           PRESIDING COMMISSIONER SAWYER:  Thank

11   you, counsel, I'll conduct this hearing.

12   Fourteen week Impact program.  You've been

13   through the Inmate Employability program.

14   You've been through as of -- You've completed on

15   November 4 Project Change.  That's a 44-week

16   program.  And it's a major program.  When I say

17   major, it has a lot of components, everything

18   from 12-step, anger management and so on.  Is

19   that correct, sir?

20           INMATE CAYABO:  Yes.

21           PRESIDING COMMISSIONER SAWYER:  Okay.

22   You have volunteered and you've got a laudatory

23   chrono for the Holiday Children's program as

24   well as you were a volunteer in the Operation

25   Courage collecting clothes for our people in the

26   service.  Is that correct?

27   RIZALINO CAYABO  D-09912  DECISION PAGE 5  5/9/06.

54

1          INMATE CAYABO:   I donate some -- a little

2    bit of money, Sir.

3          PRESIDING COMMISSIONER SAWYER:   You

4    raised some money?

5          INMATE CAYABO:   No, myself.

6          PRESIDING COMMISSIONER SAWYER:   You

7    donated money?

8          INMATE CAYABO:   Yes.

9          PRESIDING COMMISSIONER SAWYER:   "Okay.

10   Thank you.  It wasn't clear in the chrono.

11   Something that -- Well, so your -- your

12   self-help, particularly AA, your vocational

13   programs, your education programs and your

14   institutional job assignments, and I must say

15   that you've gotten good work reports in those

16   institutional job assignments as well.  You lack

17   any criminal history, as I mentioned before, of

18   violent crime or any crime.  You have matured.

19   You're 60-years-old going on 61 this year.  And

20   we feel because of the maturation, growth and

21   greater understanding of yourself and what had

22   happened here has reduced the probability of

23   recidivism.  You have realistic parole plans too

24   and a job offer, certainly family support.

25   There's several areas that are particularly

26   impressive.  One is Sylvia's still there for

27   RIZALINO CAYABO  D-09912  DECISION PAGE 6  5/9/06

55

1    you.

2         INMATE CAYABO:  Yes.

3         PRESIDING COMMISSIONER SAWYER:  And I'm

4    serious.  She's got to be a very strong woman

5    and that's to your credit.  And we're going to

6    depend on her to make sure she helps you make

7    proper decisions when you're out.

8         INMATE CAYABO:  Yes, Sir.

9         PRESIDING COMMISSIONER SAWYER:  And so

10    that's a great -- that's a great person to take

11    care of you once you get out of here.  Now, you

12    do have your children.  And they are going on

13    with their lives and they miss you and you've

14    been maintaining a relationship with them.

15    That's good, that's a plus.  And then probably

16    the most notable was the letter from the

17    victim's wife, your sister.  Is that correct?

18         INMATE CAYABO:  Yes, Sir.

19         PRESIDING COMMISSIONER SAWYER:  And she

20    has forgiven you for this.

21         INMATE CAYABO:  Yes.

22         PRESIDING COMMISSIONER SAWYER:  And wants

23    to get on with her life.  She's no longer angry

24    with you.  She was angry for awhile but she felt

25    that that was hurting both her and you.  So

26    you've maintained close family ties while in

27    RIZALINO CAYABO  D-09912  DECISION PAGE 7  5/9/06

56

1   prison and they've come to visit you and you've

2   corresponded with them and so you've kept --

3.  you've kept an option open to you, a line open

4   to you to the outside.  So you still know what's

5   going on on the outside.  You haven't -- You're

6   not totally isolated here.  And that will help

7   you reintegrate into society.  Your positive

8   institutional behavior.  You have -- You've been

9   down over 20 years and you've had no 115's.

10  You've had three 128's, the last being in 1992.

11  Certainly that shows that you've got positive

12  self-control while in the institution.  That's

13  hard to do.  That's hard to do.  We don't see

14  this -- We don't see zero on 115's from people

15  that come through looking for a date.  And so

16  you're to be congratulated for that.

17          INMATE CAYABO:  Thank you.

18      PRESIDING COMMISSIONER SAWYER: And

19  that's an indicator, that's a positive indicator

20  that you'll perform well when you get outside

21  because that makes us nervous, releasing a

22  person from prison to the outside world.  And we

23  feel comfortable with you, sir.

24          INMATE CAYABO:  Thank you.

25          PRESIDING COMMISSIONER SAWYER:  You show

26  signs of remorse and indicate you understand the

27  RIZALINO CAYABO  D-09912  DECISION PAGE 8  5/9/06

57

1    nature and magnitude of the offense and accepts

2    responsibility for the criminal behavior and has

3    a desire to change towards good citizenship.  We

4    got that from you.  I asked you some questions

5    about, you know, would it be -- is that what --

6    is this a Pilipino cultural thing that if they

7    don't ask permission from the father, or in this

8    case the brother to marry, is it okay to kill

9    that person in the Philippines and you said it

10   wasn't.  So it's not okay there.  It's not okay

11   here.  And it's certainly not justifiable to

12   take another -- a life because of a cultural

13   issue like this.

14           INMATE CAYABO:  Yes, I agree.

15           PRESIDING COMMISSIONER SAWYER:   Okay.

16   Okay.  I'm going to turn this over to

17   Commissioner Yacono to talk about the

18   psychological reports.

19           DEPUTY COMMISSIONER YACONO:  And I'm going

20   to refer to a couple of the reports.  And again,

21   we've covered this and your counsel's covered

22   this but just the emphasis again that from the

23   June 11, 2003, the substance abuse history,

24   because you have admitted again that you've got

25   an issue here with alcohol.  The psychiatrist

26   said that for the past six years you've been

27   RIZALINO CAYABO  D-09912  DECISION PAGE 9  5/9/06

1    active in Alcoholics Anonymous.  I think it's
2    longer than that. If we're starting from '94.
3    But it's been pretty consistent and long term.
4    It says contributing to his reevaluation and
5    insight into the motivational dynamics of the
6    instant offense.  Fancy words for you realize
7    you were drinking hard on that particular day
8    and that had a lot to do with creating the
9    situation.  Again, the diagnostic impressions,
10   really there is no contributory clinical
11   disorder or personality disorder that's being
12   noted.  I did quote from a prior eval, but even
13   those that were cited had been in remission or
14   resolved.  And that's pretty significant.  The
15   review of life crime, emphasis again, gaining
16   considerable insight into the instant offense
17   and active participation in AA.  Fully cognizant
18   of the impact and gravity of the actions, admits
19   misplaced sense of duty and responsibility,
20   remorseful and deeply regrets what he cannot
21   undo.  Over the past few years sister, the
22   victim's wife, has reconciled with inmate and
23   greatly facilitating the healing process.  The
24   dangerousness assessment, does not fit the
25   typical criminal profile, no history, juvenile
26   or adult, prior to this.  And I think you were
27   RIZALINO CAYABO  D-09912  DECISION PAGE 10  5/9/06

59

1   45 when this occurred?

2           ATTORNEY TARDIFF:  How old were you at

3   the time of the crime?

4           INMATE CAYABO:  Thirty-nine.

5           ATTORNEY TARDIFF:  Thirty-nine.

6           DEPUTY COMMISSIONER YACONO:  Which is not

7   a typical hotheaded kid.

8           INMATE CAYABO:  Thirty-eight.

9           DEPUTY COMMISSIONER YACONO:  Okay.

10          INMATE CAYABO:  Thirty-eight, 39.

11          DEPUTY COMMISSIONER YACONO:  You weren't

12  22.

13          INMATE CAYABO:  No.

14          DEPUTY COMMISSIONER YACONO:  Okay.  Let's

15  go on.  Model inmate, no 115's, total compliance

16  with institutional requirements and standards.

17  Institutional record over the last 18 years

18  places him in a very low risk category and if

19  released to the community no greater than the

20  average citizen.  And then some points from the

21  March 8, 2000 evaluation.  Referred for

22  assessment of level of dangerousness.  Remorse

23  was clearly genuine and appropriate.  Lack of

24  criminal history, lack of violent criminal

25  history, lack of 115's.  No violence and greater

26  maturity.  So his violence potential in the

27  RIZALINO CAYABO  D-09912  DECISION PAGE 11  5/9/06

60

1   controlled setting considerably -- is considered

2   to be significantly below average.  And in the

3   community no more than the average citizen,

4   found no evidence his violence potential should

5   be above average at all.  One thing I disagree

6   with a little bit, but no risk factors, although

7   the admission of being intoxicated during the

8   commitment of this crime but seems to have in

9   his words quit for good, and I presume that

10  means alcohol consumption.  And if I might, one

11  issue here.  You made us a guarantee.  I hear

12  that --

13          INMATE CAYABO:  Yes, Sir.

14          DEPUTY COMMISSIONER YACONO:  --

15  occasionally, that I guarantee that --

16          INMATE CAYABO:  I promise that I will be

17  --

18          DEPUTY COMMISSIONER YACONO:  --

19  (indiscernible).

20          INMATE CAYABO:  -- a productive, good,

21  law-abiding citizen.

22          DEPUTY COMMISSIONER YACONO:  Okay.  Well

23  you're going to be on parole.  If you get

24  through this process, you're going to be on

25  parole for five years.  I guarantee you,

26  nobody's going to discharge you for that five

27  RIZALINO CAYABO  D-09912  DECISION PAGE 12  5/9/06

61

1    year timeframe, so you're going -- we're going

2    to watch you quite clearly when we get through

3    this so -- And the Commissioner and I have other

4    concerns about putting yourself in situations.

5    Since gambling was part of this routine and it

6    so serious you figured you had to carry a gun to

7    go to gamble as well, there'll be other issues.

8    Other than that, I'm done, Sir.

9         PRESIDING COMMISSIONER SAWYER:  Thank

10   you.  We'll go to base term of confinement.  The

11   base life offense which the prisoner's been

12   convicted is murder in the second degree, Penal

13   Code section 187.  The offense occurred on

14   10-4-1987 -- 1987, that's right.  The term is

15   derived from the matrix located in the

16   California Code of Regulations, Title 15 at

17   2403(c), second degree murder, offense committed

18   on or after 11-8-1978.  The Panel finds that

19   Category II(c) is appropriate in that there was

20   a prior relationship.  The victim was involved

21   in a prior relationship with the prisoner as a

22   family member, as a brother-in-law, which

23   contributed to the motivation for the act

24   resulting in death.  And also, the death

25   resulted from severe trauma inflicting --

26   inflicted with deadly intensity.  He was shot in

27   RIZALINO ZAYABO  D-09912  DECISION PAGE 13  5/9/06

62

1    the back of the head.   In the matrix it gives a

2    choice of three -- three choices, 18, 19 or 20

3    years.   We chose the middle term and that we

4    assess 228 months for the base offense.   And the

5    calculation goes this way.   The base life

6    offense is 228.   And adjustment for weapons,

7    because you used a firearm we added two years,

8    24 months.   Post-conviction credits.   This is

9    four months a year that you get credit for, for

10   being 115 free.   So every year that went by,

11   which in your case is your entire term, you

12   ended up with 82 months of good time because of

13   your behavior or lack -- or because of your good

14   behavior or lack of bad behavior.   It's all the

15   same.   So we subtract 82 months from the total.

16   Our total was 252.   And we subtract 82 months

17   which gives you a total period of confinement,

18   170 months, and you're well beyond that of __ .

19   course with your going over 20 years and 10

20   months at this time.

21           DEPUTY COMMISSIONER YACONO:   Can I take a

22   brief recess and just pause for one second.

23                   [Off the record]

24           DEPUTY COMMISSIONER YACONO:   Okay.   We're

25   back on tape.

26           PRESIDING COMMISSIONER SAWYER:   The

27   RIZALINO CAYABO   D-09912   DECISION PAGE 14   5/9/06

63

1     purpose of the recess, the Deputy Commissioner

2     noted that I made a mistake.  I took some numbers

3     from the Board report that were inaccurate to

4     note that the crime occurred 10-4-1984 not 1987.

5     As I was doing the calculations on the base term

6     of confinement I read the base life offense for

7     which the prisoner's convicted is murder, PC 187.

8     The offense occurred and it should be 10-4-84.

9     This does not, however, change the calculations

10    that I'm referring -- that I've been referring to

11    and I'm finishing up now.  The total period of

12    confinement is still 170 months.  Special

13    conditions of parole.  Do not possess -- Do not

14    use or possess alcoholic beverages.  Do you

15    understand that?

16          INMATE CAYABO:  Yes, Sir.

17          DEPUTY COMMISSIONER YACONO:  I'm sorry.

18    I'm going to pause for one second here.

19               [Off the record]

20          DEPUTY COMMISSIONER YACONO:  All right.

21    We're back on tape.

22          PRESIDING COMMISSIONER SAWYER:  It's an

23    important day for you and I'm sorry we keep

24    getting interrupted here.  We were interrupted by

25    a video conferencing that's coming in for the

26    next hearing.  Do not possess -- use or possess

27    RIZALINO CAYABO  D-09912  DECISION PAGE 15  5/9/06

64

1    alcoholic beverages.  You understand that?

2              INMATE CAYABO:  Yes, Sir.

3              PRESIDING COMMISSIONER SAWYER:  Never,

4    ever again.

5              INMATE CAYABO:  Yes.

6              PRESIDING COMMISSIONER SAWYER:  You

7    understand?

8              INMATE CAYABO:  Yes.

9    ------ PRESIDING COMMISSIONER SAWYER:  You okay

10   with that?

11             INMATE CAYABO:  Yes, Sir, I'm really okay

12   with that.

13             PRESIDING COMMISSIONER SAWYER:  You're

14   going to have to submit to alcohol testing.

15             INMATE CAYABO:  Okay, Sir.

16             PRESIDING COMMISSIONER SAWYER:  We're

17   also going -- since you're submitting to testing

18   we're also going to do the same thing with

19   anti-narcotic testing, THC testing, which is

20   marijuana, and to participate in a substance --

21   you're going to have participate in substance

22   abuse programs such as AA.

23             INMATE CAYABO:  Okay, Sir.

24             PRESIDING COMMISSIONER SAWYER:  You okay

25   with that?

26             INMATE CAYABO:  Yes.

27   RIZALINO CAYABO  D-09912  DECISION PAGE 16  5/9/06

65

1       PRESIDING COMMISSIONER SAWYER:  Report to

2   the parole outpatient client for evaluation.

3   Attend the parole outpatient clinic and this

4   will be driven by your parole officer.  They'll

5   determine what you need to do in terms of your

6   parole at the local level.  Do you understand?

7       INMATE CAYABO:  Okay.   Yes.

8       PRESIDING COMMISSIONER SAWYER:  Okay.

9   And in addition, do not gamble.

10      INMATE CAYABO:  Okay.

11      PRESIDING COMMISSIONER SAWYER:  Okay.

12      INMATE CAYABO:  Yes.

13      PRESIDING COMMISSIONER SAWYER:  Or attend

14  or be in an area where gambling is taking place.

15      INMATE CAYABO:  Okay.  Yes, Sir.

16      PRESIDING COMMISSIONER SAWYER:  Because

17  around gambling is drinking and around gambling

18  is guns.  And that's what got you into this in

19  the first place.  So we want to try to keep you

20  as far as away from anything that would stress

21  you out into doing something that you might

22  regret in the future.

23      INMATE CAYABO:  Okay.

24      PRESIDING COMMISSIONER SAWYER:  Do you

25  agree to those, sir?

26      INMATE CAYABO:  Yes, Sir.

27  RIZALINO CAYABO  D-09912  DECISION PAGE 17  5/9/06

66

1         PRESIDING COMMISSIONER SAWYER:  Those

2  special conditions?

3         INMATE CAYABO:  Yes.

4         PRESIDING COMMISSIONER SAWYER:  Okay.

5  Now, in the meantime, you need to stay

6  discipline-free.  You know how to do that.

7         INMATE CAYABO:  Yes, Sir.

8         PRESIDING COMMISSIONER SAWYER:  Continue

9  to work.  Continue doing what you're doing.

10  Because this is going to take four or five

11  months.

12         INMATE CAYABO:  Okay.

13         PRESIDING COMMISSIONER SAWYER:  It's got

14  to go through decision review at my headquarters

15  in Sacramento.  They're going to look at it and

16  make sure we did everything right.  Okay.  So it

17  goes through decision review.  Then it goes to

18  the Governor's office and the Governor's people

19  review it.  And they make a determination

20  whether it's okay or not.  Do you understand

21  what I'm saying?

22         INMATE CAYABO:  Yes, Sir.

23         PRESIDING COMMISSIONER SAWYER:  Okay.

24  There's going to be some time.  I would advise

25  you -- We would advise you at this point not to

26  go out saying I got a date and I'll see you guys

27  RIZALINO CAYABO  D-09912  DECISION PAGE 18  5/9/06

67

1   later.  Because the Governor can reverse it.  You

2   understand that, you've probably heard that.

3        INMATE CAYABO:  Yes, I heard that, Sir,

4   how true it is.

5        PRESIDING COMMISSIONER SAWYER:  Okay.  So

6   I don't get many of mine reversed.  I'm serious.

7   I don't get many of mine reversed that I know

8   about.  I've had two in the last 10 months come

9   back to the Board out of the number of dates, I

10  don't know how many dates I've given, but I've

11  only had two come back from the Governor's

12  office in 10 months.  And so I think that's

13  probably pretty good because I try to do a good

14  solid case.  So there you have it.  Do you have

15  any questions or concerns?

16       DEPUTY COMMISSIONER YACONO:  No, I think

17  we've covered pretty much everything.

18       PRESIDING COMMISSIONER SAWYER:  Okay.  Do

19  you have any questions?

20       INMATE CAYABO:  No, Sir.

21       PRESIDING COMMISSIONER SAWYER:  All

22  right.  Well good luck to you, sir.

23       INMATE CAYABO:  Thank you very much, Sir.

24       PRESIDING COMMISSIONER SAWYER:  You're

25  welcome.

26  DEPUTY COMMISSIONER YACONO:  Don't let us

27  RIZALINO CAYABO  D-09912  DECISION PAGE 19  5/9/06

68

1   down.   You guaranteed it.

2           INMATE CAYABO:   I guarantee --

3           DEPUTY COMMISSIONER YACONO:   Your word is

4   your bond.

5           INMATE CAYABO:   Yes.

6           PRESIDING COMMISSIONER SAWYER:   Okay.

7           ATTORNEY TARDIFF:   Okay.   We need his

8   pink copy.

9                           --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22                                      PENDING REVIEW

23   PAROLE GRANTED                     AND APPROVAL

24   THIS DECISION WILL BE FINAL ON _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED

27   RIZALINO CAYABO   D-09912   DECISION PAGE 20   5/9/06

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that

I have transcribed tape(s) which total one in

number and cover a total of pages numbered 1 - 68,

and which recording was duly recorded at

CORRECTIONAL TRAINING FACILITY, at SOLEDAD,

CALIFORNIA, in the matter of the SUBSEQUENT PAROLE

CONSIDERATION HEARING of RIZALINO CAYABO,

CDC No. D-09912 on MAY 9, 2006; and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned

tape(s) to the best of my ability.

I hereby certify that I am a disinterested

party in the above-captioned matter and have no

interest in the outcome of the hearing.

Dated June 19, 2006 at Sacramento County,

California.


*Marsha Mees*
Marsha Mees
Transcriber
PETERS SHORTHAND REPORTING

**E X H I B I T   5**

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

RIZALINO CAYABO, D-09912
SECOND-DEGREE MURDER

AFFIRM:                        _____

MODIFY:                        _____

REVERSE:                 _____X_____

On October 4, 1984, Rizalino Cayabo shot to death his sister's husband, 31-year-old Medaro Lozano. According to the probation report, Tulare County Sheriff's Deputies responded to a reported shooting and learned that Mr. Lozano had been shot in the back of the head. Witnesses advised that Mr. Cayabo drove his vehicle up to the carport area where Mr. Lozano and others were watching television. Mr. Cayabo exited his vehicle, walked up behind Mr. Lozano and shot him once in the back of the head at close range. Mr. Cayabo then returned to his vehicle and drove away. Mr. Lozano died from his gunshot wound.

Mr. Cayabo was arrested later that day. He was 39 years old at the time of the murder and had no prior criminal record. Following a court trial, he was convicted of second-degree murder with the use of a firearm. He was sentenced to 15 years to life in prison for murder, plus a consecutive two-year term for use of a firearm. The judgment was affirmed on appeal.

I have considered various positive factors in reviewing whether Mr. Cayabo is suitable for parole at this time. Although he was counseled three times for minor misconduct, Mr. Cayabo managed to remain discipline-free throughout his incarceration and he made efforts to enhance his ability to function within the law upon release. He completed vocational training in dry cleaning, and received additional training in sewing machine repair, mill and cabinet work and data processing. He also held institutional jobs in the kitchen, yard crew and in prison industry textiles, among other things. He availed himself of such self-help and therapy as Alcoholics Anonymous, Life Skills Program, Impact Program and Inmate Employability Program, and he completed a 44-week self-enhancement course. And he received some positive evaluations from mental-health and correctional professionals over the years. In addition, he maintains seemingly supportive relationships with family and friends, including his sister, who in recent years wrote support letters stating that she forgives Mr. Cayabo for murdering her husband. He also made plans upon his release to live with his wife in Tulare County, his county of last residence, and to work as a farm laborer.

Despite the positive factors I have considered, the second-degree murder for which Mr. Cayabo was convicted was especially heinous because his stated motive for the crime — that he felt angry and betrayed because Mr. Lozano did not ask his permission to marry his sister — is very trivial in relation to the magnitude of the brutal murder he committed. According to Mr. Cayabo's statement in the probation report, he killed Mr. Lozano because he violated Filipino custom by not asking for Mr. Cayabo's permission to marry his sister. Mr. Cayabo

Rizalino Cayabo, D-0991
Second-Degree Murder
Page 2

further stated that "this crime would never have occurred, if Lozano had gone to him and
apologized, as was Filipino custom." In addition to the trivial basis for the murder, there is also
evidence in the record before me that the murder involved some level of premeditation.
Mr. Cayabo told the probation officer that prior to the offense he drove to his friend's house to
gamble, but he left when he realized Mr. Lozano was there. Mr. Cayabo drove around for
approximately one hour, drinking alcohol and "getting more and more upset." He then returned
to his friend's house, took the .38 caliber pistol from the glove compartment of the vehicle,
walked up behind Mr. Lozano and shot him one time in the head. The probation officer noted
that "[t]he victim was extremely vulnerable, as the defendant approached the victim from behind
and shot him without the victim knowing the defendant was present. ... On the day of the
crime, he had the weapon and the victim was present, and apparently it was time to restore his
honor and therefore, he committed this totally unprovoked crime of murder." Mr. Cayabo's
actions also exposed several additional people to the risk of death or serious injury. Mr. Cayabo
told the probation officer that other men were sitting with Mr. Lozano when he shot him. The
gravity of the second-degree murder committed by Mr. Cayabo is alone sufficient for me to
conclude presently that his release from prison would pose an unreasonable public-safety risk.
The Tulare County District Attorney's Office and the Tulare County Sheriff's Office both
expressed to the 2006 Board their opposition to Mr. Cayabo's parole, based in part on the gravity
of the murder he committed.

At age 61 now, after being incarcerated for 22 years, Mr. Cayabo says he accepts responsibility
for the murder and is remorseful for his actions. But given the current record before me, and
after carefully considering the very same factors the Board must consider, I find that the gravity
of the murder perpetrated by Mr. Cayabo presently outweighs the positive factors. Accordingly,
because I believe his release would pose an unreasonable risk of danger to society at this time, I
REVERSE the Board's 2006 decision to grant parole to Mr. Cayabo.

Decision Date: 9-28-2006

ARNOLD SCHWARZENEGGER
Governor, State of California

**E X H I B I T   6**

SUPERIOR COURT OF THE STATE OF CALIFORNIA THE COUNTY OF TULARE

Visalia, California   July 1, 1985

THE PEOPLE OF THE STATE OF CALIFORNIA,

             Plaintiffs,

      vs

RIZALINO GUERRERO CAYABO,

           Defendant

No. 22849   Dept. No. 4

Judge, Honorable DAVID L. ALLEN

Clerk          Carolyn McCown

Bailiff        Richard Hineman

Reporter      Diane Kennedy

Probation Officer

Nature of Hearing    |  REPORT, RECOMMENDATION OF PROBATION OFFICER AND JUDGMENT

Attorney(s) for People:   William Yoshomoto, Deputy District Attorney

Attorney(s) for Defendant:   David Liebowitz, Deputy Public Defender

Defendant present.

Court finds Offense to be:   Felony, to wit: Violation of §187 PC, Murder, 2nd Degree with Special Allegation of §12022.5 PC, Personally Used a Firearm

~~Defendant waived formal arraignment for judgment.~~

No legal cause why judgment cannot be imposed at this time.

ORDER:  Probation Denied, for the reasons stated by the court:

   Defendant committed to (X) State Prison ( ) California Youth Authority ( ) Tulare County Jail for the term as follows:

   Fifteen years to life with an additional two years for the enhancement for a total of seventeen years to life. The two years enhancement is to run consecutive to the 15 years to life.

   Defendant to pay a Restitution Fine pursuant to Section 13967 of the Government Code in the amount of $2,000.00, payable in the manner set forth by the adult authority.

   Defendant given credit for __49__ days actual time; __25__ days good time/work time for a total of __74__ days served awaiting sentence.

   Sheriff to delivery defendant to Director of Corrections, (X) Northern Reception Center, Vacaville, California ( ) California Institution for Women, Frontera, California.

Defendant advised by the Court of his Appeal Rights.
Notice of appeal filed with the Court.
Defendant advised by the Court of his Parole Obligation upon release from custody.

Court finds defendant does not have the ability to pay fees or costs on appeal.

Remanded  (X) Bail Exonerated /Property Bond

DA. PD. PO. Sheriff

**A T T A C H M E N T   A**

1
2
3
4                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
5                       **IN AND FOR THE COUNTY OF TULARE**
6
7    In Re                                    )      Case    No.174532
                                              )
8         RIZALINO CAYABO                     )
                                              )      **RULING RE: PETITION**
9                                             )      **FOR WRIT OF HABEAS**
                                              )      **CORPUS**
10   For Writ of Habeas Corpus                )
                                              )
11   _____ )
12
13   Petitioner has failed to state a basis for relief.
14         The Court applies the "some evidence" standard of review to the denial of a parole
15   release date by the Board of Prison Terms or reversal of a granting of parole by the Governor:
16   In re Ramirez (2001) 94 Cal.4th 549, 563; In re Rosenkrantz (2000) 80 Cal. App.4th 409, 423,
17   In re Powell (1988) 45 Cal.3d 894, 904. Under the "some evidence" standard the Board of
18   Prison term's decision will be upheld as long as there is "some basis in fact" for the decision.
19         It is settled law that the gravity of the offense alone may be enough to justify a
20   denial or reversal of a granting of parole. The court in *In Re Jeffrey David Elkins (2006)*
21   *44 Cal. App.4th 475* stated the  law as follows; " "The Governor's assumption that a prisoner
22   may be deemed unsuitable for release on the basis of the commitment offense "alone" is correct,
23   but the proposition must be properly understood. The commitment offense is one of only
24    two indicative of unsuitability a prisoner cannot change (the other being his previous record
25   of violence). Reliance on such an immutable factor "without regard to or consideration of
26   subsequent circumstances may be unfair and runs contrary to rehabilitative goals espoused
27    by the prison system and could result in a due process violation. The committment offense
28                                              -1-

1   can negate suitability only if circumstances of the crime rationally indicate that the offender

2   will present an unreasonable public safety risk if released from prison. Yet , the predictive

3   value of the commitment offense may be very questionable after a long period of time Thus,

4   denial of release based solely on the basis of the gravity of the commitment offense

5   warrants especially close scrutiny."

6   In the Elkins case the court reversed the denial of parole by the Governor.

7   Upon a review of the Governor's basis for reversing the granting of parole in the instant

8   Case it is clear that the "some evidence" rule applies justifying the Governor's decision.

9   The Governor's stated position is that because of the nature of the commitment offense the

10  petitioner poses an unreasonable risk of danger to the community.

11  In reaching that decision the Governor considered the manner in which the murder was carried

12  out.

13  The petitioner was aware that the victim was in a relative's home. The petitioner drove around

14  in his vehicle for about an hour consuming alcohol all the while becoming more and more

15  angry. The petitioner removed a 38 cal. handgun from his glove box, went into the residence,

16  walked up behind the victim and shot him ,without warning, in the back of the head.

17  The cold bloodedness of the offense, the premeditation of the offense and the danger to others

18  in the manner it was carried out all convinced the Governor that the petitioner was not a

19  suitable candidate for parole at the present time.

20  Upon this court's review of the rationale stated by the Governor this court finds that the

21  Governor's decision is not arbitrary or capricious and is based on sound consideration

22  of the relevant factors.

23  Petitioner's Petition for Writ of Habeas Corpus is denied.

24

25  Date received by judge: 11-29-06

26  Dated: 11-30-06

27  Daryl B. Ferguson
    Judge of the Superior Court

28  -2-

## PROOF OF SERVICE BY MAIL

CASE NAME:  **CAYABO v. SCHWARTZENEGGER**

CASE NO. :  **To be assigned**

I, **Rizalino Cayabo**, hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

**WRIT OF HABEAS CORPUS**

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

    Jerry Brown
    Attorney General
    450 Golden Gate Ave., #11000
    San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct, doing so this __//__ day of __January__, 2007, at Soledad, California.